# APPEAL NO. 12-17808

## IN THE UNITED STATES COURT OF APPEALS

### FOR THE NINTH CIRCUIT

GEORGE K. YOUNG, JR.,

              Plaintiff-Appellant,

  v.

STATE OF HAWAII and NEIL
ABERCROMBIE in his capacity as
Governor of the State of Hawaii;
DAVID M. LOUIE in his capacity as
State Attorney General; COUNTY OF

*(caption continued)*

D.C. No. 1:12-cv-00336-HG-BMK

APPEAL FROM A JUDGMENT OF
THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF
HAWAII

THE HONORABLE HELEN
GILLMOR, DISTRICT JUDGE

---

AMICUS CURIAE BRIEF OF THE STATE OF HAWAII
IN SUPPORT OF COUNTY OF HAWAII
DEFENDANTS-APPELLEES, IN SUPPORT OF AFFIRMANCE

ADDENDA 1-18

CERTIFICATE OF SERVICE

GIRARD D. LAU          3771
Solicitor General, State of Hawaii
KIMBERLY TSUMOTO GUIDRY   7813
First Deputy Solicitor General, State of Hawaii
ROBERT T. NAKATSUJI      6743
Deputy Solicitor General, State of Hawaii
Department of the Attorney General
425 Queen Street
Honolulu, Hawaii  96813
Tel:  (808) 586-1360
Fax:  (808) 586-1237
Attorneys for Amicus Curiae
State of Hawaii

HAWAII, as a sub-agency of the State of Hawaii and WILLIAM P. KENOI in his capacity as Mayor of the County of Hawaii; and the Hilo County Police Department, as a sub-agency of the County of Hawaii and HARRY S. KUBOJIRI in his capacity as Chief of Police; JOHN DOES 1-25; JANE DOES 1-25; CORPORATIONS 1-5, AND DOE ENTITIES 1-5,

Defendants-Appellees.

# Table of Contents

I.  The Second Amendment Does Not Protect a Right to Carry Guns **in Public.** ................................................................................. 3

    A.  *Heller* itself Supports Exclusion of Public Carry. ................... 3

    B.  Threat to Public Safety from Public Carry, Concealed or Unconcealed, is Substantial. ......................................................... 7

    C.  History and Logic Further Support Exclusion of Public Carry.  ............ 14

II.  Even if the Second Amendment has some applicability outside the home and covers Young, Hawaii's restrictions easily survive intermediate scrutiny. ...... 18

    A.  Hawaii's Restrictions are Substantially Related to Important Governmental Interests. ............................................................... 20

    B.  Hawaii Restricts, but Does Not Ban, Public Carry. ............... 23

III.   There is No Improper Unfettered Discretion, nor Procedural Due Process Violation. ............................................................................... 26

IV.  Young's challenges to other Hawaii statutes regulating particular weapons must be disregarded. ......................................................... 28

CONCLUSION  ................................................................................. 29

# Table of Authorities

## Cases

Bd. of Trustees v. Fox,
   492 U.S. 469 (1989) ...........................................................................19-20

Bolker v. C.I.R.,
   760 F.2d 1039 (9th Cir. 1985) ............................................................. 29

Camreta v. Greene,
   131 S. Ct. 2020 (2011) ........................................................................ 29

Clark v. Jeter,
   486 U.S. 456 (1988) ............................................................................ 19

D.C. v. Heller,
   554 U.S. 570 (2008) ..........................................3, 4, 5, 6, 7, 9, 14, 15, 16, 17, 19

Doe v. Reed,
   586 F.3d 671 (9th Cir. 2009) ............................................................... 19

English v. State,
   35 Tex. 473 (1871) ............................................................................. 16

Erdelyi v. O'Brien,
   680 F.2d 61 (9th Cir. 1982) ................................................................. 27

Heller v. District of Columbia,
   670 F.3d 1244 (D.C. Cir. 2011) ........................................................... 15

Hightower v. City of Boston,
   693 F.3d 61 (1st Cir. 2012) ............................................................. 19, 27

Kachalsky v. Cacace,
   817 F.Supp.2d 235 (S.D.N.Y. 2011) ................................................... 10

Kachalsky v. County of Westchester,
   701 F.3d 81 (2d Cir. 2012) ..................................6, 14, 19, 20, 21, 22, 25, 26, 27

McDonald v. City of Chicago, Ill.,
   130 S.Ct. 3020 (2010) ..................................................................... 3, 14

Moore v. Madigan,
    702 F.3d 933 (7th Cir. 2012) ................................................ 15, 16, 26

National Rifle Ass'n v. Bureau of ATF,
    700 F.3d 185 (5th Cir. 2012) ................................................ 15

Nordyke v. King,
    644 F.3d 776, vacated, 664 F.3d 774 (9th Cir. 2011) ......................... 19

Peterson v. Martinez,
    707 F.3d 1197 (10th Cir. 2013) ........................................ 5, 15, 17, 26

Piszczatoski v. Filko,
    840 F.Supp.2d 813 (D.N.J. 2012) ..................................... 10, 14, 17, 27

Richards v. County of Yolo,
    821 F.Supp.2d 1169 (E.D. Cal. 2011) ...................................... 17

Robertson v. Baldwin,
    165 U.S. 275 (1897) ........................................................ 5

Turner Broadcasting System v. FCC,
    520 U.S. 180 (1997) ....................................................... 22

U.S. v. Marzzarella,
    614 F.3d 85 (3d Cir. 2010) ............................................. 18, 20

United States v. Fields,
    699 F.3d 518 (9th Cir. 2012) ............................................... 5

United States v. Masciandaro,
    638 F.3d 458 (4th Cir. 2011) ........................................ 6, 14, 19

U.S. v. Salerno,
    481 U.S. 739 (1987) ....................................................... 20

Williams v. Puerto Rico,
    2012 WL 6675356 (D. Puerto Rico 2012) ................................... 26

Woollard v. Gallagher,
    712 F.3d 865 (4th Cir. 2013) ........................... 8, 20, 21, 22, 25, 26

**Constitutional Provisions**

Article III ........................................................................................... 29

First Amendment ............................................................................... 27

Second Amendment .................... 3, 4, 5, 6, 7, 9, 11, 14, 15, 16, 17, 18, 19, 26, 27, 28

**Statutes**

Haw. Rev. Stat. Chapter 134 ............................................................... 3

Haw. Rev. Stat. § 134-5 ..................................................................... 28

Haw. Rev. Stat. § 134-6 ............................................................... 1, 2, 28

Haw. Rev. Stat. § 134-7 ....................................................................... 1

Haw. Rev. Stat. § 134-9 .......................................... 1, 2, 23, 25, 26, 27, 28, 29

Haw. Rev. Stat. § 134-9(a) (2011) ................................................... 3, 24

Haw. Rev. Stat. § 134-16 ................................................................... 29

Haw. Rev. Stat. §§ 134-23 through -27 ............................................ 23, 24

Haw. Rev. Stat. § 134-23 ............................................................... 2, 28

Haw. Rev. Stat. § 134-24 ..................................................................... 2

Haw. Rev. Stat. § 134-25 ............................................................... 2, 28

Haw. Rev. Stat. § 134-26 ..................................................................... 2

Haw. Rev. Stat. § 134-27 ..................................................................... 2

Haw. Rev. Stat. § 134-52 ................................................................... 28

Haw. Rev. Stat. § 134-53 ................................................................... 28

**Legislative Material**

1927 Haw. Sess. Laws Act 206, Sections 5-7 ................................... 15, 20

1933 Haw. Sess. Laws (Special Sess.) Act 26, Sections 6 & 8 ............... 20

1961 Haw. Sen. J. at 874 ................................................................... 3

1961 Haw. Sess. Laws. Act 163, Section 1 ........................................ 20

1990 Sen. J. at 1242-1243 ................................................................ 20

2006 Haw. Sess. Laws Act 66, § 1 ..................................................... 2

## Rules

Fed. R. App. Pro. 29(a) .................................................................... 1

## Other Authorities

1689 *Declaration of Right* ............................................................... 16

4 William Blackstone,
   *Commentaries on the Laws of England* (1769). ........................ 4, 9

A. Gerney et al., *America under the Gun* (Apr. 2013)
   *available by clicking PDF link at* http://www.americanprogress.org/
   issues/civil-liberties/report/2013/04/02/58382/america-under-the-gun/ .......12-13

CDC, *Nonfatal Injury Reports*,
   available at http://webappa.cdc.gov/sasweb/ncipc/nfirates2001.html ................. 7

Centers for Disease Control and Prevention (CDC),
   *National Vital Statistics Reports*, Vol. 61, No. 6 (2012) ...................... 7

Charles C. Branas et al., *Investigating the Link Between Gun Possession
   and Gun Assault*, 99 Amer. J. of Pub. Health 2034 (Nov. 2009),
   *available at* http://works.bepress.com/cgi/viewcontent.cgi?article=
   1087&context=dennis_culhane ............................................................12-13

Charles, *The Faces of the Second Amendment Outside the Home*,
   60 Clev. St. L. Rev. 1 (2012) ............................................................ 16

Crime Prevention & Justice Assistance Division,
   *Firearm Registrations in Hawaii, 2006, available at*
   http://ag.hawaii.gov/cpja/rs/specialrpts2003_2012. ........................... 24

D. Hemenway et al., *Gun Use in the United States: Results from two National Surveys*, 6 Injury Prevention 263, 267 (2000), *available by clicking PDF link at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1730664/ ............. 13

Don Kates, *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204 (1983).......................................... 17

Ian Ayres & John J. Donohue III, *More Guns, Less Crime Fails Again: The Latest Evidence from 1977 – 2006*, 6 Econ J. Watch 218 (May 2009), *available by clicking PDF link at* http://econjwatch.org/articles/more-guns-less-crime-fails-again-the-latest-evidence-from-1977-2006 ...................... 11

Ian Ayres & John J. Donohue III, *Shooting Down the "More Guns, Less Crime" Hypothesis*, 55 Stan. L. Rev. 1193 (April, 2003) ................................ 12

Jens Ludwig, *Concealed-Gun-Carrying Laws and Violent Crime*, 18 Int'l Rev. L. & Econ. 239 (1998) .................................................... 12

Law Center to Prevent Gun Violence, *Gun Laws Matter 2012* (Nov. 2012), *available at* http://smartgunlaws.org/gun-laws-matter-2012-understanding-the-link-between-weak-laws-and-gun-violence/ ................................. 13

Merriam Webster on-line dictionary ........................................................ 4

Philip J. Cook et al., *Gun Control After Heller*, 56 U.C.L.A. L. Rev. 1041 (2009) .................................................... 23

Violence Policy Center, *License to Kill IV: More Guns, More Crime*, (June 2002), *available at* http://www.vpc.org/graphics/ltk4.pdf........................ 12

<u>AMICUS CURIAE BRIEF OF THE STATE OF HAWAII</u>
<u>IN SUPPORT OF COUNTY OF HAWAII</u>
<u>DEFENDANTS-APPELLEES, IN SUPPORT OF AFFIRMANCE</u>

Amicus Curiae is the **State of Hawaii**, whose interest in this case is in **defending the constitutionality of the Hawaii gun laws** challenged in this case. It files pursuant to FRAP 29(a), allowing any State to file an amicus brief without leave of court.[1]

Plaintiff-Appellant Young's complaint only expressly challenged Hawaii Revised Statutes ("HRS") §§134-6 and 134-9.

HRS §134-9 provides in relevant part:

**Licenses to carry.** (a) **In an exceptional case, when an applicant shows reason to fear injury to the applicant's person or property**, the chief of police of the appropriate county may grant a license to an applicant who is a citizen of the United States of the age of twenty-one years or more or to a duly accredited official representative of a foreign nation of the age of twenty-one years or more to carry a pistol or revolver and ammunition therefore **concealed** on the person within the county where the license is granted. Where the urgency or the need has been sufficiently indicated, the respective chief of police may grant to an applicant of good moral character who is a citizen of the United States of the age of twenty-one years or more, is **engaged in the protection of life and property**, and is not prohibited under section 134-7 from the ownership or possession of a firearm, a license to carry a pistol or revolver and ammunition therefore **unconcealed** on the person within the county where the license is granted.

