**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MICHAEL NOZZI, an individual;
NIDIA PELAEZ, an individual; LOS
ANGELES COALITION TO END
HUNGER AND HOMELESSNESS, a
non-profit organization, on behalf of
themselves and similarly situated
persons,

*Plaintiffs-Appellants*,

v.

HOUSING AUTHORITY OF THE CITY
OF LOS ANGELES; RUDOLPH
MONTIEL, in his official capacity,
*Defendants-Appellees*.

No. 13-56223

D.C. No.
2:07-cv-00380-
GW-FFM

OPINION

Appeal from the United States District Court
for the Central District of California
George H. Wu, District Judge, Presiding

Argued and Submitted
July 10, 2015—Pasadena, California

Filed November 30, 2015

Before: Stephen Reinhardt and Richard R. Clifton, Circuit
Judges and Miranda M. Du,[*] District Judge.

Opinion by Judge Reinhardt

---

## SUMMARY[**]

---

### Civil Rights

The panel reversed the district court's summary judgment
in favor of defendants, directed that summary judgment be
entered in favor of plaintiffs, and remanded for further
proceedings in a putative class action in which plaintiffs
alleged that defendants, the local administrators of the
Section 8 Housing Choice Voucher Program, reduced the
amount of Section 8 beneficiaries' subsidies without
providing adequate notice, in violation of federal and state
law.

The panel first noted that this Court had previously held
that plaintiffs have a property interest in Section 8 benefits to
which the procedural protections of the Due Process Clause
apply. *Nozzi v. Housing Authority of the City of Los Angeles*,
425 F. App'x 539 (9th Cir. 2011). The panel held that the
Housing Authority failed to provide meaningful information
to Section 8 beneficiaries about a change to the program's

---

[*] The Honorable Miranda M. Du, District Judge for the U.S. District
Court for the District of Nevada, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

subsidy payment standard and the effect of that change upon the beneficiaries and their property interests. The panel held that this failure violated both the requirements of the Voucher Program regulations and the requirements of procedural due process. It also resulted in a violation of two state statutes, California Government Code §§ 815.6 & 815.2, which require public entities to take reasonable efforts to comply with the mandatory duties established by federal regulations. The panel reversed and remanded with instructions for the district court to enter summary judgment in favor of the plaintiffs on the merits of the federal and state law claims.

The panel ordered that on remand, the case be reassigned to a different district judge—a judge other than the two identified by the current district judge who himself had declined to hear the case further. The panel stated that further factual development may be needed to determine the size and validity of plaintiffs' class and to determine the appropriate remedy.

## COUNSEL

Barrett S. Litt (argued), Kaye, McLane, Bednarski & Litt, LLP, Pasadena, California; Patrick Dunlevy, Lisa R. Jaskol, Stephanie Carroll, Public Counsel, Los Angeles, California, for Plaintiffs-Appellees.

Roy G. Weatherup (argued) and Brant H. Dveirin, Lewis Brisbois Bisgaard & Smith LLP, Los Angeles, California, for Defendants-Appellees.

**OPINION**

REINHARDT, Circuit Judge:

The Section 8 Housing Choice Voucher Program provides rental assistance to the most vulnerable members of our society. For many, especially those in areas with a high cost of living, the continuous receipt of these benefits is the only means through which Section 8 beneficiaries and their families can obtain safe, affordable housing. For those on a fixed income or those living paycheck to paycheck, any unexpected decrease in the subsidy can result in homelessness. For this reason, the program contains procedural protections designed to ensure that beneficiaries have at least a full year to plan for certain changes that may decrease the beneficiary's subsidy and increase the rent that they will have to pay.

Plaintiffs are the putative class representatives of a group of tenants who receive rent subsidies through the Section 8 Housing Choice Voucher Program. They assert that the Defendants, the local administrators of the Voucher Program, reduced the amount of Section 8 beneficiaries' subsidies without providing adequate notice, in violation of federal and state law. We agree. Accordingly, we reverse the grant of summary judgment in favor of the defendants, direct that summary judgment be entered in favor of the plaintiffs, and remand for further proceedings consistent with this opinion.

## I.  STATUTORY AND REGULATORY BACKGROUND

## A.  Overview of the Section 8 Housing Choice Voucher Program

In 1974, Congress created the Section 8 housing program in order to "aid[] low-income families in obtaining a decent place to live" and "promot[e] economically mixed housing." Housing and Community Development Act of 1974, Pub. L. 93-383 § 201(a), 88 Stat. 633, 622–66 (1974) (codified as amended at 42 U.S.C. § 1437f).  For over four decades, the program has provided rental assistance to low-income, elderly, and disabled families.  *See generally Park Village Apartment Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1152 (9th Cir. 2011).

The majority of federal housing assistance takes place through the Housing Choice Voucher Program, which subsidizes the cost of renting privately-owned housing units. 42 U.S.C. § 1437f(o).  The Voucher Program is funded and regulated by the federal Department of Housing and Urban Development, and it is administered at the local level through "public housing agencies."  24 C.F.R. § 982.1(a).

The public housing agencies determine whether individuals are eligible to participate in the program. 24 C.F.R. § 982.201.  When an individual is approved, the public housing agency gives that person a voucher which entitles him to search for qualifying privately-owned housing. 24 C.F.R. § 982.302.  When a voucher-possessing individual finds a qualifying unit, the unit owner and public housing agency will negotiate and enter into a housing assistance payment contract, which *inter alia* specifies the maximum monthly rent that the unit owner may charge.  42 U.S.C.

§ 1437f(c).  After that contract has been formed, the public housing agency will make subsidy payments to the unit owner on behalf of the tenant.[1]

An extensive set of statutory provisions and regulations governs the calculation of the subsidy that must be paid on behalf of each tenant.  *See* 42 U.S.C. § 1437f(o); 24 C.F.R. § 982.501 *et seq.*  To begin with, the Department of Housing and Urban Development must set the fair market rent for established geographic areas across the United States. 24 C.F.R. § 982.503(a)(1).  The public housing agency must use this fair market rent to create a local voucher "payment standard" for each of the areas in its jurisdiction.  24 C.F.R. § 982.503(b)(1)(I).  A payment standard is the maximum subsidy payment that the housing agency will provide for each type of apartment in the area.  *Id.*  It must generally be set between 90 percent and 110 percent of the fair market rent for the area.  24 C.F.R. § 982.503(b)(1)(i).[2]

All tenants are responsible for contributing 30% of their monthly adjusted income or 10% of their gross monthly

---

[1] As the "beneficiaries" at issue in this opinion are those Section 8 recipients who have already secured and are currently leasing apartments that are paid for, in part, by Section 8 subsidies, the terms "beneficiary" and "tenant" are used interchangeably throughout the opinion.

[2] The public housing agency must request approval to establish a payment standard outside of this range.  24 C.F.R. § 982.503(b)(2).  The Department of Housing and Urban Development may approve such a variance if the public housing agency meets one of the prescribed exceptions.  *See* 24 C.F.R. § 982.503(c)–(d).

income, whichever is greater. 42 U.S.C. § 1437f(c)(2)(A).[3] Tenants whose rental units cost more than the payment standard have a higher expected contribution. Such tenants must *also* pay any amount by which their rent exceeds the established payment standard. 42 U.S.C. § 1437f(o)(2)(B).[4] In either case, the subsidy covers the balance of the rent.

## B.  Procedures for Decreasing the Payment Standard

Practically, the formula for calculating a tenant's expected rent contribution means that a decision by the public housing agency to increase the payment standard will generally yield larger subsidies. By contrast, a decrease in the payment standard will generally decrease subsidies and may increase the rental contribution of a substantial number of tenants.[5]

---

[3] This calculation must account for any welfare assistance tenants receive that is specifically designated for housing costs. 42 U.S.C. § 1437f(o)(2)(A)(iii).

[4] An example helps to illustrate this formula. Abel and Beth both must contribute 30% of their monthly adjusted income, for a total of $100 each. The payment standard for one-bedroom apartments in their area is $400. Abel rents a $400 apartment. He must pay $100 towards his rent and will receive the remaining $300 as a rent subsidy. Beth rents a $500 apartment. She must pay the $100 from her monthly adjusted income, but must *also* pay the amount by which her $500 apartment exceeds the $400 payment standard–another $100, for a total of $200.