---

[1] The State of Hawaii (and Governor and Attorney General), **as party** defendants, were dismissed below on immunity grounds, Clerk's Record (CR) 42 at 9-14, and plaintiff does <u>not</u> appeal that dismissal.

Young's challenge to the old "place to keep firearms" statute, HRS §134-**6** -- which was **repealed in 2006** -- is moot.  The District Court, however, generously construed Young's challenge as extending to the successor statutes that replaced Section 134-6:  (1) HRS §134-23, place to keep loaded firearms other than pistols and revolvers; (2) HRS §134-24, place to keep unloaded firearms other than pistols and revolvers; (3) HRS §134-25, place to keep pistol or revolver; (4) HRS §134-26, prohibiting carrying or possessing a loaded firearm on a public highway unless licensed under 134-9; and (5) HRS §134-27, place to keep ammunition.  2006 Haw. Sess. Laws Act 66, §1. <u>See</u> **Addendum for text of these statutes.**  These statutes require the applicable firearms or ammunition to be confined to the possessor's "place of business, residence, or sojourn" but allow the firearms or ammunition to be carried in an "enclosed container" between the possessor's place of business, residence, or sojourn and certain authorized places, including, inter alia, hunting places, repair shops, target ranges, and licensed dealers.

HRS §134-9, however, provides an important exception to the above general rule, by allowing certain persons to be licensed to "carry" handguns and ammunition **in public**.  The <u>first</u> sentence of HRS §134-9 authorizes the granting of licenses to "carry a pistol or revolver and ammunition therefore **concealed** on the person[,]" while the <u>second</u> sentence of HRS §134-9 authorizes the granting of

2

licenses to "carry a pistol or revolver and ammunition therefore **unconcealed** on the person[.]" HRS §134-9(a) (2011). **Concealed** carry licenses may be granted only "when the **applicant shows reason to fear injury to the applicant's person or property**[.]" Id. **Unconcealed** carry licenses may be granted only when the applicant "is engaged in the protection of life and property," **e.g. security guards,**[2] and where the "urgency or need" to so carry is indicated. Id.

## I.  The Second Amendment Does Not Protect a Right to Carry Guns **in Public**.

The district court correctly held that "HRS Chapter 134's limitations on carrying weapons **in public** do[] not implicate activity protected by the Second Amendment." CR42 at 27-28.

### A.  *Heller* itself Supports Exclusion of Public Carry.

The Supreme Court has held only that the Second Amendment protects the right to possess a handgun **in the home** for the purpose of self-defense. D.C. v. Heller, 554 U.S. 570, 626-35 (2008) ("[W]e hold that the District's ban on handgun possession **in the home** violates the Second Amendment"); McDonald v. City of Chicago, Ill., 130 S.Ct. 3020, 3050 (2010) ("In Heller, we held that the Second Amendment protects the right to possess a handgun **in the home** for the purpose of self-defense."). Heller expressly limited the right recognized:

---

[2] 1961 Hawaii Senate Journal at 874.

Like most rights, the **right secured by the Second Amendment is not unlimited.** From Blackstone though the 19th-century cases, commentators and courts routinely explained that **the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. . . . For example, the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues. . . .** Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on **longstanding prohibitions** on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms [footnote 26: We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive.].

                         *          *          *

[The Second Amendment] surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of **hearth[3] and home**.

          . . . .

          In sum, we hold that the District's ban on handgun possession **in the home** violates the Second Amendment.

          . . . .

          [T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table. These include the absolute prohibition of handguns held and used for self-defense **in the home**.

Heller, 554 U.S. at 626-27, 635-36.

          Heller thus did not extend the Second Amendment to the carrying of

handguns outside the home, **in public**. Most significantly, Heller's explicit

reference to the majority of courts holding **concealed** carry laws to be

constitutional as **an "example"** of the Second Amendment right not being a right

---

[3] Merriam Webster on-line dictionary defines "hearth," in relevant part,
 as: "Home."

4

to "keep and carry any weapon ... in any manner whatsoever," makes clear that even the <u>Heller</u> **majority** believes the Second Amendment does <u>not</u> protect a person's right to publicly carry a concealed weapon.  <u>Heller</u> itself, therefore, puts to rest any Second Amendment claim to a right to <u>concealed</u> public carry.

Furthermore, the Supreme Court in <u>Robertson v. Baldwin</u>, 165 U.S. 275, 281-82 (1897), stated that:  "the right of the people to keep and bear arms ... is <u>not</u> infringed by laws **prohibiting the carrying of concealed weapons**."  "[C]arefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative." <u>United States v. Fields</u>, 699 F.3d 518, 522 (9th Cir. 2012); <u>see</u> <u>Peterson v. Martinez</u>, 707 F.3d 1197, 1210 (10th Cir. 2013) (noting that "Supreme Court dicta [binds] almost as firmly as ... outright holdings, particularly when the dicta is recent and not enfeebled by later statements," and explaining that <u>Robertson</u>'s dicta, although not recent, is actually **strengthened** (as opposed to "enfeebled") by <u>Heller</u>'s recent language regarding concealed carry). Any claim by Young to **concealed** carry, therefore, fails.

<u>Heller</u> not only expressly approved cases exempting concealed carry from the Second Amendment's scope, it also made clear that the Second Amendment did not limit certain other "presumptively lawful regulatory measures," including prohibitions on the possession of firearms by felons and the mentally ill, laws forbidding the carrying of firearms in sensitive places such as schools and

government buildings, or laws imposing conditions and qualifications on the commercial sale of arms. 554 U.S. at 626-27 & n.26.  Heller accepted those limitations on, or exclusions from, the Second Amendment as a given, without even questioning their exclusion.  Why?  Because such laws clearly, on their face, relate to preserving **public safety**.  There is little other plausible rationale given the list of measures the Supreme Court excluded without so much as a word of explanation. Kachalsky v. County of Westchester, 701 F.3d 81, 99 (2d Cir. 2012) (stating that Heller accepted "sensitive places" ban, for example, "presumably on the ground that [firearms are] too **dangerous** … in those locations").  If a measure helps to preserve public safety, therefore, that would be a strong, if not sufficient, reason to exempt such measure from Second Amendment protection. Id. at 96-97 ("while the state's ability to regulate firearms is circumscribed in the home, '**outside the home**, firearm rights have always been more limited, because **public safety** interests often outweigh individual interests in self-defense.' Masciandaro, 638 F.3d at 470.  There is a **longstanding tradition of states** regulating firearm possession and use **in public** because of the dangers posed to **public safety**.").[4]

    Therefore, if carrying firearms in public presents a serious public safety risk, public carry should be deemed outside the scope of the Second Amendment.

---

[4] As the Fourth Circuit noted, "This is serious business.  We do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we miscalculated as to Second Amendment rights." United States v. Masciandaro, 638 F.3d 458, 475 (4th Cir. 2011).

### B. Threat to Public Safety from Public Carry, Concealed or Unconcealed, is Substantial.

The safety risk is clear for the **concealed** carry of firearms in public --

activity even <u>Heller</u> exempts from Second Amendment scrutiny -- but it is also

clear for the public carrying of **unconcealed** firearms as well, which presents many

of the same dangers to public safety, and poses additional risks as well.  Concealed

or unconcealed, firearms are lethal weapons, and they are all too often used to kill

and hurt people, both intentionally and by accident.  The statistics are genuinely

staggering. <u>See</u> Centers for Disease Control and Prevention (CDC), *National Vital*

*Statistics Reports*, Vol. 61, No. 6, at 18-19 (2012) (showing for 2010 (preliminary

figures for 2011 are even higher) **31,328 total U.S. deaths related to firearms**,

including **11,078** firearms related **homicides, 19,392 suicides** by firearm, and **606**

**accidental** firearms deaths).  In addition, there were an additional **73,505 nonfatal**

gunshot **injuries** in 2010. CDC, *Nonfatal Injury Reports*, available at http://web

appa.cdc.gov/sasweb/ncipc/nfirates2001.html.  Thus, there were a stunning

**104,833** firearms related deaths or injuries in 2010 alone.

As for the specific act of <u>carrying firearms **in public**</u>, it is common sense

that any strong anger or conflict between people that arises in the public sphere is

made inherently more dangerous when one or more of the parties is carrying a

firearm, concealed or unconcealed.  And it cannot be denied that incidents of

public anger or conflict are frequent and widespread.[5]  When a conflict breaks out, or someone becomes extremely upset or angry while in public, common sense indicates that the danger increases dramatically if the conflicting or angry person(s) are armed.  See <u>Woollard v. Gallagher</u>, 712 F.3d 865, --- (4th Cir. 2013) ("limiting the public carrying of handguns protects citizens and inhibits crime by … [l]essening 'the likelihood that basic confrontations between individuals would turn deadly.'").  This is true regardless of whether the angry person is armed openly or in a concealed fashion.  It is <u>having</u> the firearm that heightens the danger.  Road rage is only the most obvious example of where being armed magnifies the risk.

Indeed, having a weapon on oneself (whether open or concealed) not only heightens the danger from anger or conflict, but could even increase the **number** of incidents of conflict in the public sphere, because a person who would ordinarily avoid conflict out of fear for one's safety might be emboldened to engage in conflict because of a sense of invulnerability provided by having the firearm.

Although there could be, on occasion, situations where an **unconcealed** weapon could deter a fight in the first place, it is just as likely that carrying an unconcealed firearm could actually increase the likelihood of starting a fight.  For example, as just noted, a person who might ordinarily avoid conflict out of concern

---

[5] It would be safe to conclude that literally **millions** of people in the United States become very angry or get into a verbal conflict **every single day**, given that the U.S. population exceeds 310 million.  If only 1% of people get very angry or into conflicts each day, that would be **3.1 million people daily**.

8

for one's safety might welcome conflict because of a sense of invincibility provided by having the firearm (whether unconcealed or concealed; indeed, an unconcealed firearm might be even more emboldening knowing one's potential adversary sees it). Also, **open** carry may encourage criminals to carry firearms themselves, either by the example set, or for parity. Police officers, in otherwise routine interactions with members of the public, might, when faced with a civilian **openly** carrying, be quicker to draw their own firearms out of self-preservation, which could lead to more shootings. Or, a gang member suddenly encountering an **openly** armed rival gang member might fear for his safety and attack preemptively.

Indeed, there is strong historical reason to view **open (unconcealed)** carrying of firearms as being especially outside the scope of the Second Amendment. Blackstone, whom the Heller majority relies upon heavily, explained that the Statute of Northampton prohibited the "offense of riding or going armed with dangerous or unusual weapons" as "a crime against the public peace, **by terrifying the good people** of the land." 4 William Blackstone, *Commentaries on the Laws of England* 148-49 (1769). Obviously, the **open and unconcealed** carrying of firearms is an action that might directly "terrify" members of the public, while a **concealed** firearm might do so only when displayed or through the public's awareness that people around them may have concealed firearms. Thus, there is no reason to limit Heller's implicit exclusion of **concealed** carry from

9

Second Amendment protection; the exclusion should extend to **unconcealed** carry as well. See Piszczatoski v. Filko, 840 F.Supp.2d 813, 836 (D.N.J. 2012) (upholding restrictions on **both** concealed **and** open carry and rejecting distinguishing restrictions on concealed carry **only**, because "the same rationales apply … almost equally" to both); Kachalsky, 817 F.Supp.2d at 270 (S.D.N.Y. 2011) (same public safety rationales justify restrictions on both concealed **and** open carry).

Some argue that a civilian being armed in public allows that person to stop a crime (e.g., a mass shooting). Even if one makes the highly questionable assumption that such a civilian -- who is not trained in law enforcement, much less how to expertly deal with life and death shooting incidents -- would be able to successfully use his or her firearm to stop a crime (and not get innocent bystanders, or him or her self, killed or injured in the process), a major countervailing point is often forgotten. These armed civilians will **not** be armed **only on that one day**, when the once in a lifetime crime (that they might thwart with their firearm) occurs, but they will be armed **every other day** of their lives, when no such incident occurs. On all of those other **thousands** of days, their carrying the firearm simply increases the risk of death or injury to themselves and others.