[5] In the hypothetical above, if the public housing agency lowered the payment standard for a one-bedroom apartment in the area from $400 to $300, Abel, who is renting a $400 apartment, would now need to pay an additional $100 for a total of $200. Beth, who is renting a $500 apartment, would need to pay an additional $200, for a total of $300. A decrease in the payment standard would not cause an increase in rent when: (1) the total rent for the unit is less than the lower payment

To avoid any hardship caused by this change, the Department of Housing and Urban Development's regulations are designed to ensure that beneficiaries have a one-year period of stable benefits in which to plan for changes to the payment standard that may adversely affect their subsidy amount and rent contribution. Each year, the public housing agency conducts annual examinations of each beneficiary, usually on the anniversary of the beneficiary's entry into the Section 8 program, to verify his continued eligibility for benefits and to calculate his expected rent contribution for the current year. 24 C.F.R. § 982.516. Alterations to a tenant's benefits may occur due to circumstantial changes, such as adjustments to the tenant's income, family composition, or cost to rent his apartment, but the regulations limit the discretion of public housing agencies to lower subsidies based on adjustments to the payment standards. If the public housing agency decides to lower the payment standards, it must provide information about the change to all beneficiaries at their annual reexaminations following the decision, and must further advise these beneficiaries that the change will not go into effect until their following reexamination one year later. *See* 24 C.F.R. § 982.505(c)(3).

This requirement provides some measure of financial stability for vulnerable Section 8 beneficiaries as it protects against sudden decreases in subsidy at the whims of the public housing agency. Absent any changes to a beneficiary's circumstances, he can be assured that his subsidy will renew with, at a minimum, the same terms as the

standard, (2) the tenant's adjusted income has also decreased, or (3) the public housing agency later raised the payment standard before the decrease went into effect.

prior year unless he had previously been warned that the public housing agency has taken an action that could adversely affect his subsidy. The regulations cast this warning in terms of the public housing agency's duty to provide information to the beneficiary that the payment standard has been decreased, to be effective at least a year afterward. Thus, under that mandatory procedure, the beneficiary necessarily has an expectation in an unaffected one-year term of benefits following the warning in which to plan for the change's potential adverse impact.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Implementation of the 2004 Payment Standard Decrease

The Housing Authority of the City of Los Angeles ("Housing Authority") administers the Voucher Program for that city.[6] In 2004, the Department of Housing and Urban Development required the Housing Authority to limit spending in order to balance the Department's 2004 budget. To meet the budget constraints, the Housing Authority's Board of Commissioners reduced the payment standard from 110% of the 50th percentile of rents in Los Angeles County to 100% of the 40th percentile of rents. At the time, the Board estimated that "approximately 45% of its approximately 45,000 Section 8 tenants would be adversely affected by the April 2004 decrease, and would have to pay an average of $104 more in rent each month if they chose to remain in their current units. Of this number, nearly 5,000

---

[6] The plaintiffs in this case also sued the Executive Director of the Housing Authority for the City of Los Angeles. Throughout the opinion, both defendants will be referred to as the "Housing Authority."

were elderly families, and nearly 4,500 were non-elderly, disabled families."**[7]**

That year, the Housing Authority instructed its staff to attach a copy of a flyer to each Section 8 beneficiaries' "notice of review determination" or "RE-38," which is a form sent annually to all Section 8 beneficiaries at the time of their annual reexamination that confirms their renewed eligibility for benefits and sets forth their rent contribution and subsidy amount for the *current* year. The flyer, which was printed in both English and Spanish, stated:

> HOUSING AUTHORITY OF THE CITY OF LOS ANGELES
>
> NOTICE
>
> Effective April 2, 2004 the Housing Authority lowered the payment standards used to determine your portion of the rent. We will not apply these lower payment standards until your next regular reexamination. If you move, however, these new lower payment standards will apply to your next unit.

That message was followed by (1) a heading stating "PAYMENT STANDARDS AND TENANT-BASED SHELTER PLUS CARE PAYMENT STANDARDS EFFECTIVE APRIL 2, 2004"; (2) a table listing the new payment standards; and (3) a statement that "Regardless of its

---

**[7]** The Board also provided, for the first time, that every tenant must pay a minimum expected contribution of $50. That change is not at issue in this case.

location, the unit's rent can never be higher than the comparable rents determined by the housing authority."**[8]** For simplicity, this will hereinafter be referred to as the "flyer." The attached RE-38 form showed the tenant's subsidy and rent contribution for the current year, a number that was unaffected by the decreased payment standards.

Approximately one year later and only thirty days before the changes to the payment standard were scheduled to be implemented and to adversely affect the tenants' subsidies and rent contributions, the Housing Authority sent out another notice of review determination. This particular notice, which will hereinafter be referred to as the "four-week notice," set forth the tenants' subsidies and rents for the upcoming year using the new, lowered payment standard. This was the first time that tenants were actually notified that the change would affect them personally or that there would be an increase to their rent contributions.

## B.  The Impacted Beneficiaries Sue

In 2007, Plaintiffs Michael Nozzi and Nidia Palaez, together with the Los Angeles Coalition to End Hunger and Homelessness, filed an amended class action complaint on behalf of affected Section 8 beneficiaries against the Housing Authority and its Executive Director.**[9]**  They claimed that, as

---

**[8]** *See* Appendix A.

**[9]** Plaintiff Los Angeles Coalition to End Hunger and Homelessness is a non-profit devoted to fighting the causes and effects of homelessness.  It advocates for more affordable housing on behalf of low-income individuals in Los Angeles.  Its membership includes people who receive Section 8 benefits and who have been negatively affected by the 2004 decrease in the payment standard.

relevant here, the Defendants' failure to provide comprehensible information to Section 8 beneficiaries about the payment standard change and its effect one year in advance of the change's implementation: (1) violated the due process clauses of the United States and California Constitutions, (2) violated California Government Code § 815.6, which governs liability for public entities that breach mandatory duties, and (3) constituted negligence pursuant to California Government Code § 815.2.

Plaintiff Michael Nozzi, a Section 8 beneficiary since December 2003, is totally and permanently disabled under Social Security's standards. As a result of the 2004 change, his expected rent contribution increased 48%—from $231 to $342 per month. Plaintiff Nidia Palaez, a beneficiary since February 2004, is a single mother with a young daughter. She experienced a 177% increase in her portion of the rent as a result of the 2004 change. She alleges that this increase has adversely affected her family's quality of life, that she has had difficulty affording suitable school clothes for her daughter, and that she has had to divert money from her food budget to cover her increased rent costs.

Both Nozzi and Palaez allege that they did not understand that their Section 8 benefits would decrease and that their own rent obligations would increase until they received notices approximately one year after the flyer, four weeks before the change in the payment standard adversely affected their rent contribution. Neither recalls receiving the original flyer, and neither could comprehend it when it was later shown to them.

## C. The District Court Disposes of Plaintiff's Claims

On November 26, 2007, the district court for the Central District of California dismissed the plaintiff's negligence claim. The court held that the plaintiffs failed to establish an essential element for such claims against a public entity: that a statute imposed a mandatory duty on the entity.[10]

In early 2009, the parties filed cross-motions for summary judgment on the remaining issues. With respect to the due process claims, the Housing Authority argued that the plaintiffs did not have a property interest protected by the due process clauses of the United States or California Constitutions.

Furthermore, the Housing Authority asserted that, even if the plaintiffs had a protected property interest, they received sufficient process because the Housing Authority had sent the flyer and "made significant efforts to increase participants' awareness of the 2004 VPS reduction through public hearings and community outreach." The Housing Authority supported its position with (1) declarations from Housing Authority employees summarily stating that all Section 8 beneficiaries receive instructional training upon entry into the Section 8 program, and (2) minutes of a public meeting and a PowerPoint presentation used at the meeting discussing changes to the Housing Authority's operation, during which a brief discussion occurred regarding the payment standard decrease.

---

[10] The district court also dismissed other claims that are not relevant to this appeal.

In response, the plaintiffs argued that they had a legitimate expectation in continued and stable Section 8 benefits.  They challenged the relevance of the Defendants' purported training sessions and public meetings to the question whether the Housing Authority provided sufficient notice to the affected beneficiaries.  Furthermore, the plaintiffs asserted, the only relevant question was whether the flyer was reasonably comprehensible to the average recipient, a question unaffected by the Housing Authority's other actions.