Put quantitatively, if one were to take a random selection of 1000 armed civilians, the odds **on any given day** that **even one** of those 1000 armed civilians

will encounter a crime, and a crime that they might successfully thwart with their firearm, is extremely low. On the other hand, the odds that **at least one** of those 1000 civilians becomes very upset, or gets into a verbal conflict, or is careless with the firearm, on any given day is, common sense would dictate, quite high. It stands to reason, therefore, that allowing members of the public to carry firearms on a daily basis jeopardizes, not enhances, public safety.

Another related reason why public carry presents a particularly serious public safety risk is that the risk of harm is to potentially **dozens of others** (including children and innocent bystanders), whereas in the home environment, the risk of harm is limited to those who live with or visit a gun owner (or his/her family) at home. Carrying weapons in public, on the other hand, puts many more lives in jeopardy.

In sum, it makes perfect sense that **public** carrying of firearms -- openly or concealed -- is outside the scope of the Second Amendment, because of the clear threat to public safety posed by such public carrying. Not only does the above **common sense** analysis of restrictions on public carry support their public safety benefit, but **empirical research** supports that conclusion as well. See, e.g., Ian Ayres & John J. Donohue III, *More Guns, Less Crime Fails Again: The Latest Evidence from 1977 – 2006*, 6 Econ J. Watch 218, 229 (May 2009), *available by clicking PDF link at* http://econjwatch.org/articles/more-guns-less-crime-fails-

11

again-the-latest-evidence-from-1977-2006 (evidence demonstrates that **right to carry laws increase aggravated assaults**); Ian Ayres & John J. Donohue III, *Shooting Down the "More Guns, Less Crime" Hypothesis*, 55 Stan. L. Rev. 1193, 1202 & n.1 (April, 2003) (rejecting Lott and Mustard conclusion that more guns leads to less crime, and concluding that statistical analysis provides "stronger evidence ... that [**"shall-issue" laws** that allow all adults without serious criminal records or mental illness to carry concealed firearms in public] **increase crime** than there is for the [opposite] conclusion."); Jens Ludwig, *Concealed-Gun-Carrying Laws and Violent Crime*, 18 Int'l Rev. L. & Econ. 239, 252 (1998) (refuting Lott and Mustard and concluding that **"shall-issue laws have resulted, if anything, in an increase in adult homicide rates."**); Violence Policy Center, *License to Kill IV: More Guns, More Crime*, at 5 (June 2002), *available at* http://www.vpc.org/graphics/ltk4.pdf (**concealed handgun license holders** in Texas **were arrested for weapon-related offenses at a rate 81 percent higher than that of the general population**); A. Gerney et al., *America under the Gun* (Apr. 2013) at pp.28-29 & 35, *available by clicking PDF link at* http://www. americanprogress.org/issues/civil-liberties/report/2013/04/02/58382/america-under-the-gun/ (**"the 10 states with the weakest gun laws,"** including weaker **public carry laws, "collectively have a level of gun violence that is ... 104 percent higher ... than the 10 states with the strongest gun laws;"** and even as

to firearm **homicides** alone, **34%** higher, and firearm **homicides among women,** **88%** higher; and as to **law enforcement agents feloniously killed with a firearm,** **139%** higher); Law Center to Prevent Gun Violence, *Gun Laws Matter 2012* (Nov. 2012), *available at* http://smartgunlaws.org/gun-laws-matter-2012-understanding-the-link-between-weak-laws-and-gun-violence/ (**states with stricter gun laws --** **including stricter public carry laws -- have lower rates of gun death**); D. Hemenway et al., *Gun Use in the United States: Results from two National Surveys*, 6 Injury Prevention 263, 267 (2000), *available by clicking PDF link at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1730664/ (survey evidence indicates that **"gun use against adults to threaten and intimidate is far more** **common than self-defense gun use ... and ... most self-reported self-defense** **gun uses are probably illegal"**); Charles C. Branas et al., *Investigating the Link Between Gun Possession and Gun Assault*, 99 Amer. J. of Pub. Health 2034, 2037 (Nov. 2009), *available at* http://works.bepress.com/cgi/viewcontent.cgi?article=1087&context=dennis_culhane at p.4 (**"gun possession by urban adults was** **associated with a significantly increased risk of being shot in an assault;"** "individuals ... in possession of a gun were 4.46 [] times more likely to be shot in an assault" and "4.23[] times more likely to be **fatally** shot in an assault").

Even though some may dispute that restrictions on public carry promote public safety -- or even claim an inverse correlation -- it "is the legislature's job,

not [courts'], to weigh conflicting evidence and make policy judgments."

Kachalsky, 701 F.3d at 99; see discussion, infra, at 22-23.

In sum, limiting the Second Amendment's scope to self-defense **in the home**
(Heller and McDonald went no further) and not extending it to the **public** sphere
follows logically from the states' need to protect public health and safety, given the
common sense and empirically supported heightened danger posed by guns in the
public sphere, whether carried concealed or unconcealed.[6]

### C.  History and Logic Further Support Exclusion of Public Carry.

Moreover, because Heller itself takes public carrying in "**sensitive places**,"
including "schools and government buildings," completely out of the Second
Amendment, it is a very small and reasonable step to view virtually the entire
public sphere as a "sensitive place" where guns can be prohibited.  After all, if
guns can be banned in schools because children are vulnerable there, logic would
dictate that guns can be banned anywhere where significant numbers of children
may be, which would cover the majority of public places.  Government buildings,
too, cover a vast array of places from post offices, libraries, city hall and court

---

[6] See Masciandaro, 638 F.3d at 475 (noting that Heller majority may have
recognized the "possibility that [the risk of "tragic act[s] of mayhem"] rise
exponentially as one moved the right from the home to the **public** square");
Piszczatoski, 840 F.Supp.2d at 829 ("The risks associated with a judicial error in
discouraging regulation of firearms carried **in public** are too great.").

houses, to buildings servicing vehicle registrations, driver's licensing, and camping permits. And if guns can be banned in sensitive places such as bars and restaurants that serve liquor because of the risk posed by inebriated patrons with firearms, logic would dictate that guns could be banned anywhere in public that such an inebriated person is likely to be or end up, which would cover areas **surrounding** bars and restaurants. See Moore v. Madigan, 702 F.3d 933, 948 (7th Cir. 2012) (Williams, J., dissenting) ("The resulting patchwork of places where loaded guns could and could not be carried … could not guarantee meaningful self-defense, which suggests that the constitutional right to carry … firearms in public for self-defense may well not exist.").

Furthermore, because Hawaii's restrictions on public carry date back **nearly 90 years** to 1927, see 1927 Haw. Sess. Laws Act 206, Sections 5-7 (see Addendum), public carry is an "activit[y] covered by a **longstanding** regulation [and is thus] **presumptively not protected from regulation by the Second Amendment**." Heller v. District of Columbia, 670 F.3d 1244, 1253 (D.C. Cir. 2011); National Rifle Ass'n v. Bureau of ATF, 700 F.3d 185, 196 (5th Cir. 2012) ("**longstanding** [including "**mid-20th century vintage**"] presumptively lawful regulatory measure -- **whether or not [on] *Heller*'s illustrative list** -- would likely **fall outside … the Second Amendment**"); Peterson v. Martinez, 707 F.3d 1197, 1211 (10th Cir. 2013) ("longstanding" restrictions are "presumptively lawful").

15

Finally, **English legal history** pre-dating the Second Amendment, which the

<u>Heller</u> majority emphasized because it construed the Second Amendment as

"**codify[ing] a *pre-existing* right**," 554 U.S. at 592, also supports excluding public

carry from the scope of the Second Amendment. The 1328 Statute of

Northampton essentially prohibited the carrying of arms in public. <u>See</u> Charles,

*The Faces of the Second Amendment Outside the Home*, 60 Clev. St. L. Rev. 1, 20

(2012) ("the historical evidence is convincing that the Statute of Northampton was

not regulating dangerous conduct with arms, but the <u>act of carrying arms **by**</u>

**itself**"); <u>Moore</u>, 702 F.3d at 944-45 (Williams, J., dissenting) (the Statute "by its

terms, prohibited <u>going armed in public</u>," and was also "understood" that way

because "going armed with dangerous weapons" "makes people terrified or

nervous").

Notably, this understanding of the Statute -- barring ordinary people from

carrying arms in public -- remained in effect in England, even after the right to

bear arms was codified in the 1689 *Declaration of Right*, <u>see</u> Charles, supra at 23-

28, and in **America** through the passage of the Second Amendment in 1791. <u>Id.</u> at

31-36 (also methodically undermining evidence for opposing view); <u>see</u> <u>also</u>

<u>English v. State</u>, 35 Tex. 473, 474, 479 (1871) (case cited in <u>Heller</u>) ("almost [all]

states ... have a similar law" "regulating [or] prohibiting, the carrying of deadly

weapons"). This demonstrates quite clearly that any pre-existing right to bear arms

did <u>not</u> extend to carrying firearms in public. Thus English and American history strongly supports public carry being excluded entirely from the Second Amendment. <u>See</u> <u>also</u> Don Kates, *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204, 267 (1983) (article cited by <u>Heller</u> majority) ("the only carrying of firearms which the [Second] amendment appears to protect is such transportation as is implicit in the concept of a right to possess -- *e.g.*, transporting them between the … owner's premises and a shooting range, or a gun store [etc.]").

For the above reasons, the Supreme Court's recognition that the Second Amendment "was <u>not</u> a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," <u>Heller</u>, 554 U.S. at 626, should extend to the concealed or unconcealed carrying of firearms **in public**.

In conclusion, the carrying of firearms **in public**, whether concealed or unconcealed, does not fall within the scope of the Second Amendment. Many federal courts have so ruled. <u>See</u>, <u>e.g.</u>, <u>Peterson</u>, 707 F.3d at 1211 ("Peterson's Second Amendment claim fails at step one of our two-step analysis: the Second Amendment does not confer a right to carry concealed weapons."); <u>Richards v. County of Yolo</u>, 821 F.Supp.2d 1169, 1174 (E.D. Cal. 2011) ("the Second Amendment does not create a fundamental right to carry a concealed weapon in public"); <u>Piszczatoski v. Filko</u>, 840 F.Supp.2d at 813, 831 (D. N.J. 2012) ("the

17

Second Amendment does not include a general right to carry handguns outside the home;" restrictions on public carry "fall outside the … Second Amendment").[7] **Plaintiffs' Second Amendment challenge to Hawaii's restrictions on public carry thus fails without further inquiry.**

Finally, even if, contrary to the above, the Second Amendment did apply to some **public** carry, it certainly does not cover one, like Young, who makes no claim of **special need** for self-defense. Young did not allege any special need in his Complaint; also, Hawaii allows concealed carry **where special need is demonstrated.** See infra 23-25, 27, 28. Hawaii's laws thus do **not substantially** burden any Second Amendment right of **Young** to bear arms in public for self-defense.[8]

II.  Even if the Second Amendment has some applicability outside the home and covers Young, Hawaii's restrictions easily survive intermediate scrutiny.

Even if, contrary to the above, the Second Amendment **does** apply to some carrying of firearms **in public**, and Hawaii's restrictions were deemed to

---

[7] As the Third Circuit, in U.S. v. Marzzarella, 614 F.3d 85, 91 (3d Cir. 2010), explained:

> the phrase "presumptively lawful" could … be read to suggest the identified restrictions are presumptively lawful because they regulate conduct **outside the scope of the Second Amendment [or]** because they **pass muster under any standard of scrutiny.** … [W]e think the better reading, based on the text and the structure of Heller, **is the former – … that these longstanding limitations are exceptions to the right to bear arms.**

[8] See footnote 9, infra.