The district court granted summary judgment in favor of the Housing Authority on the due process claims and the remaining state statutory claim, an alleged violation of § 815.6.  According to the district court, the plaintiffs could not have a protectable property interest in their Section 8 benefits because the Housing Authority had complete discretion to reduce the payment standard.  The only restriction, the district court wrote, was 24 C.F.R. § 982.505(c)(3), which required the agency to provide notice, but did not create a property interest protectable by the due process clauses.

With regard to the California Government Code § 815.6 claim, the district court held that such a claim required the plaintiffs to show that the Housing Authority had breached a "mandatory duty" imposed by statute.  The court reasoned that even if 24 C.F.R. § 982.505(c)(3) or the due process clauses created such a duty, there was no basis on which to conclude that the Housing Authority had breached its obligations under that regulation.

**D.** *Nozzi I*

On appeal, a different panel of this Court reversed. *Nozzi v. Housing Authority of the City of Los Angeles* ("*Nozzi I*") (mem.), 425 F. App'x 539 (9th Cir. 2011). With regard to the plaintiffs' due process claims, we held that the district court "improperly concluded that plaintiffs' property interest in Section 8 benefits did not require adequate notice that their benefits were subject to the planned reduction." 425 F. App'x at 541. To begin with, the plaintiffs had a "well-settled property interest" in Section 8 benefits because "the statute, in tandem with regulatory requirements 'restrict[ing] the discretion'" of the Housing Authority, "protected against an abrupt and unexpected change in benefits." *Id.*[11] We remanded for the district court to apply the *Mathews v. Eldridge* balancing test to determine if the Housing Authority's notice was sufficient.[12] *Id.*

---

[11] In so holding, the prior panel held that the grant of summary judgment in favor of the defendants was inappropriate because there was a material issue of fact as to whether the steps taken by the Housing Authority protected against a sudden change in benefits. The majority did not find it necessary, for purposes of reversing the district court's grant of summary judgment, to address the merits of the plaintiffs' contentions that they had a right to a stable one-year term of benefits and that any steps by the Housing Authority taken less than one year before the change would be insufficient to protect this interest.

[12] As described in greater detail below, *Mathews v. Eldridge*, 424 U.S. 319 (1976) requires courts, when determining what process is due to protect an interest covered by the due process clause, to examine (1) the private interest that will be affected by an official action; (2) the risk of erroneous deprivation of such interest through the procedures used, and the probable value of additional or substitute safeguards; and (3) the government's interest, which includes the administrative burdens of additional or substitute procedures. *Id.* at 335.

As for the California Government Code § 815.6 claim, we noted that the statute permits private individuals to sue public entities when three elements have been met: (1) there is an enactment imposing a mandatory duty, (2) that enactment is intended to protect the individual from the type of injury suffered, and (3) the breach of the mandatory duty was the proximate cause of the injury suffered. *Id.* We held that the "district court incorrectly concluded that the notice provided by defendants satisfied the mandatory duty in § 982.505 to provide one-year notice before implementing the reduced [payment standard]." *Id.* The notice required by the regulation must be, "[a]t a minimum," "sufficiently effective to protect housing benefits recipients from an abrupt and unexpected reduction in benefits." *Id.* Accordingly, this Court remanded the § 815.6 claim for further consideration.**[13]**

Finally, we held that the district court's dismissal of the plaintiffs' state law negligence claim was "erroneous" because public entities "may be held vicariously liable for the negligent acts of their individual employees" under California Government Code § 815.2. *Id.* This claim was also remanded for further consideration.

### E.  Remand and the Current Appeal

On remand from *Nozzi I*, pursuant to a jointly agreed upon phased discovery plan, the plaintiffs sought discovery of the identities of Section 8 tenants who had been sent the flyer and whose benefits were ultimately affected by the decreased payment standard. They also sought discovery

---

**[13]** Again, for the purposes of reversing summary judgment in favor of the defendants, the prior panel did not find it necessary to address whether plaintiffs' had a right to a stable one-year term of benefits.

pertaining to any training sessions and public outreach efforts by the Housing Authority that concerned the payment standard. Before the completion of discovery, the Housing Authority filed a renewed motion for summary judgment. The plaintiffs objected that ruling on summary judgment should be deferred under Federal Rule of Civil Procedure 56(d), which allows the court to defer considering a motion for summary judgment when the nonmovant shows that it cannot yet present facts essential to its opposition. The Housing Authority disagreed, arguing that no further discovery was necessary.

The district court ignored the plaintiffs' request for more discovery and issued a tentative ruling granting summary judgment to the Housing Authority which it later reduced to a final judgment. In that order, the district court determined that, applying the *Mathews* test, plaintiffs received constitutionally adequate process. Specifically, the district court reasoned, the flyer, training sessions, public outreach meetings, and four-week notice provided more than enough notice to Section 8 beneficiaries.

With regard to the California Government Code § 815.6 claim, the district court rejected the plaintiffs' claim that the notice provided was not adequate, and held that the totality of the Housing Authority's efforts protected plaintiffs from an "abrupt" and "unexpected" reduction in their Section 8 benefits. Finally, the court held that the Housing Authority could not be vicariously liable for the conduct of its employees, because its employees did not breach any mandatory duty owed to the plaintiffs. This appeal followed.

### III.  STANDING AND STANDARD OF REVIEW

As an initial matter, the Housing Authority claims that the plaintiffs lack standing to bring this action. It is incorrect.  To establish standing, plaintiffs must establish that they have: (1) an injury in fact, (2) that is "fairly traceable to the challenged action of the defendant" and (3) that is "likely to be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (quotation marks omitted).  Here, the plaintiffs alleged that the Housing Authority decreased the amount of their Section 8 benefits and therefore increased the amount they had to pay in rent without adhering to the protections required by due process and by Voucher Program regulations.  As the Supreme Court has held, "[w]hen the suit is one challenging the legality of government action or inaction" and "the plaintiff is himself an object of the action . . . there is ordinarily little question that the action or inaction has caused him injury[.]"  *Id.* at 561–62.  Plaintiffs request compensatory damages, as well as declaratory and injunctive relief, for uncompensated injuries that were ongoing when they filed their complaint.  As a result, they met all three standing requirements.

We review the district court's grant of summary judgment to the Housing Authority for each claim *de novo* and must determine whether, "viewing the evidence in the light most favorable to the non-moving party, there are any genuine issues of material fact and whether the district court correctly applied the substantive law." *Leisik v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002).[14]  If we determine that

---

[14] Plaintiffs also contend that the district court abused its discretion in denying their motion to postpone consideration of the Defendants' motion for summary judgment until the completion of discovery.  Because we

there are no genuine issues of material fact remaining, that the Housing Authority does not prevail, and that it has had a "full and fair opportunity" to present its case, we may consider whether plaintiffs are entitled to summary judgment. *Albino v. Baca*, 747 F.3d 1162, 1176 (9th Cir. 2014) (en banc). Here, we also consider, at the plaintiffs' request, whether to reassign this case to a different district judge, which we may do only when a party can show "personal biases or unusual circumstances," such as when the district judge can be reasonably expected to have substantial difficulty setting aside his previous impressions of the case or when reassignment is desirable in order to preserve the appearance of justice. *Krechman v. Cnty. of Riverside*, 723 F.3d 1104, 1111 (9th Cir. 2013).

## IV. PROCEDURAL DUE PROCESS

## A. The Contours of the Plaintiffs' Property Right

The Due Process Clause of the Fourteenth Amendment imposes procedural constraints on governmental decisions that deprive individuals of liberty or property interests. *Mathews*, 424 U.S. at 332 (1976).[15] Thus, the first question

---

hold that granting summary judgment in favor of the defendants was improper for other reasons, and because there is no cause for further discovery on the summary judgment issues following remand, we need not address this contention.

[15] The language of Article I § 7 of the California Constitution is "virtually identical" to the Due Process Clause of the United States Constitution, with the caveat that California courts place a higher significance on the dignitary interest inherent in providing proper procedure. *Today's Fresh Start, Inc. v. Los Angeles Cnty. Office of Education*, 303 P.3d 1140, 1150 (Cal. 2013). Recognizing this difference,

in any case in which a violation of procedural due process is alleged is whether the plaintiffs have a protected property or liberty interest and, if so, the extent or scope of that interest. *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 569–70 (1972). The property interests that due process protects extend beyond tangible property and include anything to which a plaintiff has a "legitimate claim of entitlement." *Id.* at 576–77. A legitimate claim of entitlement is created "and [its] dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* at 577. Further, as we have previously held, plaintiffs have a protected property right in public benefits when, as here, a statute authorizes those benefits and the "implementing regulations" "greatly restrict the discretion" of the people who administer those benefits. *See Griffeth v. Detrich*, 603 F.2d 118, 121 (9th Cir. 1979).