**substantially** burden that right (despite Young lacking a special self-defense need, and Hawaii allowing **special needs** public carry), they satisfy **intermediate** scrutiny, the toughest standard applied by other federal appellate courts.[9] Federal courts apply intermediate, not strict, scrutiny because restrictions on carrying firearms **in public** do not burden the "core" protections of the Second Amendment. See Masciandaro, 638 F.3d at 469-71 (4th Cir. 2011); Kachalsky, 701 F.3d at 93 (2nd Cir. 2012). Heller recognized that the "core" protections of the Second Amendment focus on "the right of law-abiding citizens to use arms in defense of **hearth and home**," Heller, 554 U.S. at 635, which obviously does not include areas **in public**. Cf. Hightower v. City of Boston, 693 F.3d 61, 73 (1st Cir. 2012) ("Under our analysis of Heller … the government may regulate the carrying of concealed weapons **outside the home**.").

Under intermediate scrutiny, the gun restrictions must be "**substantially** related to an **important** governmental" interest. See Clark v. Jeter, 486 U.S. 456, 461 (1988); Kachalsky, 701 F.3d at 96-97. The restrictions "need not be the least restrictive means … to survive intermediate scrutiny," Doe v. Reed, 586 F.3d 671, 680 (9th Cir. 2009); the "fit" between means and ends need not be "perfect," but merely "reasonable," in "proportion to the interest served." Bd. of Trustees v. Fox,

---

[9] **Ninth Circuit** "substantial burden" trigger for "heightened scrutiny" was **vacated** en banc. See Nordyke v. King, 644 F.3d 776, 786, vacated, 664 F.3d 774 (9th Cir. 2011). Standard has not yet been resolved in Ninth Circuit.

492 U.S. 469, 480 (1989); Marzzarella, 614 F.3d at 98.

### A. Hawaii's Restrictions are Substantially Related to Important Governmental Interests.

In this case, the important governmental interest supporting Hawaii's public carry restrictions is public safety. Hawaii's elected officials, as far back as 1927 (and continuing to today) recognized the public safety risks posed by firearms in public and addressed that concern by enacting comprehensive place to keep and license to carry laws nearly 90 years ago. See 1927 Haw. Sess. Laws Act 206, Sections 5-7; see also 1933 Haw. Sess. Laws (Special Sess.) Act 26, Sections 6 & 8; 1961 Haw. Sess. Laws. Act 163, Section 1. (see Addendum).

In 1990, rather than specifically prohibit firearms near schools, the Hawaii Senate Judiciary committee increased the penalties for most firearms violations (including public carry without a license) explaining that: "While your Committee strongly agrees that our educational institutions should be places of sanctuary, we believe just as strongly that our **entire community** should be a **safe place to live** and learn and that **everyone deserves to feel free from the threat of harm wherever they go**." 1990 Senate Journal at 1242-43. Public safety and crime prevention are important, indeed compelling, governmental interests. See U.S. v. Salerno, 481 U.S. 739, 750 (1987); Kachalsky, 701 F.3d at 97 (2d Cir. 2012) ("the parties agree [] New York has substantial, indeed compelling, governmental interests in public safety and crime prevention"); Woollard, 712 F.3d at --- (4th

Cir. 2013) ("protecting public safety and preventing crime" "are substantial governmental interests").

For the reasons detailed in the prior section, see supra at 7-13 (citing empirical research supporting restrictions on public carry, and explaining, inter alia, that anger and conflicts that arise in public are made more dangerous when persons are armed), restricting the carrying of firearms in public is **substantially** related to public safety. Federal appeals courts have agreed with this common sense conclusion. See Woollard, 712 F.3d at ---, --- ("limiting the public carrying of handguns protects citizens and inhibits crime by, inter alia … [l]essening 'the likelihood that basic confrontations between individuals would turn deadly' …. [T]he good-and-substantial-reason requirement is reasonably adapted to Maryland's significant interests in protecting public safety and preventing crime."); Kachalsky, 701 F.3d at 98 ("Restricting handgun possession **in public** … is substantially related to New York's interests in public safety and crime prevention.").

There are other reasons, too, that restricting public carry enhances public safety, including decreasing "the availability of handguns to criminals via theft," "curtailing the presence of handguns during routine police-citizen encounters … [that may turn] routine [encounters into] high-risk stops," "[a]verting the confusion [and] potentially tragic consequences … that can result from the presence of a third

21

person with a handgun during a [police-criminal suspect] confrontation [because of] confusion as to which side of the confrontation the [third] person is on," and "[f]acilitating the identification of those persons carrying handguns who pose a menace." Woollard, 712 F.3d at ---.

Even if there may be some contradictory empirical evidence -- i.e., evidence that public safety is harmed or not enhanced by restrictions on public carry -- courts may not, even under **intermediate** scrutiny, second-guess a legislature's conclusions as long as there is substantial evidence to support its conclusions. See Turner Broadcasting System v. FCC, 520 U.S. at 189, 211 (1997) (under "intermediate scrutiny," the "**question is not whether** Congress, as an objective matter, **was correct** to determine [its law] is necessary to [serving its goal;], the question is whether the legislative conclusion was **reasonable** and supported by **substantial evidence .... [W]e are not to 'reweigh the evidence *de novo*, or to replace Congress' factual predictions with our own.'**... [T]he possibility of **drawing two inconsistent conclusions from the evidence does not prevent ... [a] finding from being supported by substantial evidence.'**"); Kachalsky, 701 F.3d at 99 ("**It is the legislature's job, not ours, to weigh conflicting evidence and make policy judgments**"); Woollard, 712 F.3d at --- ("**we cannot substitute [opposing] views for the considered judgment of the [legislature]**").  There is, of course, substantial **empirical evidence** to support the Hawaii legislature's belief

22

that public safety is enhanced by restrictions on public carry. **See articles listed supra at 11-13**. That is sufficient to satisfy intermediate scrutiny.

Moreover, **common sense** suggests that public carry significantly threatens public safety because millions of otherwise law-abiding people each day become angry, are involved in conflict, or are careless, and if they are then carrying a lethal firearm the risks of death and injury obviously skyrocket. On the other hand, the number of people on any given day who actually encounter a crime that they could and would successfully thwart (rather than exacerbate) with a firearm is comparatively miniscule. See discussion supra at 7-8, 10-11. And any potential deterrent effect of public carrying is offset by criminals arming themselves in response. Philip J. Cook et al., *Gun Control After Heller*, 56 U.C.L.A. L. Rev. 1041, 1081 (2009) (Two-thirds of gun offense prisoners report choosing to use a gun because of possible armed victims).

### B. Hawaii Restricts, but Does Not Ban, Public Carry.

Furthermore, Hawaii's restrictions on public carry are particularly well tailored to the public safety concern, and take into account countervailing self-defense benefits. Section 134-9, along with §§134-23 through -27, regulating the carrying of lethal firearms in public, contrary to plaintiff's contentions, do not set forth a total **ban** on either the **open** or **concealed** carry of handguns. First, there are the usual exceptions for carrying in public when there is a change of residence

23

or place of business, or for transporting to or from a place of repair, a target range, a licensed dealer, etc. See HRS §§134-23 through -27. **Most importantly**, the county police chiefs have discretion to issue a permit allowing an individual to carry a **concealed** handgun "in an exceptional case" where: "**an applicant shows reason to fear injury to the applicant's person or property**." HRS §134-9(a).

The chiefs also have discretion to issue a permit allowing an individual to **openly** carry a handgun "[w]here the urgency or the need has been sufficiently indicated," and where applicant "**is engaged in the protection of life or property**." Id.

In short, Hawaii's laws, rather than flatly banning public carry, allow for **concealed** public carry where an applicant demonstrates a special reason to fear for his or her personal safety or property (and allow **open** carry for those whose occupation involves protecting life or property). **In 2006, for example, 1 of 1 concealed carry, and 227 of 229 open carry, applications were granted.**[10] Although even an **outright ban** on public carry would be substantially related to protecting public safety under intermediate scrutiny (as explained supra at 20-23), Hawaii's generous allowance for public carry in **special needs** situations **lessens any burden** and **enhances** the connection between Hawaii's laws and its public

---

[10] Crime Prevention & Justice Assistance Division, *Firearm Registrations in Hawaii, 2006* at 7, *available at* http://ag.hawaii.gov/cpja/rs/specialrpts2003_2012.

safety goal. See Kachalsky, 701 F.3d at 86, 98 ("Restricting handgun possession **in public** to those who ["demonstrate a **special need** for self-protection distinguishable from that of the general community"] is substantially related to … interests in public safety and crime prevention."); Woollard, 712 F.3d at --- ("the good-and-substantial-reason requirement [for a permit to carry a handgun] is reasonably adapted to Maryland's significant interests in protecting public safety and preventing crime").[11]

As discussed supra at 10-11, the **numerical disparity** -- between the large number of days an armed civilian becomes very angry, gets into a serious conflict, or is careless (and thus where being armed increases public danger), versus the miniscule number of days she encounters a crime that she might successfully thwart with a firearm -- **is huge**, and would justify an outright **ban**. However, rather than flatly **ban** public carry, Hawaii **restricts** public carry to those demonstrating a special reason to fear an attack. This is well tailored because it **narrows the above numerical disparity**, as a special-needs licensee is more likely to face an attack on any given day than the average citizen.

---

[11]  For this reason, Young's attack on 134-9's **"exceptional case"** element for concealed carry is frivolous. This element assures that, like New York's law upheld in Kachalsky, more than a mere **generalized fear** for safety is required.

Likewise, 134-9's "suitability" requirement prevents licensing persons with serious criminal backgrounds or other characteristics that would render their public carrying of firearms especially dangerous.

Unsurprisingly, therefore, federal appellate courts uniformly uphold public carry **restrictions**. Kachalsky (2nd Cir.), Woollard (4th Cir.), Peterson (10th Cir.). The Seventh Circuit's Moore v. Madigan, 702 F.3d 933, ruling is not to the contrary. The Illinois statute struck down in Moore was a **complete ban** on carrying firearms in public. Id. at 940. Moore, in fact, contrasted the Illinois statute with the New York statute upheld in Kachalsky, which, like Hawaii's, allows concealed public carry for those demonstrating a special need for self-protection. Id. at 941; see also Williams v. Puerto Rico, 2012 WL 6675356 at *7 (D. Puerto Rico 2012) (distinguishing Moore as involving a **complete ban**); Woollard, 712 F.3d at --- n.10 (recognizing same distinction).

In conclusion, even if the Second Amendment covers **public** carry to some extent, and Hawaii's restrictions were deemed to impose a substantial burden (despite Young having no special need, and Hawaii allowing special needs public carry), those restrictions easily satisfy intermediate scrutiny.

III.   There is No Improper Unfettered Discretion, nor Procedural Due Process Violation.

Given the explicit criteria set forth in HRS §134-9 for receiving a license to carry concealed or openly, see supra at 1, 2-3, 24, it is plain that police chiefs do not have "unbridled" discretion in the permit approval process. In any event, even if the chiefs did have such "unbridled" discretion, the courts have rejected

importing **First** Amendment doctrine --allowing **facial** attacks on licensing schemes giving officials unbridled discretion over **speech** -- into the **Second** Amendment context. See Hightower, 693 F.3d at 80-81; Kachalsky, 701 F.3d at 91-92; Piszczatoski, 840 F.Supp.2d at 831-32.  Accordingly, Young cannot make such a **facial** attack on 134-9.

Even an **as applied** attack would fail because Young never alleged that he meets 134-9's "reason to fear injury" criterion for **concealed** carry (or the "urgency or the need" and "engaged in the protection of life and property" criteria for **open** carry).[12]  Young objects to having to meet those criteria, not to how those criteria were applied to him.

Young's procedural due process challenge fails as well.  Because 134-9 provides that an applicant who meets the specified criteria (including, inter alia, "reason to fear injury") "**may**" be granted a license to carry, Young clearly has no **state-created** liberty or property interest to trigger a procedural due process inquiry. See Erdelyi v. O'Brien, 680 F.2d 61, 63 (9th Cir. 1982) (no "property interest" in concealed carry license absent "**mandatory** language … restrict[ing] the discretion … to deny licenses").  Nor is there a **Second Amendment** right to public carry (to trigger a procedural due process inquiry), because 1) public carry is wholly outside the scope of the Second Amendment, see Section I, supra, and 2)

---

[12]  Finally, Young does <u>not</u> allege that others who made an equally poor or non-existent showing of reason to fear injury <u>did</u> receive a license.

even if public carry were within the Second Amendment, Hawaii's compelling interest in public safety and crime prevention would render a **ban** on public carry -- and *a fortiori*, Hawaii's more generous "reason to fear injury" qualification for public carry -- valid under intermediate scrutiny. See Section II, supra.