Thus, as we held in *Nozzi I*, the plaintiffs here have a property interest in Section 8 benefits to which the procedural protections of the due process clause apply. 425 F. App'x at 541 ("Section 8 participants have a property interest in housing benefits[.]"); *Ressler v. Pierce*, 692 F.2d 1212, 1215–16 (9th Cir. 1982) ("In addition, [the plaintiff] has a constitutionally protected 'property' interest in Section 8 benefits by virtue of her membership in a class of individuals whom the Section 8 program was intended to benefit."); *see also Roth*, 408 U.S. at 576 ("[A] person receiving . . . benefits

---

we nevertheless address the plaintiffs' federal and state due process claims together, as it is unnecessary to take the additional factor into account in this case.

under statutory and administrative standards defining eligibility for them has an interest in continued receipt of those benefits that is safeguarded by procedural due process."); *Holbrook v. Pitt*, 643 F.2d 1261, 1278 (7th Cir. 1981) ("Courts have held in a variety of circumstances that certified tenants in Section 8 programs have protectable property interests under the due process clause.").

The "dimensions" of the property interest here "are defined by existing rules . . . or understandings that secure certain benefits"—in this case, the Voucher Program statute and regulations. *See Roth*, 408 U.S. at 577. These regulations limit the Housing Authority's discretion to alter tenants' subsidies through changes to the payment standard unless tenants have been advised of the change and notified that the reduced standard will not be implemented for at least a full year afterwards. *See* 24 C.F.R. § 982.505(c)(3); *see also Nozzi I*, 425 F. App'x at 541–42 ("[T]he Section 8 regulations 'closely circumscribe' [the Housing Authority's] discretion—by prohibiting [it] from immediately implementing a reduced [payment standard] and requiring [it] to inform participants that a reduced [standard] will be implemented[.]"). This mandatory one-year postponement is designed to serve as an "equitable . . . safeguard[] against reductions in subsidy." Section 8 Housing Choice Voucher Program; Expansion of Payment Standard Protection, 65 Fed. Reg. 42508-01, 42508 (July 10, 2000).

Thus, plaintiffs' property right extends beyond Section 8 benefits generally. The protected property right is in housing benefits that continue in existence for a period of at least one year after the beneficiary is advised that his benefits may be decreased by a change to the payment standard. The tenant can budget for annual leases, plan for any drastic changes,

and take steps to avoid his family's eviction, secure in the knowledge that his benefits will not be adversely affected during the extended period his property rights remain in effect.

The district court and the Housing Authority heavily rely on *Rosas v. McMahon*, 945 F.2d 1469 (9th Cir. 1991) to support the argument that the plaintiffs do not have a protected property interest, but that case is inapplicable. In *Rosas*, the local agency provided notice of a change to welfare benefits 10 days before its implementation, as required by a regulation. *Id.* at 1472. The plaintiffs insisted that they were entitled to an earlier notice about which the statutes and regulations said nothing. *Id.* at 1474. This court rejected the plaintiffs' claim and held that welfare recipients had no right to notice of the "passage of statutes" which reduced their benefits or to a "grace period" before benefits were reduced. *Id.* at 1473–74.

*Rosas*, however, relied on the fact that there was no "pre-existing regulation intended to forestall the implementation of a congressionally mandated program change until [program participants] were provided with notice of that change." *Id.* at 1475. Where, as here, a pre-existing regulation *does* forestall the implementation of a reduction in benefits for a one year period, it is the plaintiffs' property interest in that term of benefits that procedural due process protects.[16]   Accordingly, the question in this case is not

_____

[16] Similarly, as the prior panel noted, the district court and the Housing Authority's reliance on *Atkins v. Parker*, 472 U.S. 115 (1985) is misplaced. In that case, Congress changed the eligibility standards required for benefits under the Food Stamp Act. There, the Court held that "Congress has plenary power to define the scope and duration of the

whether the plaintiffs have an interest protected by due process—it is clear that they do—but rather "[w]hat process is due to protect plaintiffs' well-settled property interest." *Nozzi*, 425 F. App'x at 542.

## B. The Process Due

Once a substantive right has been created, "it is the Due Process Clause which provides the procedural minimums, and not a statute or regulation." *Geneva Towers*, 504 F.2d at 491 n.13; *Nozzi*, 425 F. App'x at 542 ("Technical compliance with regulatory procedures does not automatically satisfy due process requirements."). For this reason, in analyzing the plaintiffs' due process claim, we do not address whether the Housing Authority complied with the requirements of 24 C.F.R. § 982.505(c)(3), but whether the Housing Authority complied with the requirements of the due process clause. We conclude that it failed to do so, and indeed, that the flyer was totally inadequate for that purpose.

Procedural safeguards come in many forms, including, *inter alia*, "timely and adequate notice," pre-termination hearings, the opportunity to present written and oral arguments, and the ability to confront adverse witnesses. *See Goldberg v. Kelly*, 397 U.S. 254, 267 (1970). Which protections are due in a given case requires a careful analysis of the importance of the rights and the other interests at stake.

entitlement to food-stamp benefits" and thus welfare recipients were not deprived of due process by Congress's adjustment. *Id.* at 129. The Housing Authority, however, does not have plenary power to implement a change in the payment standard. Rather its authority is limited to changing the amount of assistance one year or more after it has informed beneficiaries of the change.

*Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976); *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).  Accordingly, in *Mathews v. Eldridge*, the Supreme Court set forth a three-part inquiry to determine whether the procedures provided to protect a liberty or property interest are constitutionally sufficient.  424 U.S. at 334–35.  First, courts must look at the nature of the interest that will be affected by the official action, and in particular, to the "degree of potential deprivation that may be created."  *Id.* at 341.    Second,  courts  must  consider  the  "fairness  and reliability" of the existing procedures and the "probable value, if any, of additional procedural safeguards."  *Id.* at 343. Finally,  courts  must  assess  the  public  interest,  which "includes the administrative burden and other societal costs that  would  be  associated  with"  additional  or  substitute procedures.  *Id.* at 347.[17]  Here, plaintiffs request notice of any intended changes to their housing subsidies provided at least one year in advance of the change.

---

[17] As the district court noted, the Supreme Court applies a streamlined test when the only question to be decided is whether the government has provided sufficient notice and there is no request for further procedural safeguards.  *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950).  Under *Mullane*, courts must determine whether the notice given was "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  *Id.* at 314.  If we were to review this case *ab initio*, we might simply apply *Mullane* to the facts of this case, as might well be appropriate.  *See Dusenbery v. United States*, 534 U.S. 161, 167–68 (2002).  Because the prior panel instructed the district court to apply *Mathews*, we also conduct our due process analysis in terms of the *Mathews* test.  We note, however, that the choice of test is not dispositive here.  For reasons that we explain below, the notice afforded to the plaintiffs in this case was insufficient under either test.

### 1.   The Private Interest at Stake

First, the private interest at stake in this case and the "degree of potential deprivation," *Mathews*, 424 U.S. at 341, is substantial. The 2004 decrease in payment standards affected Section 8 beneficiaries' rent by an average of $104 per month, a deprivation that could be "very serious to a poor person." *Geneva Towers*, 504 F.2d at 492; *see also Escalera v. New York City Hous. Auth.*, 425 F.2d 853, 864 (2d Cir. 1970) ("[E]ven small charges can have great impact on the budgets of public housing tenants, who are by hypothesis below a certain economic level."). For plaintiffs Nozzi and Palaez, the payment standard yielded 48% and 177% increases in their respective rent obligations. This reduction in a tenant's subsidies and accompanying increase in the cost of housing "could force tenants to forego other perhaps necessary purchases and could even force some tenants to seek other less expensive housing." *Geneva Towers*, 504 F.2d at 491.