Finally, even if, contrary to the above, the Second Amendment required allowing public carry for those who establish special reasons to fear injury in public -- beyond a general fear all citizens may have -- plaintiff never alleged in his Complaint any special reasons why his safety was in greater jeopardy than the average person. Thus, he has no standing to raise such a **special-needs-based** Second Amendment claim, nor, therefore, standing to raise a **procedural Due Process** objection based upon alleged inadequate process allowing him to make the **special-needs** showing.

## IV. Young's challenges to other Hawaii statutes regulating particular weapons must be disregarded.

Young challenges several other statutes beyond HRS §§134-6 and 134-9 for the first time in his Opening Brief at 26-41, including HRS §§134-23 and 134-5[13] to the extent that they limit the carrying of **rifles** and **shotguns** in public, HRS §134-52 banning possession of **switchblades**, HRS §134-53 banning possession of

---

[13] Young incorrectly cites HRS §134-25 in his Opening Brief at 29-30, when he meant HRS §134-5.

**butterfly knives**, and HRS §134-16 banning possession of **electric guns**.  None of these statutes were specifically mentioned in his previous pleadings.  An appellate court generally will not consider issues raised for the first time on appeal; because Young did not challenge any of these statutes in the District Court, and no factual record underpins these new claims, these claims must be disregarded. <u>Bolker v. C.I.R.</u>, 760 F.2d 1039, 1042 (9th Cir. 1985).

Furthermore, because Young never alleged that he imminently <u>desired</u> to carry a rifle or shotgun in public,[14] or to own a switchblade, butterfly knife, or an electric gun, **he has alleged no "injury in fact"** stemming from the laws banning such actions.  He thus **lacks Article III standing** to challenge those laws. <u>Camreta v. Greene</u>, 131 S. Ct. 2020, 2028 (2011).


### CONCLUSION

All of plaintiff's challenges to Hawaii's firearms laws must be rejected. Amicus State of Hawaii respectfully asks that this Court AFFIRM the judgment below.

DATED:  Honolulu, Hawaii, May 31, 2013.

/s/ Girard D. Lau
GIRARD D. LAU
Solicitor General of Hawaii
[additional counsel listed on following page]

---

[14]  He only applied for a license under 134-9, which statute provides only for licenses to carry **pistols** or **revolvers**. Complaint at 13.

KIMBERLY TSUMOTO GUIDRY
First Deputy Solicitor General
ROBERT T. NAKATSUJI
Deputy Solicitor General

Attorneys for Amicus
Curiae State of Hawaii

<u>CERTIFICATE OF COMPLIANCE</u>

I certify that the brief is proportionately spaced, has a typeface of 14 points

or more and contains  _7,000_  words.

DATED:  Honolulu, Hawaii, May 31, 2013.

<div style="margin-left: 40%;">

/s/ Girard D. Lau
GIRARD D. LAU
Solicitor General of Hawaii
KIMBERLY TSUMOTO GUIDRY
First Deputy Solicitor General
ROBERT T. NAKATSUJI
Deputy Solicitor General


Attorneys for Amicus
Curiae State of Hawaii

</div>

## INDEX TO ADDENDA

| Addendum | Description |
|----------|-------------|
| 1 | Haw. Rev. Stat. § 134-5 |
| 2 | Haw. Rev. Stat. § 134-6 [Section repealed in 2006] |
| 3 | Haw. Rev. Stat. §134-7 |
| 4 | Haw. Rev. Stat. § 134-9 |
| 5 | Haw. Rev. Stat. § 134-16 |
| 6 | Haw. Rev. Stat. § 134-23 |
| 7 | Haw. Rev. Stat. § 134-24 |
| 8 | Haw. Rev. Stat. § 134-25 |
| 9 | Haw. Rev. Stat. § 134-26 |
| 10 | Haw. Rev. Stat. § 134-27 |
| 11 | Haw. Rev. Stat. § 134-52 |
| 12 | Haw. Rev. Stat. § 134-53 |
| 13 | 1927 Haw. Sess. Laws Act 206, Sections 5-7 |
| 14 | 1933 Haw. Sess. Laws (Special Sess.) Act 26, Sections 6 & 8 |
| 15 | 1961 Haw. Sess. Laws. Act 163, Section 1 |
| 16 | 1961 Haw. Sen. J. at 874 |
| 17 | 1990 Sen. J. at 1242-1243 |
| 18 | 2006 Haw. Sess. Laws Act 66, § 1 |

### § 134-5. Possession by licensed hunters and minors; target shooting; game hunting

(a) Any person of the age of sixteen years, or over or any person under the age of sixteen years while accompanied by an adult, may carry and use any lawfully acquired rifle or shotgun and suitable ammunition while actually engaged in hunting or target shooting or while going to and from the place of hunting or target shooting; provided that the person has procured a hunting license under chapter 183D, part II. A hunting license shall not be required for persons engaged in target shooting.

(b) A permit shall not be required when any lawfully acquired firearm is lent to a person, including a minor, upon a target range or similar facility for purposes of target shooting; provided that the period of the loan does not exceed the time in which the person actually engages in target shooting upon the premises.

(c) A person may carry unconcealed and use a lawfully acquired pistol or revolver while actually engaged in hunting game mammals, if that pistol or revolver and its suitable ammunition are acceptable for hunting by rules adopted pursuant to section 183D-3 and if that person is licensed pursuant to part II of chapter 183D. The pistol or revolver may be transported in an enclosed container, as defined in section 134-25 in the course of going to and from the place of the hunt, notwithstanding section 134-26.

2005 – Section repealed in 2006

§ 134-6 Carrying or use of firearm in the commission of a separate felony; place to keep firearms; loaded firearms; penalty.

\* \* \*

(c) Except as provided in sections 134-5 and 134-9, all firearms and ammunition shall be confined to the possessor's place of business, residence, or sojourn; provided that it shall be lawful to carry unloaded firearms or ammunition or both in an enclosed container from the place of purchase to the purchaser's place of business, residence, or sojourn, or between these places upon change of place of business, residence, or sojourn, or between these places and the following: a place of repair; a target range; a licensed dealer's place of business; an organized, scheduled firearms show or exhibit; a place of formal hunter or firearm use training or instruction; or a police station. " Enclosed container" means a rigidly constructed receptacle, or a commercially manufactured gun case, or the equivalent thereof that completely encloses the firearm.

(d) It shall be unlawful for any person on any public highway to carry on the person, or to have in the person's possession, or to carry in a vehicle any firearm loaded with ammunition; provided that this subsection shall not apply to any person who has in the person's possession or carries a pistol or revolver and ammunition therefor in accordance with a license issued as provided in section 134-9.

(e) Any person violating subsection (a) or (b) shall be guilty of a class A felony. Any person violating this section by carrying or possessing a loaded firearm or by carrying or possessing a loaded or unloaded pistol or revolver without a license issued as provided in section 134-9 shall be guilty of a class B felony. Any person violating this section by carrying or possessing an unloaded firearm, other than a pistol or revolver, shall be guilty of a class C felony.

\* \* \*

(f) Any vehicle used in the commission of an offense under subsection (d) shall be forfeited to the State, subject to the notice and hearing requirements of chapter 712A.

[2005 Supp.]

**§ 134-7. Ownership or possession prohibited, when; penalty**

(a) No person who is a fugitive from justice or is a person prohibited from possessing firearms or ammunition under federal law shall own, possess, or control any firearm or ammunition therefor.

(b) No person who is under indictment for, or has waived indictment for, or has been bound over to the circuit court for, or has been convicted in this State or elsewhere of having committed a felony, or any crime of violence, or an illegal sale of any drug shall own, possess, or control any firearm or ammunition therefor.

(c) No person who:

(1) Is or has been under treatment or counseling for addiction to, abuse of, or dependence upon any dangerous, harmful, or detrimental drug, intoxicating compound as defined in section 712-1240, or intoxicating liquor;

(2) Has been acquitted of a crime on the grounds of mental disease, disorder, or defect pursuant to section 704-411; or

(3) Is or has been diagnosed as having a significant behavioral, emotional, or mental disorders as defined by the most current diagnostic manual of the American Psychiatric Association or for treatment for organic brain syndromes;

shall own, possess, or control any firearm or ammunition therefor, unless the person has been medically documented to be no longer adversely affected by the addiction, abuse, dependence, mental disease, disorder, or defect.

(d) No person who is less than twenty-five years old and has been adjudicated by the family court to have committed a felony, two or more crimes of violence, or an illegal sale of any drug shall own, possess or control any firearm or ammunition therefor.

(e) No minor who:

(1) Is or has been under treatment for addiction to any dangerous, harmful, or detrimental drug, intoxicating compound as defined in section 712-1240, or intoxicating liquor;

(2) Is a fugitive from justice; or

(3) Has been determined not to have been responsible for a criminal act or has been committed to any institution on account of a mental disease, disorder, or defect;

shall own, possess, or control any firearm or ammunition therefor, unless the minor has been medically documented to be no longer adversely affected by the addiction, mental disease, disorder, or defect.

For the purposes of enforcing this section, and notwithstanding section 571-84 or any other law to the contrary, any agency within the State shall make its records relating to family court adjudications available to law enforcement officials.

(f) No person who has been restrained pursuant to an order of any court, including an ex parte order as provided in this subsection, from contacting, threatening, or physically abusing any person, shall possess, control, or transfer ownership of any firearm or ammunition therefor, so long as the protective order, restraining order, or any extension is in effect, unless the order, for good cause shown, specifically permits the possession of a firearm and ammunition. The restraining order or order of protection shall specifically include a statement that possession, control, or transfer of ownership of a firearm or ammunition by the person named in the order is prohibited. Such person shall relinquish possession and control of any firearm and ammunition owned by that person to the police department of the appropriate county for safekeeping for the duration of the order or extension thereof. In the case of an ex parte order, the affidavit or statement under oath that forms the basis for the order shall contain a statement of the facts that support a finding that the person to be restrained owns, intends to obtain or to transfer ownership of, or possesses a firearm, and that the firearm may be used to threaten, injure, or abuse any person. The ex parte order shall be effective upon service pursuant to section 586-6. At the time of service of a restraining order involving firearms and ammunition issued by any court, the police officer may take custody of any and all firearms and ammunition in plain sight, those discovered pursuant to a consensual search, and those firearms surrendered by the person restrained. If the person restrained is the registered owner of a firearm and knows the location of the firearm, but refuses to surrender the firearm or refuses to disclose the location of the firearm, the person restrained shall be guilty of a misdemeanor. In any case, when a police officer is unable to locate the firearms and ammunition either registered under this chapter or known to the person granted protection by the court, the police officer shall apply to the court for a search warrant pursuant to chapter 803 for the limited purpose of seizing the firearm and ammunition.

For the purposes of this subsection, good cause shall not be based solely upon the consideration that the person subject to restraint pursuant to an order of any court, including an ex parte order as provided for in this subsection, is required to possess or carry firearms or ammunition during the course of the person's employment. Good cause consideration may include but not be limited to the protection and safety of the person to whom a restraining order is granted.

(g) Any person disqualified from ownership, possession, control, or the right to transfer ownership of firearms and ammunition under this section shall surrender or dispose of all firearms and ammunition in compliance with section 134-7.3.

(h) Any person violating subsection (a) or (b) shall be guilty of a class C felony; provided that any felon violating subsection (b) shall be guilty of a class B felony. Any person violating subsection (c), (d), (e), (f), or (g) shall be guilty of a misdemeanor.