Furthermore, for many Section 8 beneficiaries, subsidies from the Voucher Program for a stable and renewable one-year term are the difference between safe, decent housing and being homeless. A tenant's inability to pay for an unexpected increase in his portion of the rent and utilities could result in eviction, which ultimately would require the public housing agency to terminate benefits, U.S. Dep't of Housing & Urban Dev., *Housing Choice Voucher Program Guidebook*, at 15-1, 5, and render it impossible for the tenant to pay for a new unit. This deprivation is especially dire considering the vulnerability of Section 8 recipients, a large portion of whom are elderly or disabled, and many of whom, like Plaintiff Pelaez, have young children.

## 2. The Risk of Erroneous Deprivation

Turning to the second *Mathews* inquiry, we must examine whether the procedures provided to the plaintiffs risked erroneous deprivation of their right to stable and renewable Section 8 benefits, as well as the value of any additional safeguards. Plaintiffs here simply request fair notice: simple and unadorned, reasonably comprehensible notice provided at least one year in advance of the change. Thus, to determine the fairness and reliability of the safeguards provided by the Housing Association and the probative value of this requested safeguard we look—as the district court did—to *Mullane* and its progeny for guidance.

"[W]hen notice is a person's due, process which is a mere gesture is not due process." *Mullane*, 339 U.S. at 314. To be constitutionally adequate, notice must be "reasonably calculated, under all the circumstances, to apprise interested parties . . . with due regard for the practicalities and particularities of the case[.]" *Id.* at 314. The means employed must be "reasonably certain" to "actually inform" the party, *id.*, and in choosing the means, one must take account of the "capacities and circumstances" of the parties to whom the notice is addressed, *Goldberg*, 397 U.S. at 268–69; *Memphis Light, Gas & Water Division v. Craft*, 436 U.S. 1, 14 n.15 (1978).

The flyer was, without doubt, entirely insufficient to meet this standard. In no respect does it reasonably inform its intended recipients of the changes to the payment standard, the meaning of those changes, or, most important, their effect upon the recipient. Because of this, Section 8 beneficiaries were not meaningfully advised regarding the payment standard and were, accordingly, deprived of their right to a

one-year term of stable benefits in which to plan for the impending potential hardship.

To begin with, the flyer, which essentially mirrored the language of 24 C.F.R. § 982.505(c)(3), is incomprehensible to anyone without a relatively sophisticated understanding of the Voucher Program's payment calculations. It uses the term "payment standards" six times without ever defining or explaining the term's meaning. A short and simple explanation, such as "this means that the Housing Authority has reduced the maximum amount it will contribute towards recipients' rent," would have provided at least a small measure of clarity. The absence of such a minimal statement is particularly troublesome because, to the ordinary Section 8 beneficiary, the flyer might well suggest that the beneficiary's expected rent contribution would decrease. *See* ER 117 ("Effective April 2, 2004 the Housing Authority lowered the payment standards used to determine your portion of the rent."). Moreover, the flyer which stated that the change to the payment standards was "[e]ffective April 2, 2004" was attached to an RE-38 that showed the tenant's expected rent contribution for the current year. This could be confusing to many tenants as that number was unaffected by the change and could give the impression that the change to the payment standard would not affect the tenant's subsidy amount at all—indeed that his subsidy would be higher than the lower payment standard should allow.

Further, the flyer in no way explained the potential effect of the change: that it could potentially increase the tenant's expected rent contribution and decrease his subsidy. Indeed, as the Housing Authority estimated at the time, this change would affect roughly 45% of Section 8 beneficiaries and require them to pay an average of $104 more in rent each

month. None of this information, however, was included in the flyer. Finally, the flyer was devoid of any name, address, or other information that Section 8 beneficiaries could contact for assistance understanding the flyer's contents. The totality of these deficiencies makes it is impossible to say that the flyer was reasonably calculated to give notice to the average recipient, or possibly even to the average reasonable jurist.[18]

The Housing Authority relies upon three actions that it asserts correct this failure inherent on the face of the flyer. None does so, singly or collectively. As discussed, absent circumstantial changes such as an increase in income or change in family composition, the plaintiffs had a legitimate expectation in a one-year term of *stable* Section 8 benefits. The first of the Housing Authority's actions that it cites is the four-week notice, which was sent only thirty days before the increase in the tenants' rent contribution was scheduled to be implemented. This notice could not possibly provide notice a full year in advance of the scheduled change.[19]

---

[18] Similarly unavailing is the Housing Authority's reliance on a letter purportedly sent to all beneficiaries on April 19, 2005. The Housing Authority did not assert that this letter is in the record, nor is there any evidence of it being so. It is only mentioned in passing in a discussion in the deposition of one of the Housing Authority's employees. That employee declared only that it was "similar to" the flyer. For the reasons already discussed, any letter that was simply "similar to" the flyer would be inadequate to provide the necessary notice for the same reasons as the flyer itself. Furthermore, the letter, like the four-week notice discussed in the next paragraph, was sent too late to have been of any use to many beneficiaries.

[19] The Housing Authority relies on *Willis v. United States*, 787 F.2d 1089 (7th Cir. 1986) for the proposition that this Court should consider subsequent steps like the four-week notice. That case is of no relevance. There, a plaintiff claimed that procedures attending the forfeiture of his

The two other actions consisted of general advice offered prior to the receipt of the flyer:  the holding of "public outreach meetings" and the conducting of "training sessions." Both fell woefully short of advising the Section 8 recipients of the meaning or effect of the change in the payment standards.

First, the public outreach meetings cannot serve to render the Housing Authority's deficient notice consistent with due process.  In 2004, the Housing Authority held several meetings about significant changes to the agency's operations that were open to the public.  A number of topics were discussed at these meetings, including the challenges faced by the Housing Authority in implementing the Section 8 program, the use of criminal background and credit checks of Section 8 beneficiaries, the portability of Section 8 benefits across apartments, and the Housing Authority's efforts to stabilize rent in the area.  As the Housing Authority noted, "part of the discussion" at these meetings, among the other topics listed, were changes to the payment standard and the impact on Section 8 beneficiaries.

These general meetings, however, are no substitute for notice provided directly to the individual tenants.  As *Mullane*

---

automobile did not comport with the requirements of due process because he only received a form letter containing nothing more than "legal 'jargon.'"  *Id.* at 1093.  The Seventh Circuit held that, while there was "no question that the language in the letter Willis received would not be adequate notice in itself," that letter in combination with a second letter enclosed within the same envelope adequately informed Willis of the forfeiture proceedings.  *Id.*  Unlike *Willis*, however, the Housing Authority's four-week notice was not contemporaneous with the flyer, and therefore could not possibly help Section 8 beneficiaries comprehend the legal jargon in the flyer at the time it was to be read.

established, "[w]here the names and post addresses of those affected . . . are at hand, the reasons disappear for resort to means less likely than the mails to apprise" affected persons. 339 U.S. at 315 (emphasis added). The Housing Authority certainly knew the names and addresses of the Section 8 tenants for whom it was supplying housing benefits, and indeed sent the flyers directly to the tenants, but it failed to provide an *understandable* notice directly to them at the time it would be relevant to the loss or diminution of their benefits.[20] All things considered, therefore, the public outreach meetings were not "*reasonably certain* to inform those affected" of the change to the payment standard, or the effect of such change. *Mullane*, 339 U.S. at 315 (emphasis added). Indeed, even construed most favorably to the Housing Authority, the outreach meetings when considered along with all the other factors in this case fail to raise a genuine issue of fact as to whether the steps taken by the Housing Authority provided constitutionally adequate notice of the potential change to the plaintiffs' property rights.

Second, the training sessions held by the Housing Authority, even when considered along with all the other factors relied on by the Authority, also cannot have rendered the flyer "reasonably certain to inform" the average Section 8 beneficiary of the potential reduction in benefits to occur one year later. Federal regulations require that the Housing Authority give certain information to beneficiaries when they

---

[20] The Housing Authority manages the benefits of approximately 45,000 Section 8 beneficiaries, around 45% of whom were estimated to have been adversely affected by the changes to the payment standards. The Housing Authority's agent did not recall how these beneficiaries were informed of the time and place of these meetings, nor could she recall whether more than 50 people attended the meeting that she attended.

are first selected to participate in the Voucher Program. 24
C.F.R. § 982.301. According to declarations from Housing
Authority employees, the Authority fulfills this requirement
by requiring all new beneficiaries to attend a one hour
"Session," during which Housing Authority staff explains to
the new beneficiaries how a tenant's rent contribution is
calculated, which includes an explanation of the term
"payment standard." The Housing Authority argues that this
explanation served to give sufficient meaning to the contents
of the otherwise incomprehensible flyer.