## § 134-9. Licenses to carry

(a) In an exceptional case, when an applicant shows reason to fear injury to the applicant's person or property, the chief of police of the appropriate county may grant a license to an applicant who is a citizen of the United States of the age of twenty-one years or more or to a duly accredited official representative of a foreign nation of the age of twenty-one years or more to carry a pistol or revolver and ammunition therefor concealed on the person within the county where the license is granted. Where the urgency or the need has been sufficiently indicated, the respective chief of police may grant to an applicant of good moral character who is a citizen of the United States of the age of twenty-one years or more, is engaged in the protection of life and property, and is not prohibited under section 134-7 from the ownership or possession of a firearm, a license to carry a pistol or revolver and ammunition therefor unconcealed on the person within the county where the license is granted. The chief of police of the appropriate county, or the chief's designated representative, shall perform an inquiry on an applicant by using the National Instant Criminal Background Check System, to include a check of the Immigration and Customs Enforcement databases where the applicant is not a citizen of the United States, before any determination to grant a license is made. Unless renewed, the license shall expire one year from the date of issue.

(b) The chief of police of each county shall adopt procedures to require that any person granted a license to carry a concealed weapon on the person shall:

(1) Be qualified to use the firearm in a safe manner;

(2) Appear to be a suitable person to be so licensed;

(3) Not be prohibited under section 134-7 from the ownership or possession of a firearm; and

(4) Not have been adjudged insane or not appear to be mentally deranged.

(c) No person shall carry concealed or unconcealed on the person a pistol or revolver without being licensed to do so under this section or in compliance with sections 134-5(c) or 134-25.

(d) A fee of $10 shall be charged for each license and shall be deposited in the treasury of the county in which the license is granted.

**§ 134-16. Restriction on possession, sale, gift, or delivery of electric guns**

(a) It shall be unlawful for any person, including a licensed manufacturer, licensed importer, or licensed dealer, to possess, offer for sale, hold for sale, sell, give, lend, or deliver any electric gun.

(b) Any electric gun possessed, offered for sale, held for sale, sold, given, lent, or delivered in violation of subsection (a) shall be confiscated and disposed of by the chief of police.

(c) This section shall not apply to:

(1) Law enforcement officers of county police departments;

(2) Law enforcement officers of the department of public safety;

(3) Conservation and resources enforcement officers of the department of land and natural resources;

(4) Members of the army or air national guard when assisting civil authorities in disaster relief, civil defense, or law enforcement functions, subject to the requirements of section 121-34.5; and

(5) Vendors providing electric guns to the individuals described in paragraphs (1) through (4);

provided that electric guns shall at all times remain in the custody and control of the law enforcement officers of the county police departments, the law enforcement officers of the department of public safety, the conservation and resources enforcement officers of the department of land and natural resources, or the members of the army or air national guard.

(d) The county police departments of this State, the department of public safety, the department of land and natural resources, and the army and air national guard shall maintain records regarding every electric gun in their custody and control. The records shall report every instance of usage of the electric guns; in particular, records shall be maintained in a similar manner as for those of discharging of firearms. The county police departments, the department of public safety, the department of land and natural resources, and the army and air national guard shall annually report to the legislature regarding these records no later than twenty days before the beginning of each regular session of the legislature.

(e) The department of land and natural resources and the department of public safety shall ensure that each of its conservation and resources enforcement officers and law enforcement officers who is authorized to use an electric gun and related equipment shall first receive training from the manufacturer or from a manufacturer-approved training program, as well as by manufacturer-certified or approved instructors in the use of electric guns prior to deployment of the electric guns and related equipment in public. Training for conservation and resources enforcement

officers of the department of land and natural resources and law enforcement officers of the department of public safety may be done concurrently to ensure cost savings.

(f) No later than June 30, 2018, the conservation and resources enforcement program of the department of land and natural resources shall meet the law enforcement accreditation or recognition standards of the Commission on Accreditation for Law Enforcement Agencies, Inc., in the use of electric guns.

**[§ 134-23]. Place to keep loaded firearms other than pistols and revolvers; penalty**

(a) Except as provided in section 134-5, all firearms shall be confined to the possessor's place of business, residence, or sojourn; provided that it shall be lawful to carry unloaded firearms in an enclosed container from the place of purchase to the purchaser's place of business, residence, or sojourn, or between these places upon change of place of business, residence, or sojourn, or between these places and the following:

(1) A place of repair;

(2) A target range;

(3) A licensed dealer's place of business;

(4) An organized, scheduled firearms show or exhibit;

(5) A place of formal hunter or firearm use training or instruction; or

(6) A police station.

"Enclosed container" means a rigidly constructed receptacle, or a commercially manufactured gun case, or the equivalent thereof that completely encloses the firearm.

(b) Any person violating this section by carrying or possessing a loaded firearm other than a pistol or revolver shall be guilty of a class B felony.

**[§ 134-24]. Place to keep unloaded firearms other than pistols and revolvers; penalty**

(a) Except as provided in section 134-5, all firearms shall be confined to the possessor's place of business, residence, or sojourn; provided that it shall be lawful to carry unloaded firearms in an enclosed container from the place of purchase to the purchaser's place of business, residence, or sojourn, or between these places upon change of place of business, residence, or sojourn, or between these places and the following:

(1) A place of repair;

(2) A target range;

(3) A licensed dealer's place of business;

(4) An organized, scheduled firearms show or exhibit;

(5) A place of formal hunter or firearm use training or instruction; or

(6) A police station.

"Enclosed container" means a rigidly constructed receptacle, or a commercially manufactured gun case, or the equivalent thereof that completely encloses the firearm.

(b) Any person violating this section by carrying or possessing an unloaded firearm other than a pistol or revolver shall be guilty of a class C felony.

Addendum 7 - Page 1

**[§ 134-25]. Place to keep pistol or revolver; penalty**

(a) Except as provided in sections 134-5 and 134-9, all firearms shall be confined to the possessor's place of business, residence, or sojourn; provided that it shall be lawful to carry unloaded firearms in an enclosed container from the place of purchase to the purchaser's place of business, residence, or sojourn, or between these places upon change of place of business, residence, or sojourn, or between these places and the following:

(1) A place of repair;

(2) A target range;

(3) A licensed dealer's place of business;

(4) An organized, scheduled firearms show or exhibit;

(5) A place of formal hunter or firearm use training or instruction; or

(6) A police station.

"Enclosed container" means a rigidly constructed receptacle, or a commercially manufactured gun case, or the equivalent thereof that completely encloses the firearm.

(b) Any person violating this section by carrying or possessing a loaded or unloaded pistol or revolver shall be guilty of a class B felony.

**[§ 134-26]. Carrying or possessing a loaded firearm on a public highway; penalty**

(a) It shall be unlawful for any person on any public highway to carry on the person, or to have in the person's possession, or to carry in a vehicle any firearm loaded with ammunition; provided that this section shall not apply to any person who has in the person's possession or carries a pistol or revolver in accordance with a license issued as provided in <u>section 134-9</u>.

(b) Any vehicle used in the commission of an offense under this section shall be forfeited to the State, subject to the notice and hearing requirements of chapter 712A.

(c) Any person violating this section shall be guilty of a class B felony.

**[§ 134-27]. Place to keep ammunition; penalty**

(a) Except as provided in sections 134-5 and 134-9, all ammunition shall be confined to the possessor's place of business, residence, or sojourn; provided that it shall be lawful to carry ammunition in an enclosed container from the place of purchase to the purchaser's place of business, residence, or sojourn, or between these places upon change of place of business, residence, or sojourn, or between these places and the following:

(1) A place of repair;

(2) A target range;

(3) A licensed dealer's place of business;

(4) An organized, scheduled firearms show or exhibit;

(5) A place of formal hunter or firearm use training or instruction; or

(6) A police station.

"Enclosed container" means a rigidly constructed receptacle, or a commercially manufactured gun case, or the equivalent thereof that completely encloses the ammunition.

(b) Any person violating this section shall be guilty of a misdemeanor.

**§ 134-52. Switchblade knives; prohibitions; penalty**

(a) Whoever knowingly manufactures, sells, transfers, possesses, or transports in the State any switchblade knife, being any knife having a blade which opens automatically (1) by hand pressure applied to a button or other device in the handle of the knife, or (2) by operation of inertia, gravity, or both, shall be guilty of a misdemeanor.

(b) Whoever knowingly possesses or intentionally uses or threatens to use a switchblade knife while engaged in the commission of a crime shall be guilty of a class C felony.

**[§ 134-53]. Butterfly knives; prohibitions; penalty**

(a) Whoever knowingly manufactures, sells, transfers, possesses, or transports in the State any butterfly knife, being a knife having a blade encased in a split handle that manually unfolds with hand or wrist action with the assistance of inertia, gravity or both, shall be guilty of a misdemeanor.

(b) Whoever knowingly possesses or intentionally uses or threatens to use a butterfly knife while engaged in the commission of a crime shall be guilty of a class C felony.

# LAWS

OF THE

# TERRITORY OF HAWAII

PASSED BY THE

# FOURTEENTH LEGISLATURE

———

# REGULAR SESSION
# 1927

———

COMMENCED ON WEDNESDAY, THE SIXTEENTH
DAY OF FEBRUARY, AND ENDED ON TUES-
DAY, THE THIRD DAY OF MAY.

———

PUBLISHED BY AUTHORITY

———

HONOLULU, HAWAII
ADVERTISER PUBLISHING CO., LTD.
1927.

B

## ACT 206

[H. B. No. 322]

AN ACT Regulating the Sale, Transfer and Possession of Certain Firearms and Ammunitions, and Amending Sections 2136, 2137, 2138, 2139, 2140, 2141, 2142, 2143, 2146 and 2147 of the Revised Laws of Hawaii 1925.

*Be it Enacted by the Legislature of the Territory of Hawaii:*

SECTION 5. Carrying or keeping small arms by unlicensed persons. Except as otherwise provided in Sections 7 and 11 hereof in respect of certain licensees, no person shall carry, keep, possess or have under his control a pistol or revolver; provided, however, that any person who shall have lawfully acquired the ownership or possession of a pistol or revolver may, for purposes of protection and with or without a license, keep the same in the dwelling house or business office personally occupied by him, and, in case of an unlawful attack upon any person or property in said house or office, said pistol or revolver may be carried in any lawful, hot pursuit of the assailant.

SECTION 6. Exceptions. The provisions of the preceding section shall not apply to marshals, sheriffs, prison or jail wardens or their deputies, policemen, mail carriers, or other duly appointed law enforcement officers, or to members of the Army, Navy, or Marine Corps of the United States, or of the National Guard, when on duty, or of organizations by law authorized to purchase or receive such weapons from the United States or this territory, or to officers or employees of the United States authorized by law to carry a concealed pistol or revolver, or to duly authorized military organizations when on duty, or to the members thereof when at or going to or from their customary places of assembly, or to the regular and ordinary transportation of pistols or revolvers as merchandise, or to any person while carrying a pistol or revolver unloaded in a wrapper from the place of purchase to his home or place of business, or to a place of repair or back to his home or place of business or in moving goods from one place of abode or business to another.

SECTION 7.  Issuse of licenses to carry.  The judge ot a court of record or the sheriff of a county, or city and county, shall, upon the application of any person having a bona fide residence or place of business within the jurisdiction of said licensing authority, or of any person having a bona fide residence or place of business within the United States and a license to carry a pistol or revolver concealed upon his person or to carry one elsewhere than in his home or office, said license being issued by the authorities of any state or political subdivision of the United States, issue a license to such person to carry a pistol or revolver within this territory elsewhere than in his home or office, for not more than one year from date of issue, if it appears that the applicant has good reason to fear an injury to his person or property, or has any other proper reason for carrying a pistol or revolver, and that he is a suitable person to be so licensed.  The license shall be in triplicate, in form to be prescribed by the treasurer of the territory, and shall bear the name, address, description and signature of the licensee and the reason given for desiring a license.  The original thereof shall be delivered to the licensee; the duplicate shall, within seven days, be sent by registered mail, to the treasurer of the territory and the triplicate shall be preserved for six years by the authority issuing said license.

# LAWS

OF THE

# TERRITORY OF HAWAII

PASSED BY THE

# SEVENTEENTH LEGISLATURE

———

## SPECIAL SESSION
## 1933

———

Commenced on Monday, the Thirtieth Day of October, 1933, and
Ended on Thursday, the Eleventh Day of January, 1934.