For many affected beneficiaries, however, this
information was provided *years* before the flyer was sent.
For others, it may have been only a period of up to twelve
months. As *Mullane* makes clear, the fact that the Housing
Authority provided tenants with this information "months and
perhaps years in advance" of the change to the payment
standard does not justify "dispensing with a serious effort to
inform [the beneficiaries] personally" of the change to their
benefits at a time the information would be directly
meaningful. *Mullane*, 339 U.S. at 318.[21] Thus, regardless of

---

[21] *Mullane* dealt with the question of what notice was sufficient to
apprise beneficiaries of a judicial settlement of accounts in a common trust
fund. In that case, when the common trust fund was created, the trust
company mailed a notice to every person who might be entitled to a share
of the fund's income. That notice included copies of state statutes that
explained that a judicial settlement of accounts would periodically occur
after the fund's establishment, and that participants would be notified of
the settlement through publications in their local newspaper. The
Supreme Court held that this procedure failed to comply with the
requirements of due process and that the trustee was required to undertake
a "serious effort to inform [those affected] personally of the accounting."
Most relevant to this case, the Supreme Court held that the trustee could
not dispense with this effort merely because it had previously provided
information to those affected. Instead, the Court held, those affected must

whether the term "payment standard" was explained to
tenants years or months before the flyer was sent, the
Housing Authority was required to send a timely notice that
provided meaningful information about the change to the
payment standard and the change's potential adverse effect on
the tenant's benefits.

Furthermore, the payment standard was far from a
primary subject of the Housing Authority's one-hour
introductory Session to the Section 8 program.  At that
Session, information must be provided to new beneficiaries
regarding:  where they may lease a unit, which landlords may
be willing to lease a unit to them, how long they have to find
a unit, how they may request an extension, the advantage of
choosing to live in an area that does not have a high
concentration of low-income families, how to complete the
forms required to request approval of a rental unit, 24 C.F.R.
§ 982.301, how people with disabilities can request a
reasonable accommodation, the amount of utilities that a
tenant would be allowed to use, and what steps tenants can
take to avoid housing discrimination.  In that same one hour
period, the Housing Authority also attempted to explain how
the Voucher Program worked generally, including the
formula used to calculate a tenant's portion of the rent and the
complicated and convoluted role that the payment standards
play in that calculation.

In light of the overwhelming amount of information and
the complex and variegated subject matter involved, any data
as to the meaning and effect of payment standards would
likely not be retained for a number of years or even a number

---

be informed, at the time of the impending settlement, "that steps *were
being taken affecting their interests*."  *Id.* at 318 (emphasis added).

of months by the average Section 8 beneficiary. It certainly could not make the flyer, which was confusing, inadequate, and indeed unintelligible on its face, "reasonably certain" to inform Section 8 beneficiaries of a potential reduction in their subsidies to take place one year after receipt of the flyer. *Mullane*, 339 U.S. at 318.[22] Thus, even when considered along with all the other factors relied on by the Housing Authority, no genuine issue of fact exists with respect to whether the beneficiaries' attendance at a Session renders the otherwise wholly inadequate flyer compliant with due process.

In sum, there can be no genuine dispute of fact as to whether the Housing Authority provided constitutionally adequate notice of the change to the payment standard, or more important, the meaning and effect of the change on the plaintiffs' Section 8 benefits. The Housing Authority simply failed to do so. The simplest means of ensuring adequate notice was the means requested by the plaintiffs: a simple and clear letter, written in plain English (or Spanish), mailed directly to the plaintiffs one year in advance of the date of the change's implementation—a letter that contained an understandable explanation of the change and the effect of that change on Section 8 benefits; in other words, a flyer that met the requirements of due process.

---

[22] Although we assume for the purposes of the above analysis that all beneficiaries actually attended one of these required Sessions, we note that some evidence suggests that not all beneficiaries actually did so. Plaintiff Pelaez states, for example, that she did not remember attending a training session, and has no recollection of "ever having the concept of Voucher Payment Standards explained to [her.]"

A proper notice would have made plaintiffs aware of the seriousness of the Housing Authority's actions. It might have stated, for example, that the Housing Authority estimated that "approximately 45% of [the] approximately 45,000 Section 8 tenants [would] be adversely affected by the April 2004 [payment standard] decrease, and [would] have to pay an average of $104 more in rent each month if they chose to remain in their current units." It might also have provided beneficiaries with a number to call in case they had questions about the upcoming change or needed help finding a more affordable apartment in light of the change. Instead, the Housing Authority's flyer failed even to achieve the minimum that due process requires: an explanation of the change to the payment standard and its likely effect upon tenants—an explanation that could reasonably be understood by the average Section 8 beneficiary. The failure to do so deprived the plaintiffs of the necessary one-year period of stable benefits in which to seek to avoid any impending hardship, and thus, of due process of law.

### 3. The Burden of Providing the Requested Procedure

Turning to the third *Mathews* inquiry, affording the procedure requested by the plaintiffs would place no burden on the Housing Authority. The plaintiffs do not ask for a hearing, an individual meeting, or even an explanation of the precise amount by which their portion of the rent would increase. They ask only for an elementary explanation of what a change to the payment standard means and what effect it has on tenants' rights. The Housing Authority's argument that it could not have sent a more precise notice because it could not have prospectively calculated whether the plaintiffs' rent would increase at the time it sent the flyer

stems from a fundamental misunderstanding of the plaintiffs' challenge. The plaintiffs recognize that there are situations in which a tenant's subsidies would not decrease despite the change to the payment standard.**[23]** The plaintiffs merely seek a uniform notice that adequately explains the effect of the change in payment standard in a manner sufficient to reasonably ensure that plaintiffs knew that they might well have to plan for and adjust to a potential decrease in their subsidy and an accompanying increase in the rent they must pay commencing one year from the time they received the flyer.

Surely this information could be readily incorporated into the standard form without placing any burden on the government's fiscal and administrative resources. There is no reason to conclude, after all, that "printing six paragraphs of information is any more burdensome than printing four paragraphs of information." *Henry v. Gross*, 803 F.2d 757, 768 (2d Cir. 1986). Indeed, the Housing Authority printed a more thorough explanation in letters that it sent to people other than those directly affected by the change. Around the same time that the Housing Authority sent the flyer to the existing tenants, it sent a letter to Voucher Program beneficiaries who had not yet found a unit to rent. That letter explained that the payment standard "is the most the Housing Authority can pay for a unit. If the rent for your unit is higher, you must pay the difference in rent." An even clearer explanation was sent to the Mayor, to members of the Los Angeles City Council, and to the members of the United States Congress from California just before the change in the

---

**[23]** A change in the payment standard would not affect, for example, a tenant whose entire unit cost less to rent than the new, decreased payment standard.

payment standard was implemented.  Those letters explained
that the change to the payment standard "means many tenants
will soon begin paying more rent or, if they choose, move to
a less expensive unit," and that the "average increase is
estimated at $100/month."**[24]**  Notably missing from the list of
people who received an adequate explanation are the people
who needed it most—the same people that due process
requires receive adequate notice—those Section 8
beneficiaries whose rent might actually be increased by the
change.

Accordingly, all of the *Mathews v. Eldridge* factors weigh
in favor of the notice that the plaintiffs seek.  The Housing
Authority's flyer, with its total absence of any effort to
explain the payment standard and its relation to tenants'
obligations, was inadequate on its face, and the Housing
Authority has not shown that any additional steps were
reasonably calculated to actually inform the plaintiffs of the
necessary information.**[25]**  Moreover, it is beyond dispute that
the Housing Authority could, at no extra cost or expense,

---

**[24]** The letters sent to high-ranking officials, unlike the flyer that was sent
to the plaintiffs, also provided a list of people who could help the Section
8 beneficiaries with a housing search.

**[25]** We reject the Housing Authority's arguments that (1) there was a
minimal risk that plaintiffs would have been erroneously deprived of their
property interest because it legally decreased the payment standard and
that (2) any error connected with the notice was harmless because the
"benefit change would have admittedly been the same."  Again, these
arguments stem from a misunderstanding of the nature of plaintiffs'
protected property interest.  While the Housing Authority could lawfully
change the payment standard, the plaintiffs have a legitimate expectation
in a one-year term of benefits to plan for and adjust to upcoming changes.
The Housing Authority's failure to provide adequate notice deprived them
of that right.

have provided the notice that would have afforded the tenants the due process they requested.