———

PUBLISHED BY AUTHORITY

———

HONOLULU, HAWAII
HONOLULU STAR-BULLETIN, LTD.
1934

ACT 26

[H. B. No. 70]

AN ACT Regulating the Sale, Transfer and Possession of Firearms and Ammunition and Repealing Sections 2136, 2137, 2138, 2139, 2140, 2141, 2142, 2143, 2144, 2145, 2146 and 2147, Revised Laws of Hawaii 1925, Act 206, Session Laws of Hawaii 1927, and Act 120, Session Laws of Hawaii 1933.

Be it Enacted by the Legislature of the Territory of Hawaii:

Section 6. The possession of all firearms and ammunition shall be confined to the possessor's place of business, residence, or sojourn, or to carriage as merchandise in a wrapper from the place of purchase to the purchaser's home, place of business or place of sojourn, or between these places and a place of repair, or upon change of place of business, abode, or sojourn, except as provided in Sections 5 and 8; provided, however, that no person who has been convicted in this Territory or elsewhere, of having committed or attempted a crime of violence, shall own or have in his possession or under his control a pistol or revolver or ammunition therefor. Any person violating any provision of this section shall be punished by a fine of not more than one thousand dollars ($1,000.00) or by imprisonment for not more than one year, or by both.

Section 8. In an exceptional case, when the applicant shows good reason to fear injury to his person or property, the chief of police of the city and county of Honolulu or the sheriff of a county, other than the city and county of Honolulu, may grant a license to a citizen of the United States or a duly accredited official representative of a foreign nation, of the age of twenty years or more, to carry concealed on his person within the city and county or the county in which such license is granted, a pistol or revolver and ammunition therefor. Unless renewed, such license shall automatically become void at the expiration of one year from date of issue. No such license shall issue unless it appears that the applicant is a suitable person to be so licensed, and in no event to a person who has been convicted of a felony, or adjudged insane, in the Territory or elsewhere. All licenses to carry concealed weapons heretofore issued shall expire at midnight on the effective date of this Act. No person shall carry concealed on his person a pistol or revolver or ammunition therefor without being licensed so to do under the provisions of this section.

For each such license there shall be charged a fee of ten dollars ($10.00), which shall be covered into the treasury of the city and county or the county in which such license is granted.

Any person violating this section shall be punished by a fine of not more than one thousand dollars ($1,000.00) or by imprisonment for not more than one year, or by both.

# SESSION LAWS

OF

# HAWAII

PASSED BY THE

## FIRST STATE LEGISLATURE

---

## REGULAR SESSION
## 1961

Convened on Wednesday, February 15
and
Adjourned Sine Die on Saturday, June 3

Published by Authority of the
Revisor of Statutes
Honolulu, Hawaii

**ACT 163**

An Act Relating to Permits to Carry Firearms.

*Be it Enacted by the Legislature of the State of Hawaii:*

SECTION 1. Section 157-9, Revised Laws of Hawaii 1955, is hereby amended to read as follows:

"Section 157-9. Permits to carry; penalty. In exceptional case, when the applicant shows good reason to fear injury to his person or property, the respective chiefs of police may grant a license to a citizen of the United States or a duly accredited official representative of a foreign nation, of the age of twenty years or more, to carry concealed on his person within the county within which such license is granted, a pistol or revolver and ammunition therefor; or where the urgency of the need has been sufficiently indicated to the respective chiefs of police, they may grant to an applicant of good moral character who is a citizen of the United States of the age of twenty years or more, who is engaged in the protection of life and property and not prohibited under the provisions of section 157-7 from the ownership or possession of a firearm, a license to carry unconcealed on his person within the county within which such license is granted, a pistol or revolver. Unless renewed, such license shall automatically become void at the expiration of one year from date of issue. No such license shall be issued unless it appears that the applicant is a suitable person to be so licensed, and in no event to a person who is prohibited under the provisions of section 157-7 from the ownership or possession of a firearm, or a person adjudged insane or appearing to be mentally deranged. No person shall carry concealed or unconcealed on his person a pistol or revolver without being licensed so to do under the provisions of this section or in compliance with the provisions of section 157-6, as amended.

For each such license there shall be charged a fee of $10, which shall be covered into the treasury of the county in which such license is granted.

Any person violating this section shall be fined not more than $1,000 or imprisoned not more than one year, or both."

SECTION 2. This Act shall take effect upon its approval.

(Approved July 8, 1961.) S.B. 199.

# JOURNAL

## of the

## SENATE OF THE FIRST LEGISLATURE

## of the

## STATE OF HAWAII

# General Session Of 1961

Convened Wednesday, February 15, 1961

Adjourned Saturday, June 3, 1961

874          SENATE JOURNAL—STANDING COMMITTEE REPORTS

Your Committee has amended the bill by changing the title to delete superfluous words and by simplifying the language in Section 1.

Your Committee on Ways and Means is in accord with the intent and purpose of the bill, as amended, and recommends that Senate Bill No. 943, S. D. 1, attached hereto, pass second reading.

Signed by all members of the Committee.

SCRep. 557 Hawaii, Maui and Kauai Select Committees on S. B. No. 1057.

Your Select Committees of Hawaii, Maui and Kauai Senators, to which was

referred **Senate Bill No. 1057**, entitled:

"RELATING TO THE SALARIES OF ELECTED AND CERTAIN OTHER OFFICERS OF THE COUNTIES OF HAWAII, MAUI AND KAUAI",

begs leave to report as follows:

Your Committees have given due consideration to the subject matter of the bill, and are in accord with its purpose. Accordingly, your Select Committees recommend the passage of **Senate Bill No. 1057** on Second Reading, and its referral to the Committee on Ways and Means for further consideration.

Signed by all members of the Committees excepting Senator Doi.

→ SCRep. 558 Judiciary on **S. B. No. 199**.

Your Committee on Judiciary to which was referred Senate Bill No. 199 entitled:

"AN ACT TO PERMIT THE CARRYING OF UNCONCEALED FIREARMS ON ONE'S PERSON",

begs leave to report as follows:

The purpose of this bill is to amend the provisions of Section 157-9, Revised Laws of Hawaii 1955, relating to permits to carry firearms. The proposed amendment is designed to extend the permit provisions to those employed as guards or watchman and/or to persons engaged in the protection of life and property and to further authorize such licensees to carry the described firearms unconcealed on their persons.

Your Committee has amended the title of said bill to read "AN ACT RELATING TO PERMITS TO CARRY FIREARMS" and has further amended Section 1 thereof to read as follows:

"Sec. 157-9. Permits to carry; penalty. In an exceptional case, when the applicant shows good reason to fear injury to his person or property, the respective chiefs of police may grant a license to a citizen of the United States or a duly accredited official representative of a foreign nation, of the age of twenty years or more, to carry concealed on his person within the county within which such license is granted, a pistol or revolver and ammunition therefor; or where

the urgency of the need has been sufficiently indicated to the respective chiefs of police, they may grant to an applicant of good moral character who is a citizen of the United States of the age of twenty years or more, who is engaged in the protection of life and property and not prohibited under the provisions of section 157-7 from the ownership or possession of a firearm, a license to carry unconcealed on his person within the county within which such license is granted, a pistol or revolver and ammunition therefor. Unless renewed, such license shall automatically become void at the expiration of one year from date of issue. No such license shall be issued unless it appear that the applicant is a suitable person to be so licensed, and in no event to a person who is prohibited under the provisions of section 157-7 from the ownership or possession of a firearm, or a person adjudged insane or appearing to be mentally deranged. No person shall carry concealed or unconcealed on his person a pistol or revolver without being licensed so to do under the provisions of this section or in compliance with the provisions of section 157-6, as amended.

For each such license there shall be charged a fee of $10, which shall be covered into the treasury of the county in which such license is granted.

Any person violating this section shall be fined not more than $1,000 or imprisoned not more than one year, or both."

Your Committee is in accord with the intent and purpose of this bill and recommends that Senate Bill No. 199, as amended in S. D. 1, hereto attached, pass second reading.

Signed by all members of the Committee excepting Senator Doi.

SCRep. 559 Judiciary on **S. B. No. 207**.

Your Committee on Judiciary to which was referred **Senate Bill No. 207** entitled:

"AN ACT TO AMEND SECTION 159-30, REVISED LAWS OF HAWAII 1955, RELATING TO PROFESSIONAL ENTERTAINMENT WITHIN LICENSED PREMISES",

begs leave to report as follows:

The purpose of this bill is to authorize the liquor commissions to establish rules and regulations governing professional entertainment in business premises operating under cabaret licenses. The existing statute specifically requires that cabaret licensees offer professional entertainment. Along with this requirement, the commissions have no present authority to regulate the nature of the entertainment so required. The proposed bill is intended to correct this enforcement deficiency.

Your Committee has amended the title of said bill by deleting the words "AS AMENDED," appearing therein and by further deleting the words "as amended," and "further" appearing in line 2 of section 1 thereof. Your Committee has further deleted the words "UNDER CON-

# JOURNAL

### of the

## SENATE OF THE

## FIFTEENTH LEGISLATURE

### of the

## STATE OF HAWAII

———————

# Regular Session of 1990

## Convened Wednesday, January 17, 1990
## Adjourned Friday, May 4, 1990

1242                        S E N A T E   J O U R N A L  -  STANDING COMMITTEE REPORTS

although the language indicates that a natural parent may request access to adoption records, the procedure set
out only covers situations where an adopted individual or adoptive parents request access.

(9)   A provision has been added for adoptions occurring prior to January 1, 1991, to permit a natural parent or an
adoptee to file an affidavit consenting to the inspection of records by the other.

(10)   A new provision has been added to allow a natural parent to obtain a copy of the original birth certificate.

(11)   Technical, nonsubstantive amendments were made for purposes of clarity and style.

Your Committee recognizes that there are compelling arguments for fully opening up adoption records; and that this bill
as amended by your Committee, while it is a major step, may be just the first step to more liberal access to adoption
records in the future.

Your Committee on Judiciary is in accord with the intent and purpose of H.B. No. 2089, H.D. 1, as amended herein,
and recommends that it pass Second Reading in the form attached hereto as H.B. No. 2089, H.D. 1, S.D. 1, and be
placed on the calendar for Third Reading.

Signed by all members of the Committee.

**SCRep. 3057      Judiciary on H.B. No. 2184**

The purpose of this bill is to outlaw gambling aboard ships whether it takes place on ships operated solely for that
purpose or on ones which offer gambling incidental to other legitimate activities.

Your Committee received testimony in support of the bill from the Attorney General and the Department of
Transportation.  The Attorney General noted that the State has long taken a stand against gambling because of its
traditional association with organized crime and because it tends to diminish the State's reputation as the premier tourist
destination, especially for families, with a corresponding economic impact.  He indicated that this bill would prevent a
recent proposal to begin inter-island operation of one of these ships from becoming a reality.

The Department of Transportation expressed its support for the bill but indicated concern that the language of the bill
was not sufficiently specific to exclude ships travelling to and from foreign ports and the continental United States from
being placed within its ambit.  These ships close down and lock their gambling equipment when they sail in State waters
and, therefore, do not present the cause for concern represented by gambling ships operated locally.  Accordingly, your
Committee has amended the bill to make it clear that these ships are not in violation of the proposed law if they conduct
gambling activity when travelling to or from foreign ports or the continental United States.

Your Committee has also amended the bill to make it clear that operators of legitimate tour ships, on which gambling is
being conducted without their consent or knowledge, will not be subjected to criminal liability for gambling conducted by
employees or passengers.  Your Committee further amends the bill so that persons transporting passengers to and from
ships on which gambling is taking place would not be covered under this new section.  The final amendment made by
your Committee deletes the provision which subjects persons soliciting, enticing, inducing, persuading or procuring
persons from visiting gambling ships to criminal liability.  Your Committee is of the opinion that these provisions raise
questions of equal protection, as persons are permitted to make identical solicitations and promotions for gambling
operations conducted outside of the State.