The state due process claims are subject to the same analysis, except that under state law there is an additional factor to consider: the "dignitary interest in informing individuals of the nature, grounds, and consequences of the action." *Today's Fresh Start*, 303 P.3d at 1150. This factor strongly favors the plaintiffs. The district court, therefore, erred in granting summary judgment to the defendants on both due process claims.

## C. Remedy

Ordinarily, where there has not been a cross-motion for summary judgment, we would reverse and remand to the district court for further factual development. We conclude, however, that even when viewing the facts in the light most favorable to the Housing Authority, there is no genuine dispute of material fact for a fact-finder to decide. In this case, therefore, the appropriate remedy is to grant summary judgment in favor of the plaintiffs *nostra sponte*.

"We have long recognized that, where the party moving for summary judgment has had a full and fair opportunity to prove its case, but has not succeeded in doing so, a court [of appeal] may enter summary judgment *sua sponte* for the nonmoving party." *Albino v. Baca*, 747 F.3d 1162, 1176 (9th Cir. 2014) (en banc); *see also Gospel Missions of Am. v. City of L.A.*, 328 F.3d 548, 553 (9th Cir. 2003) ("Even when there has been no cross-motion for summary judgment, a district court may enter summary judgment sua sponte against a moving party if the losing party has had a 'full and fair opportunity to ventilate the issues involved in the matter.'"

(quoting *Cool Fuel, Inc. v. Connett*, 685 F.2d 309, 312 (9th Cir. 1982)).  So long as the moving party has "be[en] given reasonable notice that the sufficiency of his or her claim will be in issue," *Buckingham v. United States*, 998 F.2d 735, 742 (9th Cir. 1993), and has therefore had "adequate time to develop the facts on which the litigant [would] depend to oppose summary judgment," *Portsmouth Square v. Shareholders Protective Comm.*, 770 F.2d 866, 869 (9th Cir. 1985), *sua sponte* summary judgment is appropriate.  Doing so preserves judicial resources by preventing courts from having to preside over "unnecessary trials" where no genuine issues of fact are in dispute, which is consistent with the overall "objective of [Federal Rule of Civil Procedure 56] of expediting the disposition of cases."  10A Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice and Procedure* § 2720, at 345 (3d ed. 1998).

The Housing Authority has been afforded ample opportunity to develop the facts on which it would oppose summary judgment.  To begin with, "[a]s the movant[] for summary judgment in this case, [the Housing Authority] w[as] on notice of the need to come forward with all [its] evidence in support of this motion, and [it] had every incentive to do so."  *Albino*, 747 F.3d at 1177.  Moreover, the Housing Authority has had two rounds of litigation in which to develop the facts necessary to oppose summary judgment. The issues here are identical to those litigated before the district court in *Nozzi I*.  At that time, the plaintiffs made a cross-motion for summary judgment, and the Housing Authority had a full and complete opportunity to develop facts to oppose it.  On remand, the Housing Authority had the opportunity to develop additional facts, but it declined to do so.  Instead, it strategically chose to move for a pre-trial disposition before the close of discovery and effectively cut

short any additional factual development. In short, the Housing Authority had more than enough notice that the sufficiency of its defense was at issue.

Despite having this opportunity, the Housing Authority has not produced evidence suggesting that there is an issue of material fact that is appropriate for resolution by a fact-finder. As explained in greater detail above, it is beyond dispute that the flyer was constitutionally inadequate. On its face, it was clearly inadequate and failed to provide notice in a form that Section 8 recipients could comprehend. The Housing Authority's subsequent steps cannot solve the flyer's deficiency as a matter of law, as those steps occurred too late to protect the plaintiffs' legitimate expectation in an unaffected one-year period of benefits in which to plan for any adverse effects of the change.

Additionally, the Housing Authority's reliance on the training sessions and the public outreach meetings fails to raise a genuine issue of material fact appropriate for resolution by a jury. The meetings it held could not, as a matter of law, have been sufficient to afford the plaintiffs the notice that due process requires. The training sessions when beneficiaries first entered the program provided relatively minimal information on the meaning of "payment standard," and this information was provided months or years before the flyer was sent. Thus, the training sessions cannot have served to ensure that the confusing and inadequate flyer was "reasonably certain" to "actually inform" the average beneficiary that he had one year in which to plan for a potential reduction to his benefits. Because there are no genuine issues of material fact as to whether the Housing Authority complied with the requirements of due process, we remand with instructions to the district court to grant

summary judgment in favor of the plaintiffs on the merits of their federal and state due process claims.

## V. The Other State Law Claims

Next, we turn to the plaintiffs' allegations that the Housing Authority violated various provisions of the California Government Code. California has abolished common law tort liability for public entities. *Miklosy v. Regents of California*, 188 P.3d 629 (Cal. 2008). Thus, under California law, "'[a] public entity is not liable for an injury,' '[e]xcept as otherwise provided by statute.'" *Eastburn v. Regional Fire Prot. Auth.*, 80 P.3d 656, 657–58 (Cal. 2003) (quoting Cal. Gov. Code § 815(a)). Plaintiffs claim that the Housing Authority is liable under two statutes: (1) California Government Code § 815.6 which governs liability for public entities that breach their mandatory duties, and (2) California Government Code § 815.2 which governs vicarious liability for public employees' negligence.

## A. California Government Code § 815.6

Under California Government Code § 815.6, a public entity will be liable to a plaintiff for injury "when (1) a mandatory duty is imposed [on the public entity] by enactment, (2) the duty was designed to protect against the kind of injury allegedly suffered, and (3) breach of the duty proximately caused injury," unless the public entity can "establish that it exercised reasonable diligence" in discharging this mandatory duty. *State Dept. of State Hospitals v. Superior Court*, 349 P.3d 1013, 1018 (Cal. 2015); *see also Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1106–07 (9th Cir. 2014). The "mandatory duty" breached by the public entity must be created by a

"constitutional provision, statute, charter provision, ordinance or regulation," Cal. Gov't Code § 810.6, including federal regulations, *id.* § 811.6 (defining "regulation' as including federal regulations).[26] Further, it must be "*obligatory*, rather than merely discretionary or permissive, in its directions to the public entity," and must "*require* rather than merely authorize or permit, that a particular action be taken[.]" *State Dept. Of State Hospitals*, 349 P.3d at 1018–19 (emphasis in original).

We hold that, even taking the facts in the light most favorable to the Housing Authority, there can be no dispute that it is liable under the statute. To begin with, as we have determined above, the Voucher Program regulations create a mandatory duty to advise plaintiffs of the change in the payment standard, the meaning of that change, and its effect upon them. 24 C.F.R. § 982.505(c).[27] The Housing Authority argues that Section 982.505(c) creates only a duty to *send* a one-year notice, with no obligations as to the *form* of that notice. This is incorrect. At a minimum, the information given to the tenants about the change in payment standards and the one-year period that tenants have to prepare

---

[26] *See also Hines v. United States*, 60 F.3d 1442, 1448–49 (9th Cir. 1995) (holding that under California law, federal regulation created a mandatory duty), *abrogated on other grounds by United States v. Olson*, 546 U.S. 43 (2005); *Bowman v. Wyatt*, 111 Cal. Rptr. 3d 787, 808 n.10 (Ct. App. 2010) (noting that jury was instructed that mandatory duty under § 815.6 could be supplied by federal regulation).

[27] Notwithstanding the Housing Authority's assertion to the contrary, the fact that there is no *federal* cause of action to enforce directly 24 C.F.R. § 982.505(c)(3) does not defeat plaintiffs' § 815.6 claim. *See Haggis v. City of Los Angeles*, 993 P.2d 983, 988 (Cal. 2000) ("*It is section 815.6, not the predicate enactment, that creates the private right of action.*" (emphasis in original)).

for its implementation must be reasonably comprehensible by the intended recipients. A mandatory obligation to provide notice includes the obligation to provide an intelligible notice that can be understood by its average intended recipients and must convey the information required by the regulation.

Next, it is apparent that the regulation was "designed to protect against the kind of injury" the plaintiffs suffered. *Haggis*, 993 P.2d at 987–88. The regulation was created as an equitable "safeguard" for tenants "against reductions in subsidy," that would give Section 8 beneficiaries one year in which to plan for adjustments to the payment standard that could adversely affect their subsidy. Section 8 Housing Choice Voucher Program; Expansion of Payment Standard Protection, 65 Fed. Reg. at 42508. Here, because plaintiffs were not given meaningful information about the change in the payment standard and its meaning and effect, the plaintiffs were deprived of the very one-year stable planning period that the regulation was designed to protect.