Your Committee on Judiciary is in accord with the intent and purpose of H.B. No. 2184, H.D. 1, as amended, and
recommends that it pass Second Reading in the form attached hereto as H.B. No. 2184, H.D. 1, S.D. 1 and be placed on
the calendar for Third Reading.

Signed by all members of the Committee.

**SCRep. 3058      Judiciary on H.B. No. 2191**

The purpose of this bill is to prohibit the possession of firearms, ammunition, and certain weapons in, on or within 750
feet of the real property comprising a public or private elementary or secondary school.

Testimony  in support of this bill was offered by the Attorney General, the Department of Education and the Hawaii
State Teachers Association.  They all testified in favor of the bill, which was originally drafted to create a "weapon free
zone" within 750 feet of the real property comprising a public or private school.  The Attorney General recounted a series
of recent events in which a teacher was shot while conducting class, students were shot in drive-by shootings, and a
student was methodically stalked, shot and killed in a high school parking lot.  This statement was echoed by the
Department of Education which reported that in the last school year, seven firearms and 61 other weapons were taken
from public school students.

Testimony in opposition to the bill was offered by the Public Defender and a number of firearm enthusiasts.  The Public
Defender submitted that a mandatory sentence of 20 years was too severe, particularly when compared to other serious
offenses.  The firearm enthusiasts were concerned by the fact that numerous legitimate firearm activities take place on
school campuses, such as ROTC training, hunter safety courses and rifle matches.

While your Committee strongly agrees that our educational institutions should be places of sanctuary, we believe just as
strongly that our entire community should be a safe place to live and learn and that everyone deserves to feel free from
the threat of harm wherever they go.  To achieve this goal, your Committee has undertaken substantial amendments to the
bill.  First, weapons offenses have been reclassified to reflect their severity.  For example, a new subsection has been
added to section 134-6, Hawaii Revised Statutes, which makes it a class A felony to possess, use or threaten to use a

SENATE JOURNAL - STANDING COMMITTEE REPORTS

firearm in the commission of a felony. A person who violates the requirement that firearms be confined to the person's place of business, residence or sojourn or that they be transported between these and certain other destinations in a specified manner or that handguns not be carried on the person without a permit would be guilty of a class B instead of a class C felony. Those who violate the requirement that firearms other than handguns not be carried on the person would be guilty of a class C felony instead of a misdemeanor. Consistent therewith, a person who uses a switchblade or other deadly weapon in the commission of a crime would be guilty of a class C felony.

Your Committee has addressed the very real concern within the community regarding the use by criminals of semi-automatic "assault" weapons. To that end, your Committee has amended the bill by adding a new subsection to Section 706-660.1, Hawaii Revised Statutes, to provide for severe mandatory minimum sentences for the use of these weapons in the commission of a felony. Under current law a first "firearm felony" offender may be sentenced to a minimum term of up to 15 years while a second "firearm felony" offender must be sentenced to a mandatory minimum term of up to 20 years. This bill would require that a first semi-automatic or automatic "firearm felony" offender be sentenced to a mandatory minimum term of up to 20 years. Your Committee believes that these harsh sentences are necessary to keep these weapons out of the hands of criminals.

Your Committee has also amended the definition of "automatic firearm" to include the parts that are currently available to convert a firearm to automatic operation.

Your Committee is in accord with the intent and purpose of H.B. No. 2191, H.D. 1, as amended herein, and recommends that it pass Second Reading in the form attached hereto as H.B. No. 2191 H.D. 1, S.D. 1, and be placed on the calendar for Third Reading.

Signed by all members of the Committee.

SCRep. 3059    Judiciary on H.B. No. 2398

The purpose of this bill is to ensure that mental health treatment is offered to convicted sex offenders and to create new offenses relating to "peeping tom" behavior and sexually harassing telephone calls.

Your Committee received testimony from the Attorney General, the Honolulu Prosecutor, the Honolulu Police Department, the Public Defender, and a number of private citizens. The Attorney General expressed strong support for the bill, particularly the provision that would require that treatment be offered to sex offenders. The Honolulu Prosecutor also expressed strong support for the treatment provision, noting that the compulsive, repetitive behavior of sex offenders can be changed only by specialized therapy.

Support was also expressed for the provision of the bill that would address the "peeping tom" type of offenses which are not currently covered by the Penal Code.

Your Committee found the testimony provided by the private citizens regarding these offenses to be particularly compelling. One person recounted a series of incidents over a period of four years during which a male intruder stole undergarments from a clothesline, began knocking at the door during the early morning hours and hounded her to the point of a nervous breakdown. Ultimately, she was forced to move.

Another person testified about similar conduct occurring over a two year period. An unknown man stole lingerie, prowled outside the bedroom window at night and was caught twice looking in. This person was so disturbed by this conduct that she spoke to other women and found that many in her neighborhood had experienced repeated visits from men who masturbate outside and into their windows. She even interviewed one offender by arrangement with his therapist. The man reported that he had a twenty year career as a peeping tom and public masturbator and that, while he had been arrested seven or eight times, he had spent only three days in jail and that was imposed on the mainland. He also stated that he was not required to undergo treatment. Another person testified about a peeping tom lurking in her yard who was later identified as a rapist being sought by the police.

These people also expressed frustration about the ability of the courts to deal with these offenders. These offenders are often not recognized or treated as sex offenders. As a result, they are routinely processed along with the rest of the large case load handled by the District Court and frequently receive only a fine with little, if any, counseling. As a further result, the opportunity to examine the offender and provide treatment that will prevent escalation in the severity of these offenses is often lost.

Your Committee finds that the need for early intervention and treatment of sexual offenders is imperative. While "peeping toms" and "exhibitionists" may seem harmless, these offenses are typically perceived by the victims as potential burglaries or sexual assaults. The criminal records of these individuals justify this concern because the rate of recidivism amongst this class of offenders is extremely high and many go on to commit more serious, violent crimes. Treatment must be afforded to these offenders and they must be monitored closely. At the same time, however, the seriousness of these offenses must be recognized and appropriate sanctions, in addition to treatment, must be imposed.

Accordingly, your Committee has amended the bill to require that all convicted sex offenders undergo presentence mental and medical examinations. If the resulting report indicates that it is appropriate, the Court would be required to offer specialized mental health treatment to these offenders while they are under sentence of the court. This would mandate that treatment be offered to offenders placed on probation whereas currently such treatment is offered only discretionarily under Section 706-624(2)(k), Hawaii Revised Statutes. Treatment would also be offered to incarcerated offenders and the Hawaii Paroling Authority would be required to consider the offender's willingness to undergo treatment and their progress, if any, when considering whether to grant parole. The authority would also be required to condition parole on continued treatment if recommended by the offender's therapist.

SEP 2 1 2006

# SESSION LAWS

OF

## HAWAII

PASSED BY THE

### TWENTY-THIRD STATE LEGISLATURE

### STATE OF HAWAII

---

## REGULAR SESSION
## 2006

Convened on Wednesday, January 18, 2006 and
Adjourned sine die on Thursday, May 4, 2006

---

Published under Authority of
Section 23G-13, Hawaii Revised Statutes
by the
Revisor of Statutes
State of Hawaii
Honolulu, Hawaii

ACT 66

## ACT 66                                        H.B. NO. 877

A Bill for an Act Relating to Crime.

*Be It Enacted by the Legislature of the State of Hawaii:*

SECTION 1. Chapter 134, Hawaii Revised Statutes, is amended by adding seven new sections to be appropriately designated and to read as follows:

\* \* \*

**§134-C Place to keep loaded firearms other than pistols and revolvers; penalty.** (a) Except as provided in section 134-5, all firearms shall be confined to the possessor's place of business, residence, or sojourn; provided that it shall be lawful to carry unloaded firearms in an enclosed container from the place of purchase to the purchaser's place of business, residence, or sojourn, or between these places upon change of place of business, residence, or sojourn, or between these places and the following:

(1) A place of repair;
(2) A target range;
(3) A licensed dealer's place of business;
(4) An organized, scheduled firearms show or exhibit;
(5) A place of formal hunter or firearm use training or instruction; or
(6) A police station.

''Enclosed container'' means a rigidly constructed receptacle, or a commercially manufactured gun case, or the equivalent thereof that completely encloses the firearm.

(b) Any person violating this section by carrying or possessing a loaded firearm other than a pistol or revolver shall be guilty of a class B felony.

**§134-D Place to keep unloaded firearms other than pistols and revolvers; penalty.** (a) Except as provided in section 134-5, all firearms shall be confined to the possessor's place of business, residence, or sojourn; provided that it shall be lawful to carry unloaded firearms in an enclosed container from the place of purchase to the purchaser's place of business, residence, or sojourn, or between these places upon change of place of business, residence, or sojourn, or between these places and the following:

(1) A place of repair;
(2) A target range;
(3) A licensed dealer's place of business;
(4) An organized, scheduled firearms show or exhibit;
(5) A place of formal hunter or firearm use training or instruction; or
(6) A police station.

''Enclosed container'' means a rigidly constructed receptacle, or a commercially manufactured gun case, or the equivalent thereof that completely encloses the firearm.

(b) Any person violating this section by carrying or possessing an unloaded firearm other than a pistol or revolver shall be guilty of a class C felony.

**§134-E Place to keep pistol or revolver; penalty.** (a) Except as provided in sections 134-5 and 134-9, all firearms shall be confined to the possessor's place of business, residence, or sojourn; provided that it shall be lawful to carry unloaded firearms in an enclosed container from the place of purchase to the purchaser's place of business, residence, or sojourn, or between these places upon change of place of business, residence, or sojourn, or between these places and the following:

    (1)  A place of repair;

    (2)  A target range;

    (3)  A licensed dealer's place of business;

    (4)  An organized, scheduled firearms show or exhibit;

    (5)  A place of formal hunter or firearm use training or instruction; or

    (6)  A police station.

"Enclosed container" means a rigidly constructed receptacle, or a commercially manufactured gun case, or the equivalent thereof that completely encloses the firearm.

(b) Any person violating this section by carrying or possessing a loaded or unloaded pistol or revolver shall be guilty of a class B felony.

**§134-F Carrying or possessing a loaded firearm on a public highway; penalty.** (a) It shall be unlawful for any person on any public highway to carry on the person, or to have in the person's possession, or to carry in a vehicle any firearm loaded with ammunition; provided that this section shall not apply to any person who has in the person's possession or carries a pistol or revolver in accordance with a license issued as provided in section 134-9.

(b) Any vehicle used in the commission of an offense under this section shall be forfeited to the State, subject to the notice and hearing requirements of chapter 712A.

(c) Any person violating this section shall be guilty of a class B felony.

**§134-G Place to keep ammunition; penalty.** (a) Except as provided in sections 134-5 and 134-9, all ammunition shall be confined to the possessor's place of business, residence, or sojourn; provided that it shall be lawful to carry ammunition in an enclosed container from the place of purchase to the purchaser's place of business, residence, or sojourn, or between these places upon change of place of business, residence, or sojourn, or between these places and the following:

    (1)  A place of repair;

    (2)  A target range;

    (3)  A licensed dealer's place of business;

    (4)  An organized, scheduled firearms show or exhibit;

    (5)  A place of formal hunter or firearm use training or instruction; or

    (6)  A police station.

"Enclosed container" means a rigidly constructed receptacle, or a commercially manufactured gun case, or the equivalent thereof that completely encloses the ammunition.

(b) Any person violating this section shall be guilty of a misdemeanor.''

<u>CERTIFICATE OF SERVICE</u>

I certify that on May 31, 2013, I electronically filed the Amicus Curiae Brief

of the State of Hawaii in Support of County of Hawaii Defendants-Appellees, in

Support of Affirmance with the Clerk of the Court for the United States Court of

Appeals for the Ninth Circuit by using the appellate CM/ECF system.

DATED: Honolulu, Hawaii, May 31, 2013.

/s/ Girard D. Lau
GIRARD D. LAU
Solicitor General of Hawaii
KIMBERLY TSUMOTO GUIDRY
First Deputy Solicitor General
ROBERT T. NAKATSUJI
Deputy Solicitor General

Attorneys for Amicus
Curiae State of Hawai