Finally, the Housing Authority breached this mandatory duty and this breach was the proximate cause of injury to the plaintiffs. As described earlier, the flyer was totally incomprehensible to anyone without a relatively sophisticated understanding of the machinations of Section 8 subsidy payments. It did not provide the average recipient with any meaningful information about the change or its potential adverse impact. As with the due process claims, the Housing Authority argues that no injury could have occurred because it had total discretion to decrease the payment standard. Once again, the Authority misunderstands the nature of the plaintiffs' challenge. The question here is not whether the payment standard could be decreased, but whether the manner in which the Housing Authority implemented the

decrease breached its mandatory duty to provide advance notice to plaintiffs of the intended action.  The answer is that it did, and that plaintiffs, who experienced an unexpected and dramatic increase in their rental obligations, suffered from that breach.

What remains then, is the question whether the Housing Authority "exercised reasonable diligence to discharge the duty."  Cal. Gov't Code § 815.6.  As described in greater detail above, there are extreme deficiencies in the flyer provided to the plaintiffs.  The Housing Authority has had two opportunities to come forward with evidence in support of its motion for summary judgment and a further opportunity to rebut the cross-motion for summary judgment brought by the plaintiffs in *Nozzi I*.  Despite this, it has fallen far short of producing evidence sufficient to raise a genuine issue of fact as to whether it made reasonable efforts to provide meaningful information to the plaintiffs about the payment standard change and its adverse effect upon them.

The Housing Authority initially took the position that it was "impossible" to draft a different, more comprehensible notice, but that position is plainly contradicted by the undisputed evidence.  The Housing Authority was clearly capable of explaining the meaning and effect of the payment standard.  It provided a comprehensible notice to Voucher Program beneficiaries who had not yet found a unit to rent. Indeed, it provided an even more thorough explanation of the meaning and effect of the change to the Mayor, members of the Los Angeles City Council, and California congressmen.

The Housing Authority produced evidence, in the form of a declaration by the individual who wrote the flyer, purportedly showing that he exercised reasonable efforts.

Even construing this declaration in the light most favorable to the defendants, however, it is insufficient to raise a genuine issue of fact as to whether the Housing Authority exercised reasonable efforts to comply with the regulation. The declaration states that the employee drafts all of his notices in language that can be understood by a person with an eighth grade education. This is a conclusion that is belied by the evidence. The flyer unquestionably does not explain the meaning and effect of the change in the payment standard in any terms at all, let alone in terms that can be understood by a person with an eighth grade education. The employee admittedly simply took the flyer's language directly from the regulation, and the Housing Authority did not offer any evidence that he took *any* steps to ensure that the language would provide any meaningful information about the change that would advise the average recipient of its meaning or effect. Nor did the Housing Authority offer any evidence suggesting that the employee considered alternatives to merely parroting the regulation, such as, *inter alia*, defining payment standard—as did the letters sent to house-hunting Section 8 beneficiaries and to the public officials.

Thus, as with the due process claims, the Housing Authority had ample opportunity to develop facts to support its defense against the state law claims, but failed to do so. Accordingly, we reverse the judgment of the district court and remand with instructions to grant summary judgment in favor of the plaintiffs on the merits of this statutory claim.

## B. California Government Code § 815.2

Under California Government Code § 815.2, a public entity is "vicariously liable for its employees' [non-immune] negligent acts or omissions within the scope of

employment[.]" *Eastburn v. Regional Fire Protection Authority*, 80 P.3d 656, 658 (Cal. 2003). The Housing Authority asserts, and the plaintiffs do not dispute, that plaintiffs theory of negligence is "essentially interchangeable" with its § 815.6 claim discussed in Section V.A above. Indeed, the elements of a vicarious liability claim against a public entity in California are "virtually identical" to the elements of a § 815.6 claim. *Alejo v. City of Alhambra*, 89 Cal. Rptr. 2d 768, 771 & n.3 (Ct. App. 1999); *see also San Mateo Union High School District v. Cnty. of San Mateo*, 152 Cal. Rptr. 3d 530, 542–544 (Ct. App. 2013). The above discussion of the plaintiffs' § 815.6 claim, therefore, applies equally to their vicarious liability claim and they are entitled to summary judgment on the merits of this claim as well.

## VI. REASSIGNMENT

Plaintiffs have requested that we use our supervisory power to reassign this case to a different district judge on remand. We reassign a case to a different district judge in "unusual circumstances." *Krechman v. County of Riverside*, 723 F.3d 1104, 1111 (9th Cir. 2013). To determine whether such reassignment is appropriate we look to three factors: (1) whether the original judge could "reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected," (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would "entail waste and duplication out of proportion to any gain in preserving the appearance of fairness." *Id.* at 1111–12.

On remand from *Nozzi I*, the district judge made a number of statements indicating his strong disagreement with this Court's holding in *Nozzi I*. Then, before ruling in favor of the Housing Authority for the second time, the judge stated, "When you do argue this in the Ninth Circuit, don't make just that argument, because if you do . . . we'll be back here again, and I'll be tearing out my hair and saying I don't understand why this happened the way it did. In fact, let me just indicate that if this case gets reversed, I want it to be like Judge Wright or Judge Real. I want it to go to some other district court judge, because I have spent a lot of time on this case. . . . I pretty much have done all I can."

The district judge's statements constitute a "rare and extraordinary circumstance[]" justifying reassignment. *Krechman*, 723 F.3d at 1112. The judge repeatedly made clear that he would have substantial difficulty setting aside his previous views of the case. Under these circumstances, remand is not only "advisable," *Krechman*, 723 F.3d at 1111, but essential in order to preserve the appearance of justice. Accordingly, we need not consider the third factor. *Krechman*, 723 F.3d at 1102 ("The first two factors are equally important and a finding of either is sufficient to support reassignment on remand."). Regardless whether duplication of effort would be involved, we have no choice but to send the case to a judge whose designation would appear to be consistent with the interests of justice.[28] Lastly, we hold that this case must be reassigned to a district judge

---

[28] Although it does not affect our decision, we note that reassignment will not entail more than minimal duplication as there is little, if any, overlap between issues to be resolved on remand and the issues previously considered by the district court.

other than one of the two judges named by Judge Wu in order to "preserve the appearance of justice." *Id.*

## VII. CONCLUSION

In sum, the district court erred by granting summary judgment to the Housing Authority. There is no genuine dispute of fact as to whether the Housing Authority failed to provide meaningful information to Section 8 beneficiaries about the change to the payment standard and the effect of that change upon the beneficiaries and their property interests. That failure violated both the requirements of the Voucher Program regulations and the requirements of procedural due process. It also resulted in a violation of two state statutes which require public entities to take reasonable efforts to comply with the mandatory duties established by federal regulations. Accordingly, we reverse and remand with instructions for the district court to enter summary judgment in favor of the plaintiffs on the merits of the federal and state law claims at issue on this appeal. In order to preserve the appearance of justice, we order the case reassigned to a different district judge—a judge other than the two identified by the current district judge who himself has declined to hear the case further. On remand, further factual development may be needed to determine the size and validity of plaintiffs' class and to determine the appropriate remedy.

**REVERSED AND REMANDED.**

# APPENDIX A

## HOUSING AUTHORITY OF THE CITY OF LOS ANGELES

### NOTICE

Effective April 2, 2004 the Housing Authority lowered the payment standards used to determine your portion of the rent. We will not apply these lower payment standards until your next regular reexamination. If you move, however, these new lower payment standards will apply to your next unit.

### PAYMENT STANDARDS and
### TENANT-BASED SHELTER PLUS CARE PAYMENT STANDARDS
### EFFECTIVE APRIL 2, 2004

| Bedroom Size | Payment Standard |
|---|---|
| Mobile H. Space | $463 |
| SRO | $505 |
| 0 | $674 |
| 1 | $807 |
| 2 | $1,021 |
| 3 | $1,378 |
| 4 | $1,646 |
| 5 | $1,892 |
| 6 | $2,139 |
| 7 | $2,386 |

Regardless of its location, the unit's rent can never be higher than the comparable rents determined by the Housing Authority.

**En Español   ⇒**