**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 14-1945**

───────────────

STEPHEN V. KOLBE; ANDREW C. TURNER; WINK'S SPORTING GOODS, INCORPORATED; ATLANTIC GUNS, INCORPORATED; ASSOCIATED GUN CLUBS OF BALTIMORE, INCORPORATED; MARYLAND SHALL ISSUE, INCORPORATED; MARYLAND STATE RIFLE AND PISTOL ASSOCIATION, INCORPORATED; NATIONAL SHOOTING SPORTS FOUNDATION, INCORPORATED; MARYLAND LICENSED FIREARMS DEALERS ASSOCIATION, INCORPORATED,

                Plaintiffs - Appellants,

        and

SHAWN J. TARDY; MATTHEW GODWIN,

                Plaintiffs,

        v.

LAWRENCE J. HOGAN, JR., in his official capacity as Governor of the State of Maryland; BRIAN E. FROSH, in his official capacity as Attorney General of the State of Maryland; COLONEL WILLIAM M. PALLOZZI, in his official capacity as Secretary of the Department of State Police and Superintendent of the Maryland State Police; MARYLAND STATE POLICE,

                Defendants - Appellees.

------------------------------

STATE OF WEST VIRGINIA; STATE OF ALABAMA; STATE OF ALASKA; STATE OF ARIZONA; STATE OF FLORIDA; STATE OF IDAHO; STATE OF KANSAS; STATE OF LOUISIANA; STATE OF MICHIGAN; STATE OF MISSOURI; STATE OF MONTANA; STATE OF NEBRASKA; STATE OF NEW MEXICO; STATE OF NORTH DAKOTA; STATE OF OKLAHOMA; STATE OF SOUTH CAROLINA; STATE OF SOUTH DAKOTA; STATE OF TEXAS; STATE OF UTAH; STATE OF WYOMING; COMMONWEALTH OF KENTUCKY; TRADITIONALIST YOUTH NETWORK, LLC; NATIONAL RIFLE

ASSOCIATION OF AMERICA; CRPA FOUNDATION; GUN OWNERS OF
CALIFORNIA; COLORADO STATE SHOOTING ASSOCIATION; IDAHO STATE
RIFLE & PISTOL ASSOCIATION; ILLINOIS STATE RIFLE
ASSOCIATION; KANSAS STATE RIFLE ASSOCIATION; LEAGUE OF
KENTUCKY SPORTSMEN, INC.; NEVADA FIREARMS COALITION;
ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS; NEW MEXICO
SHOOTING SPORTS ASSOCIATION; NEW YORK RIFLE & PISTOL
ASSOCIATION; TEXAS STATE RIFLE ASSOCIATION; VERMONT
FEDERATION OF SPORTSMAN'S CLUBS; VERMONT RIFLE & PISTOL
ASSOCIATION; GUN OWNERS OF AMERICA, INC.; GUN OWNERS
FOUNDATION; U.S. JUSTICE FOUNDATION; THE LINCOLN INSTITUTE
FOR RESEARCH AND EDUCATION; THE ABRAHAM LINCOLN FOUNDATION
FOR PUBLIC POLICY RESEARCH, INC.; CONSERVATIVE LEGAL DEFENSE
AND EDUCATION FUND; INSTITUTE ON THE CONSTITUTION; CONGRESS
OF RACIAL EQUALITY; NATIONAL CENTER FOR PUBLIC POLICY
RESEARCH; PROJECT 21; PINK PISTOLS; WOMEN AGAINST GUN
CONTROL; THE DISABLED SPORTSMEN OF NORTH AMERICA; LAW
ENFORCEMENT LEGAL DEFENSE FUND; LAW ENFORCEMENT ACTION
NETWORK; LAW ENFORCEMENT ALLIANCE OF AMERICA; INTERNATIONAL
LAW ENFORCEMENT EDUCATORS AND TRAINERS ASSOCIATION; WESTERN
STATES SHERIFFS' ASSOCIATION,

                    Amici Supporting Appellants,

LAW CENTER TO PREVENT GUN VIOLENCE; MARYLANDERS TO PREVENT
GUN VIOLENCE, INCORPORATED; BRADY CENTER TO PREVENT GUN
VIOLENCE; STATE OF NEW YORK; STATE OF CALIFORNIA; STATE OF
CONNECTICUT; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF
IOWA; STATE OF MASSACHUSETTS; STATE OF OREGON; DISTRICT OF
COLUMBIA,

                    Amici Supporting Appellees.

━━━━━━━━━━

Appeal from the United States District Court for the District of
Maryland, at Baltimore.    Catherine C. Blake, District Judge.
(1:13-cv-02841-CCB)

━━━━━━━━━━

Argued: March 25, 2015                Decided: February 4, 2016

━━━━━━━━━━

Before TRAXLER, Chief Judge, and KING and AGEE, Circuit Judges.

━━━━━━━━━━

Affirmed in part, vacated in part, and remanded by published
opinion. Chief Judge Traxler wrote the opinion for the court as
to Parts I, II, III, V, and VI, in which Judge Agee joined.
Judge Agee wrote separately as to Part IV. Judge King wrote an
opinion dissenting as to Part III and concurring in the judgment
as to Parts IV and V. Chief Judge Traxler wrote a dissenting
opinion as to Part IV.

---

**ARGUED:** John Parker Sweeney, BRADLEY ARANT BOULT CUMMINGS LLP,
Washington, D.C., for Appellants. Matthew John Fader, OFFICE OF
THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for
Appellees. **ON BRIEF:** T. Sky Woodward, James W. Porter, III,
Marc A. Nardone, BRADLEY ARANT BOULT CUMMINGS LLP, Washington,
D.C., for Appellants. Douglas F. Gansler, Attorney General of
Maryland, Jennifer L. Katz, Assistant Attorney General, OFFICE
OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for
Appellees. Kyle J. Bristow, BRISTOW LAW, PLLC, Clarkston,
Michigan; Jason Van Dyke, THE VAN DYKE LAW FIRM, PLLC, Plano,
Texas, for Amicus Traditionalist Youth Network, LLC. Patrick
Morrisey, Attorney General, Elbert Lin, Solicitor General, Julie
Marie Blake, Assistant Attorney General, OFFICE OF THE ATTORNEY
GENERAL OF WEST VIRGINIA, Charleston, West Virginia, for Amicus
State of West Virginia; Luther Strange, Attorney General of
Alabama, Montgomery, Alabama, for Amicus State of Alabama;
Michael C. Geraghty, Attorney General of Alaska, Juneau, Alaska,
for Amicus State of Alaska; Thomas C. Horne, Attorney General of
Arizona, Phoenix, Arizona, for Amicus State of Arizona; Pam
Bondi, Attorney General of Florida, Tallahassee, Florida, for
Amicus State of Florida; Lawrence G. Wasden, Attorney General of
Idaho, Boise, Idaho, for Amicus State of Idaho; Derek Schmidt,
Attorney General of Kansas, Topeka, Kansas, for Amicus State of
Kansas; James D. Caldwell, Attorney General of Louisiana, Baton
Rouge, Louisiana, for Amicus State of Louisiana; Bill Schuette,
Attorney General of Michigan, Lansing, Michigan, for Amicus
State of Michigan; Chris Koster, Attorney General of Missouri,
Jefferson City, Missouri, for Amicus State of Missouri; Timothy
C. Fox, Attorney General of Montana, Helena, Montana, for Amicus
State of Montana; Jon Bruning, Attorney General of Nebraska,
Lincoln, Nebraska, for Amicus State of Nebraska; Gary King,
Attorney General of New Mexico, Santa Fe, New Mexico, for Amicus
State of New Mexico; Wayne Stenehjem, Attorney General of North
Dakota, Bismarck, North Dakota, for Amicus State of North
Dakota; E. Scott Pruitt Attorney General of Oklahoma, Oklahoma
City, Oklahoma, for Amicus State of Oklahoma; Alan Wilson,
Attorney General of South Carolina, Columbia, South Carolina,
for Amicus State of South Carolina; Martin J. Jackley, Attorney

General of South Dakota, Pierre, South Dakota, for Amicus State
of South Dakota; Greg Abbott, Attorney General of Texas, Austin,
Texas, for Amicus State of Texas; Sean Reyes, Attorney General
of Utah, Salt Lake City, Utah, for Amicus State of Utah; Peter
K. Michael, Attorney General of Wyoming, Cheyenne, Wyoming, for
Amicus State of Wyoming; Jack Conway, Attorney General of
Kentucky, Frankfort, Kentucky, for Amicus Commonwealth of
Kentucky.     Charles J. Cooper, David H. Thompson, Peter A.
Patterson, COOPER & KIRK, PLLC, Washington, D.C., for Amicus
National Rifle Association of America, Inc.     C.D. Michel,
Clinton B. Monfort, Anna M. Barvir, MICHEL & ASSOCIATES, P.C.,
Long Beach, California, for Amici CRPA Foundation, Gun Owners of
California, Colorado State Shooting Association, Idaho State
Rifle & Pistol Association, Illinois State Rifle Association,
Kansas State Rifle Association, League of Kentucky Sportsmen,
Inc., Nevada Firearms Coalition, Association of New Jersey Rifle
& Pistol Clubs, New Mexico Shooting Sports Association, New York
State Rifle & Pistol Association, Texas State Rifle Association,
Vermont Federation of Sportsmen's Clubs, and Vermont Rifle &
Pistol Association.  Michael Connelly, U.S. JUSTICE FOUNDATION,
Ramona, California, for Amicus U.S. Justice Foundation; Robert
J. Olson, Herbert W. Titus, William J. Olson, John S. Miles,
Jeremiah L. Morgan, WILLIAM J. OLSON, P.C., Vienna, Virginia,
for Amici Gun Owners of America, Inc., Gun Owners Foundation,
U.S. Justice Foundation, The Lincoln Institute for Research and
Education, The Abraham Lincoln Foundation for Public Policy
Research, Inc., Conservative Legal Defense and Education Fund,
and Institute on the Constitution.     Brian S. Koukoutchos,
Mandeville, Louisiana; James B. Astrachan, ASTRACHAN GUNST
THOMAS, P.C., Baltimore, Maryland, for Amici Congress of Racial
Equality, National Center for Public Policy Research, Project
21, Pink Pistols, Women Against Gun Control, and The Disabled
Sportsmen of North America.  Dan M. Peterson, DAN M. PETERSON,
PLLC, Fairfax, Virginia, for Amici The Law Enforcement Legal
Defense Fund, Law Enforcement Action Network, Law Enforcement
Alliance of America, International Law Enforcement Educators and
Trainers Association, and Western States Sheriffs' Association.
Jonathan K. Baum, Chicago, Illinois, Mark T. Ciani, KATTEN
MUCHIN ROSENMAN LLP, New York, New York, for Amici Law Center to
Prevent Gun Violence and Marylanders to Prevent Gun Violence,
Inc.  Jonathan E. Lowy, Kelly Sampson, BRADY CENTER TO PREVENT
GUN VIOLENCE, Washington, D.C.; Elliott Schulder, Suzan F.
Charlton, Amit R. Vora, Catlin Meade, Stephen Kiehl, COVINGTON
& BURLING LLP, Washington, D.C., for Amicus Brady Center To
Prevent Gun Violence.  Barbara D. Underwood, Solicitor General,
Anisha S. Dasgupta, Deputy Solicitor General, Claude S. Platton,
Assistant Solicitor General, Eric T. Schneiderman, Attorney

4

General of the State of New York, for Amicus State of New York;
Kamala D. Harris, Attorney General of California, Sacramento,
California, for Amicus State of California; George Jepsen,
Attorney General of Connecticut, Hartford, Connecticut, for
Amicus State of Connecticut; Russell A. Suzuki, Attorney General
of Hawaii, Honolulu, Hawaii, for Amicus State of Hawaii; Lisa
Madigan, Attorney General of Illinois, Chicago, Illinois, for
Amicus State of Illinois; Thomas J. Miller, Attorney General of
Iowa, Des Moines, Iowa, for Amicus State of Iowa; Martha
Coakley, Attorney General of Massachusetts, Boston,
Massachusetts, for Amicus Commonwealth of Massachusetts; Ellen
F. Rosenblum, Attorney General of Oregon, Salem, Oregon, for
Amicus State of Oregon; Karl A. Racine, Attorney General of The
District of Columbia, Washington, D.C., for Amicus The District
of Columbia.

———————————

TRAXLER, Chief Judge, wrote the opinion for the court as to Parts I, II, and III, in which Judge Agee joined.

In April 2013, Maryland passed the Firearm Safety Act ("FSA"), which, among other things, bans law-abiding citizens, with the exception of retired law enforcement officers, from possessing the vast majority of semi-automatic rifles commonly kept by several million American citizens for defending their families and homes and other lawful purposes. Plaintiffs raise a number of challenges to the FSA, contending that the "assault weapons" ban trenches upon the core Second Amendment right to keep firearms in defense of hearth and home, that the FSA's ban of certain larger-capacity detachable magazines ("LCMs") likewise violates the Second Amendment, that the exception to the ban for retired officers violates the Equal Protection Clause, and that the FSA is void for vagueness to the extent that it prohibits possession of "copies" of the specifically identified semi-automatic rifles banned by the FSA. The district court rejected Plaintiffs' Second Amendment challenges, concluding that the "assault weapons" and larger-capacity magazine bans passed constitutional muster under intermediate scrutiny review. The district court also denied Plaintiffs' equal protection and vagueness claims.

In our view, Maryland law implicates the core protection of the Second Amendment—"the right of law-abiding responsible

6

citizens to use arms in defense of hearth and home," District of Columbia v. Heller, 554 U.S. 570, 635 (2008), and we are compelled by Heller and McDonald v. City of Chicago, 561 U.S. 742 (2010), as well as our own precedent in the wake of these decisions, to conclude that the burden is substantial and strict scrutiny is the applicable standard of review for Plaintiffs' Second Amendment claim.  Thus, the panel vacates the district court's denial of Plaintiffs' Second Amendment claims and remands for the district court to apply strict scrutiny.  The panel affirms the district court's denial of Plaintiffs' Equal Protection challenge to the statutory exception allowing retired law enforcement officers to possess prohibited semi-automatic rifles.  And, the panel affirms the district court's conclusion that the term "copies" as used by the FSA is not unconstitutionally vague.

## I.  Background

### A.

The FSA substantially expanded Maryland's gun control laws. Prior to passage of the FSA, Maryland law permitted citizens in good standing to possess semi-automatic[1] rifles after passing an

---

[1] To fire a semi-automatic rifle, the shooter must pull the trigger each time he wishes to discharge a round of ammunition. In other words, a semi-automatic rifle fires "only one round with a single trigger pull. . . .  To fire a subsequent round, the trigger must be released and pulled again." J.A. 2254. By (Continued)

extensive background check.[2]   The FSA made it a crime after October 1, 2013, to "possess, sell, offer to sell, transfer, purchase, or receive" or to transport into Maryland any firearm designated as an "assault weapon."   Md. Code, Crim. Law § 4-303(a).   Under the FSA, the term "assault weapon" includes "assault long gun[s]," "assault pistol[s]," and "copycat weapon[s]."   Id. at § 4-301(d).   Plaintiffs' challenge in this appeal is limited to the ban on "assault long guns," i.e., most semi-automatic rifles.   An "assault long gun" is defined as any one of the more than 60 semi-automatic rifle or shotgun models specifically listed in section 5-101(r)(2) of the Maryland Public Safety Code, see Md. Code, Crim. Law § 4-301(b), "or their copies," Md. Code, Pub. Safety § 5-101(r)(2).[3]   The FSA

_____

contrast, an automatic rifle, like an M-16, will continuously discharge rounds "for as long as the trigger [is depressed or] until the magazine is empty."   Id. at 2254-55.   No party is challenging the ban on automatic weapons.

[2]   Pre-ban Maryland law required a prospective purchaser of what is now defined as an "assault weapon" to provide information such as his "name, address, Social Security number, place and date of birth, height, weight, race, eye and hair color, signature, driver's or photographic identification, [and] occupation."   2003 Maryland Laws Ch. 5, § 2.   This information is still required under current Maryland law for individuals wishing to purchase regulated firearms.   See Md. Code, Pub. Safety § 5-118(b)(1).

[3]   The term "assault pistol" is defined by reference to a list of 15 semi-automatic pistols, specified by make and model. See Md. Code, Crim. Law § 4-301(c).   Handguns are categorized (Continued)

does not define the term "copies."  The list of prohibited weapons includes the semi-automatic rifle models most popular by far among American citizens, the AR-15 "and all imitations" and the semi-automatic AK-47 "in all forms."  <u>Id.</u> at § 5-101(r)(2)(ii) and (xv).[4] Anyone who possesses a prohibited semi-automatic rifle or otherwise violates the FSA's restrictions on such rifles "is guilty of a misdemeanor" and is subject to a

_____

separately by the FSA, <u>see</u> Md. Code, Pub. Safety Code § 5-101(n)(1) (defining handgun as a "firearm with a barrel less than 16 inches in length"), although there certainly are semi-automatic handguns not listed as "assault pistols" under the FSA.

"Copycat weapons" are semi-automatic rifles and shotguns not specifically listed under section 5-102(r)(2) but similar in terms of style and features to the listed weapons.  <u>See</u> Md. Code, Crim. Law § 4-301(e)(2) ("'Copycat weapon' does not include an assault long gun or an assault pistol.").

[4]  Maryland's law does expressly permit its citizens to possess a couple of semi-automatic rifles.  For example, it specifically exempts the WWII-era M1 Garand, <u>see</u> Md. Code, Pub. Safety § 5-101(r)(2)(xxxvii), and the AR-15 "H-BAR", <u>see</u> § 5-101(r)(2)(xv), a heavy barrel iteration of the AR-15, neither of which are popular home defense firearms.  Citizens might also legally possess other semi-automatic rifles that are not listed under § 5-101(r)(2), presuming the citizen has sufficient expertise to determine that the firearm does not constitute a "copy" of one of the banned rifles or an "imitation" of the AR-15 pattern semi-automatic rifle.  One semi-automatic rifle that apparently passes muster is the AR-10, <u>see</u> J.A. 210, a firearm that is ill-suited to home defense for some smaller individuals because of its heavy recoil which makes it difficult "to reobtain the target and to quickly and accurately fire subsequent shots if needed."  J.A. 2267.

prison term of up to three years.   Md. Code, Crim. Law § 4-306(a).

The FSA also imposed new limits on the acquisition of detachable magazines in Maryland.   Prior to the FSA, Maryland law permitted the acquisition and transfer of detachable magazines with a capacity of up to 20 rounds.   See 2002 Maryland Laws Ch. 26, § 2.   The FSA now makes it illegal to "manufacture, sell, offer for sale, purchase, receive, or transfer a detachable magazine that has a capacity of more than 10 rounds of ammunition for a firearm."   Md. Code, Crim. Law § 4-305(b).[5]   The FSA, however, does not expressly prohibit the transportation of magazines holding more than 10 rounds into Maryland from out of state, as it does the transportation of semi-automatic rifles.   The same penalties that apply to a violation of the statutory prohibitions against semi-automatic rifles apply to a violation of the provisions regulating magazines holding more than 10 rounds.   See Md. Code, Crim. Law § 4-306(a).

The FSA provides a few exceptions to the ban on possessing semi-automatic rifles or LCMs.   For example, the statute

---

[5]   The statute defines a "detachable magazine" as "an ammunition feeding device that can be removed readily from a firearm without requiring disassembly of the firearm action or without the use of a tool, including a bullet or cartridge." Md. Code, Crim. Law § 4-301(f).

contains a grandfather clause pursuant to which "[a] person who lawfully possessed" or "completed an application to purchase" a prohibited semi-automatic rifle "before October 1, 2013" may lawfully continue to "possess and transport" it. See Md. Code, Crim. Law § 4-303(b)(3)(i). And the FSA's prohibitions do not apply to several classes of individuals, such as active law enforcement officers and licensed firearms dealers under certain circumstances. See Md. Code, Crim. Law §§ 4-302(1), (3). Another exception allows retired state or local law enforcement agents to possess banned weapons and LCMs if the weapon or magazine was "sold or transferred to the [retired agent] by the law enforcement agency on retirement," or the retired agent "purchased or obtained" the weapon "for official use with the law enforcement agency before retirement." See Md. Code, Crim. Law §§ 4-302(7)(i), (ii).

### B.

Plaintiff Stephen Kolbe is a life-long resident of Maryland who resides in Towson and owns a small business in Baltimore County. Kolbe owns "one full-size semiautomatic handgun" that is equipped with a standard detachable magazine that holds more than 10 rounds. J.A. 1851. Various personal experiences, including an incident in which an employee's ex-boyfriend threatened to come kill her at work but police did not respond for thirty minutes, and Kolbe's family's close proximity to "a

11

high-traffic public highway," J.A. 1852, have caused Kolbe to conclude that he needs to keep firearms for the purpose of "self-defense in [his] home." J.A. 1851. But for the ban imposed by the FSA, Kolbe would purchase a semi-automatic rifle, which "possess[es] features which make[s] [it] ideal for self-defense in the home." J.A. 1851.

Plaintiff Andrew Turner is a Maryland resident who currently owns three semi-automatic rifles, now banned as assault weapons under the FSA, and a semi-automatic handgun, all of which come with standard detachable magazines holding more than 10 rounds. While on active duty in the United States Navy, Turner suffered an injury that makes it difficult for him to operate firearms and thus necessitates "access to full-capacity magazines . . . to ensure," among other things, his ability to defend himself in his home. J.A. 1856. According to Turner, he would purchase additional semi-automatic rifles with detachable LCMs if Maryland law did not prohibit him from doing so. Turner's primary purpose for owning such firearms is self-defense in his home, but he also uses his currently owned semi-automatic rifles for target shooting and hunting.

Finally, Wink's Sporting Goods, Inc., and Atlantic Guns, Inc. -- two businesses that operate in the firearms, hunting, and sport shooting industries -- joined the individual plaintiffs in challenging the FSA. Likewise, several trade,

hunting and gun-owners' rights organizations joined as plaintiffs on their own behalf and on behalf of their members.[6]

Just before the FSA took effect on October 1, 2013, Plaintiffs filed a Motion for a Temporary Restraining Order and sought declaratory and injunctive relief, arguing that the ban on possession of assault rifles and the 10-round limitation on detachable magazines abridges their rights under the Second Amendment; that the exemption for retired law enforcement officers under the FSA violates the Equal Protection Clause of the Fourteenth Amendment; and that the term "copies" as it is used in section 5-101(r)(2) of Maryland's Public Safety Code is unconstitutionally vague under the Due Process Clause of the Fourteenth Amendment.

After the district court denied Plaintiffs' Motion for a Temporary Restraining Order, the parties filed cross motions for summary judgment on the merits. The district court determined that intermediate scrutiny applied to the Second Amendment claims. In granting summary judgment to the State, the district court concluded, under intermediate scrutiny, that Maryland's ban on "assault" rifles and LCMs met the applicable standards and was thus valid under the Second Amendment. See Kolbe v.

---

[6]    These include Associated Gun Clubs of Baltimore, Inc.; Maryland Shall Issue, Inc.; Maryland State Rifle and Pistol Association, Inc.; National Shooting Sports Foundation, Inc.; and the Maryland Licensed Firearms Dealers Association, Inc.

O'Malley, 42 F. Supp. 3d 768, 797 (D. Md. 2014). The district court also granted summary judgment for the State on Plaintiffs' Equal Protection claim to the statutory exception for retired law enforcement officers, holding that retired officers "are differently situated" than ordinary citizens who wish to obtain assault rifles. Id. at 798. Finally, the district court granted summary judgment for the State on Plaintiffs' vagueness claim based on its conclusion that the ban on possessing assault rifles "or their copies" sets forth "an identifiable core of prohibited conduct." Id. at 802.

Plaintiffs appeal.

## II.  Standard of Review

As we noted above, the district court decided this case on cross-motions for summary judgment. "When faced with cross-motions for summary judgment, we consider each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." Bacon v. City of Richmond, 475 F.3d 633, 337-38 (4th Cir. 2007) (internal quotation marks omitted). In doing so, we apply the ordinary de novo standard, while "resolving all doubts and inferences in favor of the non-moving party." Id.

Plaintiffs challenge each of the district court's rulings. We address these challenges seriatim.

14

III.   Second Amendment

We turn first to Plaintiffs' Second Amendment challenge to the FSA's ban on semi-automatic rifles and LCMs.  The Second Amendment, of course, provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  In United States v. Chester, we fashioned a two-part approach to resolving Second Amendment challenges, see 628 F.3d 673, 680 (4th Cir. 2010), much like the approach adopted by several of our sister circuits in the wake of Heller, see, e.g., Fyock v. Sunnyvale, 779 F.3d 991, 996 (9th Cir. 2015); Ezell v. City of Chicago, 651 F.3d 684, 701-03 (7th Cir. 2011); Heller v. District of Columbia ("Heller II"), 670 F.3d 1244, 1252 (D.C. Cir. 2011); United States v. Reese, 627 F.3d 792, 800-01 (10th Cir. 2010); United States v. Marzzarella, 614 F.3d 85, 89 (3d Cir. 2010).  First, we ask "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee."  Chester, 628 F.3d at 680 (internal quotation marks omitted).  The answer to this question requires an "historical inquiry" into "whether the conduct at issue was understood to be within the scope of the right at the time of ratification."  Id.; see Heller, 554 U.S. at 626-27.  If the answer to this initial inquiry is no, "the challenged law is valid."  Chester, 628 F.3d at 680.  However, "[i]f the

15

challenged regulation burdens conduct that was within the scope of the Second Amendment as historically understood, then we move to the second step of applying an appropriate form of means-end scrutiny."  Id.

A. Does the FSA's Ban Implicate Second Amendment Rights?

We first address the threshold question of whether the bans imposed by the FSA burden conduct that falls within the scope of the Second Amendment.  As is now well understood, Heller affirmed that the Second Amendment protects a preexisting "individual right to possess and carry weapons in case of confrontation."  554 U.S. at 592.  "[D]eeply rooted in this Nation's history and tradition," McDonald, 561 U.S. at 768 (internal quotation marks omitted), this right is among the "fundamental rights necessary to our system of ordered liberty," id. at 778.  The right to keep and bear arms historically has been understood to encompass "self-defense and hunting," Heller, 554 U.S. at 599, but Heller made clear "the central component of the Second Amendment right" is "individual self-defense," McDonald, 561 U.S. at 767.  Moreover, the right to keep arms is at its greatest strength in "the home, where the need for defense of self, family, and property is most acute."  Heller, 554 U.S. at 628.

The FSA makes it unlawful for any citizen "to possess, . . . purchase, or receive" an "assault weapon."  Md. Code, Crim.

Law § 4-303(a).[7]   The statute prohibits all forms of possession of any weapon listed in section 5-101(r)(2)—a law-abiding citizen cannot keep any of these weapons in the home for any reason, including the defense of self and family.   Accordingly, the conduct being regulated by the FSA includes an individual's possession of a firearm in the home for self-defense.

The Supreme Court has already performed an historical analysis of our traditional understanding of a citizen's right to keep a weapon at home for self-defense, concluding that "the right of law-abiding, responsible citizens to use arms in defense of hearth and home" lies at the core of the Second Amendment.   Heller, 554 U.S. at 635.   Any prohibition or restriction imposed by the government on the exercise of this right in the home clearly implicates conduct protected by the Second Amendment.

The right to keep and bear arms, as a matter of history and tradition, "is not unlimited," of course, as even law-abiding citizens do not have "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." Id. at 626.   Of particular relevance to this appeal is the historical limitation upon which arms a citizen had the right to bear, as the Second Amendment protects only "the sorts of

---

[7]   The same statutory prohibitions (except as to possession) apply to LCMs.   See Md. Code, Crim. Law § 4-305(b).

17

weapons . . . <u>in common use at the time</u>." <u>Id.</u> at 627 (emphasis added) (internal quotation marks omitted). "[The Second Amendment] does not extend to all types of weapons, only to those typically possessed by law-abiding citizens for lawful purposes." <u>Marzzarella</u>, 614 F.3d at 90. This limitation reflects "the historical tradition of prohibiting the carrying of dangerous <u>and</u> unusual weapons." <u>Id.</u> (internal quotation marks omitted; emphasis added).

Moreover, when the regulated conduct relates to a particular class of weapons, we must address an additional issue before we can say with assurance that the Second Amendment applies and turn to the question of the appropriate level of scrutiny. That is, we must determine whether the particular class of weapons prohibited or regulated by the statute are themselves protected by the Second Amendment. <u>See</u> <u>Friedman v. City of Highland Park</u>, 784 F.3d 406, 414 (7th Cir. 2015) (Manion, J., dissenting) ("[W]here, as here, the activity is directly tied to specific classes of weapons, we are faced with an additional threshold matter: whether the classes of weapons regulated are commonly used by law-abiding citizens. If the weapons in question (assault rifles and high-capacity magazines) are not commonly used by law-abiding citizens, then our inquiry ends as there is no Second Amendment protection . . . .").

In United States v. Miller, 307 U.S. 174 (1939), the Court rejected a Second Amendment challenge to the defendants' convictions for unlawful possession of a short-barreled shotgun because there was no "evidence tending to show" that such a weapon was related "to the preservation or efficiency of a well regulated militia" or was "part of the ordinary military equipment," id. at 178. Significantly, however, Miller noted that "ordinarily when called for [militia] service [able-bodied] men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time." Id. at 179; see Heller, 554 U.S. at 624–25 ("The traditional militia was formed from a pool of men bringing arms in common use at the time for lawful purposes like self-defense. In the colonial and revolutionary war era, small-arms weapons used by militiamen and weapons used in defense of person and home were one and the same." (internal quotation marks and alteration omitted)). Reading Miller's passages together, the Heller Court clarified Miller's holding and explained that "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." Heller, 554 U.S. at 625 (emphasis added). Accordingly, the Second Amendment extends only to those weapons "typically possessed by law-abiding citizens for lawful purposes," id.; see Marzzarella, 614 F.3d at 90 ("[The Second Amendment extends] . .

19

. only to those [weapons] typically possessed by law-abiding citizens for lawful purposes."); *Heller II*, 670 F.3d at 1260 ("[W]e must also ask whether the prohibited weapons are typically possessed by law-abiding citizens for lawful purposes; if not, then they are not the sorts of Arms protected by the Second Amendment." (internal citation and quotation marks omitted)); *United States v. Fincher*, 538 F.3d 868, 873 (8th Cir. 2008) (explaining there is no protection for "weapons not typically possessed by law-abiding citizens for lawful purposes" (internal quotation marks omitted)). Thus, we must determine whether semi-automatic rifles and LCMs are commonly possessed by law-abiding citizens for lawful purposes. *See Fyock*, 779 F.3d at 998; *Heller II*, 670 F.3d at 1260-61.

### Commonly Possessed

Like a number of courts that have previously considered this question, we have little difficulty in concluding that the banned semi-automatic rifles are in common use by law-abiding citizens. *See, e.g.*, *Heller II*, 670 F.3d at 1261 ("We think it clear enough in the record that semi-automatic rifles and magazines holding more than ten rounds are indeed in 'common use,' as the plaintiffs contend. Approximately 1.6 million AR-15s alone have been manufactured since 1986, and in 2007 this one popular model accounted for 5.5 percent of all firearms, and 14.4 percent of all rifles, produced in the U.S. for the

domestic market."); Colorado Outfitters Ass'n v. Hickenlooper, 24 F. Supp. 3d 1050, 1068 (D. Colo. 2014) (concluding that statute "affects the use of firearms that are both widespread and commonly used for self-defense," in view of the fact that "lawfully owned semi-automatic firearms using a magazine with the capacity of greater than 15 rounds number in the tens of millions"); Shew v. Malloy, 994 F. Supp. 2d 234, 246 (D. Conn. 2014) (concluding that semi-automatic rifles such as the AR-15 as well as magazines with a capacity greater than 10 rounds "are 'in common use' within the meaning of Heller and, presumably, used for lawful purposes"). We make the assessment based on the present-day use of these firearms nationwide. See, e.g., Heller II, 670 F.3d at 1261 (looking to present-day use to assess common use); United States v. Tagg, 572 F.3d 1320, 1326 (11th Cir. 2009) (same); United States v. Fincher, 538 F.3d 868, 874 (8th Cir. 2008) (same)

We think it is beyond dispute from the record before us, which contains much of the same evidence cited in the aforementioned decisions, that law-abiding citizens commonly possess semi-automatic rifles such as the AR-15. Between 1990 and 2012, more than 8 million AR- and AK-platform semi-automatic rifles alone were manufactured in or imported into the United States. J.A. 1877. In 2012, semi-automatic sporting rifles accounted for twenty percent of all retail firearms sales. J.A.

1880.  For perspective, we note that in 2012, the number of AR- and AK-style weapons manufactured and imported into the United States was more than double the number of Ford F-150 trucks sold, the most commonly sold vehicle in the United States.  J.A. 1878.

Likewise, the record in this case shows unequivocally that LCMs are commonly kept by American citizens, as there are more than 75 million such magazines in circulation in the United States.  In fact, these magazines are so common that they are standard.  "[O]n a nationwide basis most pistols are manufactured with magazines holding ten to 17 rounds."  J.A. 2122.  Even more than 20 years ago, "fully 18 percent of all firearms owned by civilians . . . were equipped with magazines holding more than ten rounds."  Heller II, 670 F.3d at 1261. Virtually every federal court to have addressed this question has concluded that "magazines having a capacity to accept more than ten rounds are in common use."  Fyock v. City of Sunnyvale, 25 F. Supp. 3d 1267, 1275 (N.D. Cal. 2014) (noting such magazines comprise "approximately 47 percent of all magazines owned" and number "in the tens-of-millions, even under the most conservative estimates" (internal quotation marks omitted), aff'd, 779 F.3d 991, 998 (9th Cir. 2015) ("[W]e cannot say that the district court abused its discretion by inferring from the evidence of record that, at a minimum, magazines are in common

22

use.").  "There may well be some capacity above which magazines are not in common use but, if so, the record is devoid of evidence as to what that capacity is; in any event, that capacity surely is not ten." Heller II, 670 F.3d at 1261; see also Shew, 994 F. Supp. 2d at 245-46; New York State Rifle & Pistol Ass'n, Inc. v. Cuomo, 990 F. Supp. 2d 349, 365 (W.D.N.Y. 2013).

In addition, we reject the State's argument that the Second Amendment does not apply to detachable magazines because magazines are not firearms—that is, detachable magazines do not constitute "bearable" arms that are expressly protected by the Second Amendment. See U.S. Const. amend. II. By Maryland's logic, the government can circumvent Heller, which established that the State cannot ban handguns kept in the home for self-defense, simply by prohibiting possession of individual components of a handgun, such as the firing pin. But of course, without the ability to actually fire a gun, citizens cannot effectively exercise the right to bear arms. See Jackson v. City of San Francisco, 746 F.3d 953, 967 (9th Cir. 2014) ("The Second Amendment protects 'arms,' 'weapons,' and 'firearms'; it does not explicitly protect ammunition. Nevertheless, without bullets, the right to bear arms would be meaningless."). In our view, "the right to possess firearms for protection implies a corresponding right" to possess component parts necessary to

23

make the firearms operable. _Id._ (internal quotation marks omitted); _see_ _Ezell_, 651 F.3d at 704 ("The right to possess firearms for protection implies a corresponding right to . . . maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective.").

This reasoning applies to the magazines in question. To the extent that firearms equipped with detachable magazines are commonly possessed by law-abiding citizens for lawful purposes, there must also be an ancillary right to possess the magazines necessary to render those firearms operable. To the extent the State can regulate these magazines, it is _not_ because the magazines are not bearable "arms" within the meaning of the Second Amendment.

Our conclusion that these magazines constitute "arms" also finds strong historical support. _Heller_ looked to early definitions of "arms" to determine what weapons implicated the Second Amendment, and those definitions were broad, including "weapons of offence, or armour of defence," or anything "that a man . . . takes into his hands, or useth in wrath to cast at or strike another." _Heller_, 554 U.S. at 581. Other dictionaries of the time say the same. _See, e.g._, Nathan Bailey, _An Universal Etymological English Dictionary_ 47 (1756) (defining "arm" as "to furnish with armour of defense, or weapons of

24

offence"). Obviously, magazines and the rounds they contain are used to strike at another and inflict damage. Early American provisions protecting the right to "arms" were also crafted partly in response to British measures that, while not taking away guns entirely, drastically impaired their utility -- suggesting "arms" should be read to protect all those items necessary to use the weapons effectively. See Saul Cornell, The Early American Origins of the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, and the Lessons of History, 17 Stan. L. & Pol'y Rev. 571, 577 (2006) (describing British efforts to steal colonial Williamsburg's store of gunpowder, thereby rendering the firearms of citizens useless). In short, magazines and other forms of ammunition have long been recognized as arms.

## Lawful Purposes

Plaintiffs Kolbe and Turner both seek to acquire and keep semi-automatic rifles, equipped with LCMs, in their homes primarily for self-defense. And, they proffered evidence suggesting that they are not alone in this regard. For example, Plaintiffs' expert James Curcuruto presented survey evidence showing that self-defense was a primary reason for the purchase of weapons banned under the FSA, and a 1989 Report from the Bureau of Alcohol, Tobacco, and Firearms indicated that self-defense was a suitable purpose for semi-automatic rifles. The

State's expert Daniel Webster even agreed that it is reasonable to assume that a purpose for keeping one of the prohibited weapons is self-defense in the home.

The State argues that even if ownership of the prohibited weapons and magazines is common, nothing in the record reflects that these weapons are commonly used for self-defense. More specifically, the State's position is premised on Plaintiffs' lack of evidence that the banned semi-automatic rifles have ever actually been used in self-defense in Maryland, as opposed to being possessed for self-defense.

The State's position flows from a hyper-technical, out-of-context parsing of the Supreme Court's statement in Heller "that the sorts of weapons protected were those in common use at the time." Heller, 554 U.S. at 627 (emphasis added; internal quotation marks omitted). The State misreads Heller, as Second Amendment rights do not depend on how often the semi-automatic rifles or regulated magazines are actually used to repel an intruder. The proper standard under Heller is whether the prohibited weapons and magazines are "typically possessed by law-abiding citizens for lawful purposes" as a matter of history and tradition, id. at 625 (emphasis added), not whether the magazines are often actually employed in self-defense incidents. Actual use in self-defense is a poor measure of whether a particular firearm is "typically possessed by law-abiding

26

citizens" for self-defense, as it is unlikely most people will ever need to actually discharge a firearm in self-defense. See Fyock, 25 F. Supp. 3d at 1276 ("The fact that few people will require a particular firearm to effectively defend themselves should be celebrated and not seen as a reason to except [that firearm] from Second Amendment protection. Evidence that such magazines are typically possessed by law-abiding citizens for lawful purposes is enough.").

More importantly, it is the government's burden to establish that a particular weapon or activity falls outside the scope of the Second Amendment right. See Ezell, 651 F.3d at 702-03 ("[I]f the government can establish that a challenged firearms law regulates activity falling outside the scope of the Second Amendment right as it was understood at the relevant historical moment—1791 or 1868—then the analysis can stop there."). So far as we can tell, nothing in the record suggests any such tradition with respect to semi-automatic rifles or LCMs. In fact, the Supreme Court, in a pre-Heller decision, hinted at the opposite, stating that "certain categories of guns," such as "machineguns, sawed-off shotguns, and artillery pieces," have a "quasi-suspect character," but that "guns falling outside those categories traditionally have been widely accepted as lawful possessions." Staples v. United States, 511 U.S. 600, 611-12 (1994). Heller reiterated that "the Second

27

Amendment does not protect those weapons <u>not typically possessed
by law-abiding citizens for lawful purposes</u>, such as short-
barreled shotguns." 554 U.S. at 625 (emphasis added).

We find nothing in the record demonstrating that law-
abiding citizens have been historically prohibited from
possessing semi-automatic rifles and LCMs. <u>See</u> <u>Friedman</u>, 784
F.3d at 418 (Manion, J., dissenting) ("[O]utside of weapons
deemed dangerous or unusual, there is no historical tradition
supporting wholesale prohibitions of entire classes of
weapons."). In fact, semi-automatic firearms have been in use
by the civilian population for more than a century.
"[I]nitially called 'self-loading' or 'auto-loading' firearms,"
J.A. 2254, semi-automatic weapons with detachable magazines
started to see significant advancements in the late 1800s. In
1893, the "Brochardt semi-auto pistol" was developed for the
civilian market. J.A. 2255. In 1905, Winchester produced a
semi-automatic rifle, equipped with either a five- or ten-round
detachable magazine. And, in 1963, Colt produced the SP-1 semi-
automatic rifle with a 20-round detachable magazine, later known
as the AR-15, a semi-automatic counterpart to the fully
automatic M-16. There is no record evidence or historical
documentation that these weapons were at all prohibited until
relatively recently.

<u>Dangerous and Unusual Weapons</u>

28

Finally, the State argues that the banned semi-automatic rifles are "unusually dangerous" and therefore do not fall within the ambit of the Second Amendment. _Heller_ makes clear that "dangerous and unusual" weapons are not "weapons typically possessed by law-abiding citizens for lawful purposes" that have some degree of Second Amendment protection. But because all firearms are dangerous by definition, the State reasons that _Heller_ must mean firearms that are "unusually dangerous" fall altogether outside of the scope of the Second Amendment. The State views the banned guns and LCMs as "unusually dangerous," rendering the Second Amendment inapplicable to the ban.

The State's novel "unusually dangerous" standard reads too much into _Heller_. As best we can tell, no statute or case has mentioned, much less adopted, the State's newly proffered standard.

In distinguishing between protected and unprotected weapons, _Heller_ focused on whether the weapons were _typically_ or _commonly_ possessed, not whether they reached or exceeded some undefined level of dangerousness. Hand grenades, sawed-off shotguns and fully automatic "M-16 rifles and the like," _Heller_, 554 U.S. at 627, are unusual weapons that fall outside of the Second Amendment because they are not in common use or typically possessed by the citizenry, _see id._; _Fincher_, 538 F.3d at 874 ("Machine guns are not in common use by law-abiding citizens for

lawful purposes and therefore fall within the category of dangerous and unusual weapons that the government can prohibit for individual use.").

Nothing in Heller suggests that courts considering a Second Amendment challenge must decide whether a weapon is "unusually dangerous." Moreover, the difficulties that would arise from the application of such a standard are fairly apparent. How is a court to determine which weapons are too dangerous to implicate the Second Amendment? The district court believed that semi-automatic rifles with LCMs are too dangerous based on evidence that they unleash greater destructive force than other firearms and appear to be disproportionately connected to mass shootings. But if the proper judicial standard is to go by total murders committed, then handguns should be considered far more dangerous than semi-automatic rifles. "[M]ost murders in America are committed with handguns. No other weapon is used nearly as often. During 2006, handguns were used in 60% of all murders while long guns . . . were used only in 7%." Carl T. Bogus, Gun Control & America's Cities: Public Policy & Politics, 1 Alb. Gov't L. Rev. 440, 447 (2008) (footnote omitted). And, the use of handguns in the number of overall homicides is out of proportion to the ownership of handguns. See id. at 447 ("[A]mong the 192 million guns in America only 35% are handguns. . . [H]andguns are used in 88% of all firearm

murders." (footnote omitted)).  Yet Heller has established that handguns are constitutionally protected and therefore cannot be too dangerous for Second Amendment purposes.

Furthermore, Heller refers to "dangerous" and "unusual" conjunctively, suggesting that even a dangerous weapon may enjoy constitutional protection if it is widely employed for lawful purposes, i.e., not unusual.  Founding era understandings of what it means for something to be "unusual" reflect that the firearm must be rare to be considered "unusual."  See Samuel Johnson, A Dictionary of the English Language 717 (1768) (defining "unusual" as "not common: not frequent: rare"); Bailey, supra, at 641 (defining "unusualness" as "rareness, and uncommonness"); accord Peruta v. Cnty. of San Diego, 742 F.3d 1144, 1154 (9th Cir. 2014) (suggesting that laws applicable to "dangerous and unusual" weapons were "understood to cover carriage of uncommon, frightening weapons only").  Scholars often read "unusual" in the same way.  See, e.g., Jordan Pratt, Uncommon Firearms as Obscenity, 81 Tenn. L. Rev. 633, 637 (2014) (equating "dangerous and unusual" firearms with "uncommon" ones"); Dan Terzian, The Right to Bear (Robotic) Arms, 117 Penn St. L. Rev. 755, 767 (2013) ("Most likely, common use is the sole limiting principle.").  If the firearm in question is commonly possessed for lawful purposes, it certainly isn't "rare" and thereby "unusual."  See, e.g., Fyock, 25 F. Supp. 3d

31

at 1275 ("To measure whether a weapon is dangerous and unusual, the court looks at whether it is in common use . . . ."); In re Wheeler, 81 A.3d 728, 750 (N.J. App. Div. 2013) ("[T]he protection was not understood to extend to the keeping, carrying or using of weapons that were deemed dangerous or unusual, in the sense that they were not typically used by the law-abiding and responsible for lawful purposes."). Indeed, it was only a dissent in Heller that focused on dangerousness alone. See Heller, 554 U.S. at 711 (Breyer, J., dissenting). Thus, the State's "unusually dangerous" argument is of no avail. Our good colleague in dissent would not reach this issue and therefore assumes for analytical purposes that semi-automatic rifles like the AR-15 are not "dangerous and unusual" but are commonly possessed by law-abiding citizens for lawful purposes.[8]

In sum, semi-automatic rifles and LCMs are commonly used for lawful purposes, and therefore come within the coverage of the Second Amendment.[9]

---

[8]  Although the dissent faults our conclusion that the AR-15 and other semi-automatic rifles prohibited by Maryland law are not so "dangerous and unusual" that they fall outside of the scope of the Second Amendment, the dissent does not rest on unusual dangerousness grounds.

[9]  Plaintiffs go too far in arguing that once we determine that the prohibited firearms fall within the protective ambit of the Second Amendment, the Act is unconstitutional and our analysis is at an end.  Although Heller indicated that the District of Columbia's ban on keeping operable handguns in the home would fail any level of constitutional scrutiny, Heller did (Continued)

B.  Appropriate Level of Scrutiny

Having determined that the Second Amendment covers the prohibited semi-automatic rifles, we next consider whether the district court erred in applying intermediate scrutiny.

We first consider which of the two relevant standards of scrutiny (strict or intermediate scrutiny) should apply.[10]  The strict-scrutiny standard requires the government to prove its restriction is "narrowly tailored to achieve a compelling

---

not do away with means-end scrutiny for Second Amendment challenges.  Heller simply found it unnecessary to decide the applicable level of scrutiny because a ban of handguns, the overwhelming choice of Americans for home defense, was clearly unconstitutional regardless of the standard applied.  See Heller II, 670 F.3d at 1265 ("If the Supreme Court truly intended to rule out any form of heightened scrutiny for all Second Amendment cases, then it surely would have said at least something to that effect.").  Accordingly, in most every post-Heller case implicating the Second Amendment, we have assumed that "an appropriate form of means-end scrutiny" will be applied once we determine that a challenged law implicates the Second Amendment.  See United States v. Pruess, 703 F.3d 242, 245 (4th Cir. 2012); United States v. Carpio-Leon, 701 F.3d 974, 978 (4th Cir. 2012); United States v. Carter ("Carter I"), 669 F.3d 411, 416 (4th Cir. 2012); United States v. Chapman, 666 F.3d 220, 225 (4th Cir. 2012); United States v. Staten, 666 F.3d 154, 158 (4th Cir. 2011); Chester II, 628 F.3d at 678.  Unless the Supreme Court directs us to the contrary, we will apply "an appropriate means-end scrutiny" to determine whether firearm regulations can apply to acts coming under the protection of the Second Amendment.

[10] In a Second Amendment challenge, we will not conduct rational-basis review.  See Heller, 554 U.S. at 628 n.27 ("If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect.").

governmental interest." Abrams v. Johnson, 521 U.S. 74, 82 (1997); see Citizens United v. Federal Election Comm'n, 558 U.S. 310, 340 (2010) (explaining strict scrutiny "requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest" (internal quotation marks omitted)). To be narrowly tailored, the law must employ the least restrictive means to achieve the compelling government interest. See United States v. Playboy Entertainment Group, Inc., 529 U.S. 803, 813 (2000). Conversely, intermediate scrutiny requires the government to "demonstrate . . . that there is a reasonable fit between the challenged regulation and a substantial government objective." Chester, 628 F.3d at 683. For several reasons, we find that the Act's firearms and magazine bans require strict scrutiny.

In Chester, we adopted a First-Amendment-like approach to determining the appropriate level of scrutiny to apply to any given Second Amendment challenge. To select the proper level of scrutiny, we consider "the nature of the conduct being regulated and the degree to which the challenged law burdens the right." 628 F.3d at 682. "A less severe regulation -- a regulation that does not encroach on the core of the Second Amendment -- requires a less demanding means-ends showing." Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco & Firearms, 700 F.3d 185, 195 (5th Cir. 2012); see also United States v.

34

_Huitron-Guizar_, 678 F.3d 1164, 1166 (10th Cir. 2012) ("The right to bear arms, however venerable, is qualified by what one might call the 'who,' 'what,' 'where,' 'when,' and 'why.'").

First, the FSA's ban on semi-automatic rifles and larger-capacity magazines burdens the availability and use of a class of arms for self-defense in the home, where the protection afforded by the Second Amendment is at its greatest. It implicates the "core" of the Second Amendment: "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." _Heller_, 554 U.S. at 634, 635; see _Kachalsky v. County of Westchester_, 701 F.3d 81, 89 (2d Cir. 2012) ("What we know from [_Heller_ and _McDonald_] is that Second Amendment guarantees are at their zenith within the home."). At stake here is a "basic right," _McDonald_, 561 U.S. at 767, "that the Framers and ratifiers of the Fourteenth Amendment counted . . . among those fundamental rights necessary to our system of ordered liberty," _id._ at 778. Indeed, "[t]he [Supreme] Court [in _Heller_] went to great lengths to emphasize the special place that the home—an individual's private property—occupies in our society." _GeorgiaCarry.Org, Inc. v. Georgia_, 687 F.3d 1244, 1259 (11th Cir. 2012).

Second, we conclude that the challenged provisions of the FSA substantially burden this fundamental right. The burden imposed in this case is not merely incidental. Maryland law

imposes a complete ban on the possession by law-abiding citizens of AR-15 style rifles—the most popular class of centerfire semi-automatic rifles in the United States.   As we explained in Section III.A., these weapons are protected under the Second Amendment.   We therefore struggle to see how Maryland's law would not substantially burden  the core Second Amendment right to defend oneself and one's family in the home with a firearm that is commonly possessed by law-abiding citizens for such lawful purposes.  Moreover, the FSA also reaches every instance where an AR-15 platform semi-automatic rifle or LCM might be preferable to handguns or bolt-action rifles--for example hunting, recreational shooting, or competitive marksmanship events, all of which are lawful purposes protected by the Constitution.  See Friedman v. City of Highland Park, 136 S. Ct. 447 (Mem.) (December 7, 2015) (Thomas, J., dissenting from the denial of cert.) ("[T]he ordinance criminalizes modern sporting rifles (e.g., AR-style semiautomatic rifles), which many Americans own for lawful purposes like self-defense, hunting, and target shooting.").   Thus, the FSA completely prohibits, not just regulates, an entire category of weaponry.[11]   As Judge

---

[11]     Despite my good friend's contrary suggestion, in prohibiting the AR-15 platform or pattern rifles and its copies or imitations, Maryland law is prohibiting  an entire class of semi-automatic rifles. Indeed, the district court recognized that the Maryland firearm law "remove[s] a class of weapons" (Continued)

Kavanaugh noted in dissent in Heller II, prohibiting this group of weapons might be "equivalent to a ban on a category of speech."  670 F.3d at 1285.

Contrary to the district court's conclusion, the fact that handguns, bolt-action and other manually-loaded long guns, and, as noted earlier, a few semi-automatic rifles are still available for self-defense does not mitigate this burden.  See, e.g., Jackson v. City & Cnty. of San Fran., 135 S. Ct. 2799, 2801 (2015) (Thomas, J., dissenting from the denial of certiorari) ("[N]othing in our decision in Heller suggested that a law must rise to the level of the absolute prohibition at issue in that case to constitute a 'substantial burden' on the core of the Second Amendment right.").  Indeed, the Supreme Court rejected essentially the same argument in Heller—that the District of Columbia's handgun ban did not unconstitutionally

---

that the plaintiffs want for home defense.  J.A. 181 (emphasis added).  Even the State's expert witness refers to the "AR-15 class" of firearms.  J.A. 438,  Modern sporting rifles using the AR-15 platform or pattern are produced by numerous manufacturers including Colt, Olympic Arms, DPMS, Eagle Arms, Bushmaster, SGW Enterprises, Essential Arms, and Sendra.  Although the FSA specifically lists the "Colt AR-15" as a prohibited weapon, the AR-15 style semi-automatic rifles produced by other manufacturers would be prohibited as copies or imitations under Md. Code, Pub. Safety § 5-101(r)(2)(xv).  See Friedman v. City of Highland Park, 136 S. Ct. 447 (Mem.) (December 7, 2015) (Thomas, J., dissenting from the denial of cert.) (describing similar "Assault Weapons" ordinance as "categorical[ly] ban[ning] . . . firearms that millions of Americans commonly own for lawful purposes"); see also J.A. 413.

burden the right to self-defense because the law permitted the possession of long guns for home defense.  See *Heller*, 554 U.S. at 629 ("It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.,* long guns) is allowed."); accord *Parker v. District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007) (rejecting the District's argument that alternative weapons rendered handgun ban lawful, calling it "frivolous," and noting that "[i]t could be similarly contended that all firearms may be banned so long as sabers were permitted"); *cf.* *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 556 (1975) ("[O]ne is not to have the exercise of liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.").  A semi-automatic rifle may not be "the quintessential self-defense weapon," as *Heller* described the handgun, 554 U.S. at 629; nonetheless, as we explained previously, AR-15s and the like are commonly possessed by law-abiding citizens for self-defense and other lawful purposes and are protected under the Second Amendment.

There are legitimate reasons for citizens to favor a semi-automatic rifle over handguns in defending themselves and their families at home.  The record contains evidence suggesting that "handguns are inherently less accurate than long guns" as they "are more difficult to steady" and "absorb less of the recoil .

38

. . ., reducing accuracy." J.A. 2131. This might be an important consideration for a typical homeowner, who "under the extreme duress of an armed and advancing attacker is likely to fire at, but miss, his or her target." J.A. 2123. "Nervousness and anxiety, lighting conditions, the presence of physical obstacles . . . and the mechanics of retreat are all factors which contribute to [the] likelihood" that the homeowner will shoot at but miss a home invader. J.A. 2123. These factors could also affect an individual's ability to reload a firearm quickly during a home invasion. Similarly, a citizen's ability to defend himself and his home is enhanced with an LCM.

In sum, for a law-abiding citizen who, for whatever reason, chooses to protect his home with a semi-automatic rifle instead of a semi-automatic handgun, or possesses an LCM for use in firearms kept in the home, the FSA significantly burdens the exercise of the right to arm oneself at home. "The right to self-defense is largely meaningless if it does not include the right to choose the most effective means of defending oneself." Friedman, 784 F.3d at 418 (Manion, J., dissenting); see id. at 413 ("[T]he ultimate decision for what constitutes the most effective means of defending one's home, family, and property resides in individual citizens and not the government. . . . The extent of danger—real or imagined—that a citizen faces at home is a matter only that person can assess in full."). The

39

FSA "restrict[s] the right[] of [Maryland's] citizens to select the means by which they defend their homes and families."  Id. at 419.

As we have noted on previous occasions, "any law that would burden the 'fundamental,' core right of self-defense in the home by a law-abiding citizen would be subject to strict scrutiny. But, as we move outside the home, firearm rights have always been more limited."  United States v. Masciandaro, 638 F.3d 458, 470 (4th Cir. 2011).  "[T]his longstanding out-of-the-home/in-the-home distinction bears directly on the level of scrutiny applicable," id., with strict scrutiny applying to laws restricting the right to self-defense in the home, see Woollard v. Gallagher, 712 F.3d 865, 878 (4th Cir. 2013) (observing that restrictions on "the right to arm oneself at home" necessitates the application of strict scrutiny).  Strict scrutiny, then, is the appropriate level of scrutiny to apply to the ban of semi-automatic rifles and magazines holding more than 10 rounds.  See Friedman, 784 F.3d at 418 (Manion, J., dissenting); cf. Heller II, 670 F.3d at 1284 (Kavanaugh, J., dissenting) (reading Heller as departing from traditional scrutiny standards but stating that "[e]ven if it were appropriate to apply one of the levels of scrutiny after Heller, surely it would be strict scrutiny rather than . . . intermediate scrutiny").

We recognize that other courts have reached different outcomes when assessing similar bans, but we ultimately find those decisions unconvincing.

The Seventh Circuit, for instance, recently upheld a ban on "assault weapons" and LCMs by dispensing with levels of scrutiny entirely. See Friedman, 784 F.3d at 410. Instead, that court conjured its own test, asking "whether a regulation bans weapons that were common at the time of ratification or those that have some reasonable relationship to the preservation or efficiency of a well regulated militia, and whether law-abiding citizens retain adequate means of self-defense." Id. (internal quotation marks and citations omitted). The Seventh Circuit's approach cannot be reconciled with Heller, which looked to present-day use to assess whether handguns are in common use (and consequently protected). See 554 U.S. at 629; see also id. at 582 ("Some have made the argument, bordering on the frivolous, that only those arms in existence in the 18th century are protected by the Second Amendment." (emphasis added)). Friedman, on the other hand, ignores the Supreme Court's specification of present-day focus and asks instead whether certain features of the weapons in question were common at the time of the Founding, effectively elevating a Heller dissent to constitutional canon. Compare Friedman, 784 F.3d at 408-09 (suggesting that present day common use cannot be the relevant

test because machine guns were in common use when they were federally banned in 1934 and are now uncommon because of the ban), with Heller, 554 U.S. at 720-21 (Breyer, J., dissenting) (same).

Friedman's problems stretch beyond its direct contradiction of Heller. For instance, the Friedman opinion defines the scope of the Second Amendment right by reference to militias -- but it then declares that states, "which are in charge of militias," should determine what weapons are rightfully held for militia-related purposes. Friedman, 784 F.3d at 410-11. That course effectively permits states to opt-out of the Second Amendment. But see McDonald, 561 U.S. at 750 ("[T]he Second Amendment right is fully applicable to states."). Friedman also concludes that the "dangerousness" of the regulated weapons should not be decisive, Friedman, 784 F.3d at 409, but nevertheless dismisses the self-defense-related benefits of those same weapons because they "can fire more shots, faster, and thus can be more dangerous in aggregate," id. at 411. And it recognizes that the restriction must be supported by some genuine state interest, but then finds such an interest in the fact that bans might "reduce[] the perceived risk from a mass shooting." Id. at 412 (emphasis added). In other words, under the Seventh Circuit's view, a significant restriction on a fundamental right might be justified by benefits that are quite literally imagined into

42

existence.    Needless  to  say,  we  see  much  to  question  in  the
Seventh Circuit's decision.

Two  courts  of  appeal  have  applied  the  standard  of
intermediate  scrutiny  to  restrictions  like  Maryland's.    See
Fyock, 779 F.3d at 999 (applying intermediate scrutiny to an LCM
ban); Heller II, 670 F.3d at 1262 (applying intermediate
scrutiny to a semi-automatic weapon and LCM ban).  Both did so
after  rather  conclusorily  determining  that  the  bans  in  those
cases  did  not  impose  any  significant  burden  on  the  Second
Amendment right.  For its part, the D.C. Circuit was "reasonably
certain"  that  the  challenged  laws  didn't  impose  a  substantial
burden, Heller II, 670 F.3d at 1262, while the Ninth Circuit
found  that  the  district  court  did  not  "abuse [its] discretion"
at  the  preliminary  injunction  stage  in  finding  much  the  same,
Fyock, 779 F.3d at 999.

For example, the D.C. Circuit in Heller II, with de minimis
analysis,  simply  concluded  that  prohibitions  of  the  arms  in
question  would  meet  intermediate  scrutiny  because  "the  ban  on
certain semi-automatic rifles [does not] prevent a person from
keeping  a  suitable  and  commonly  used  weapon  for  protection  in
the home or for hunting[.]"  670 F.3d at 332.  As noted earlier,
this genre of judicial conclusion seems plainly contrary to the
Supreme Court's logic and statements in Heller: "It is no answer
to  say . . .  that  it  is  permissible  to  ban  the  possession  of

43

handguns so long as the possession of other firearms (i.e., long guns) is allowed." 554 U.S. at 629. Notwithstanding this guidance from the Supreme Court, the Heller II court went on to also summarily conclude that "the prohibition of semi-automatic rifles and large-capacity magazines does not effectively disarm individuals or substantially affect their ability to defend themselves." 670 F.3d at 1262. This holding seems to directly contradict the Supreme Court's statement in Heller that the Second Amendment "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." 554 U.S. at 635. Thus, we find Heller II and Fyock without persuasive reasoning and simply incorrect.

Whatever may be said about the bans at issue in Fyock and Heller II, it should be obvious by this point that we view Maryland's ban quite differently. A wholesale ban on an entire class of common firearms is much closer to the total handgun ban at issue in Heller than more incidental restrictions that might be properly subject to intermediate scrutiny. The law here "goes beyond mere regulation" and is instead "a total prohibition of possession of certain types of arms." Arnold v. Cleveland, 616 N.E.2d 163, 176 (Ohio 1993) (Hoffman, J., concurring in part and dissenting in part) (addressing assault-weapons ban); see also Marzzarella, 614 F.3d at 97 (stressing

that the ban in Heller was subject to most scrutiny because "[i]t did not just regulate possession of handguns; it prohibited it"). In this way, Maryland's outright ban on LCMs and "assault weapons" is akin to a law that "foreclose[s] an entire medium of expression." City of Ladue v. Gilleo, 512 U.S. 43, 55 (1994). Such laws receive exceptionally rigorous review in the analogous context of the First Amendment, id., and we see no reason for a different method here.

Our distinguished dissenting colleague asserts that we have imprudently and unnecessarily broken with our sister courts of appeal and infers that we will bear some responsibility for future mass shootings. In our view, inferences of this nature have no place in judicial opinions and we will not respond beyond noting this. The meaning of the Constitution does not depend on a popular vote of the circuits and it is neither improper nor imprudent for us to disagree with the other circuits addressing this issue. We are not a rubber stamp. We require strict scrutiny here not because it aligns with our personal policy preferences but because we believe it is compelled by the law set out in Heller and Chester.

Because the district court did not evaluate the challenged provisions of the FSA under the proper standard of strict scrutiny, and the State did not develop the evidence or arguments required to support the FSA under the proper standard,

45

we vacate the district court's order as to Plaintiffs' Second Amendment challenge and remand for the court to apply strict scrutiny in the first instance. This is not a finding that Maryland's law is unconstitutional. It is simply a ruling that the test of its constitutionality is different from that used by the district court. The State should be afforded the opportunity to develop its case in light of this more demanding standard, and Plaintiffs should be permitted to do so as well. In doing so, the parties may look to "a wide range of sources, such as legislative text and history, empirical evidence, case law, and common sense, as circumstances and context require." Carter I, 669 F.3d at 418.[12]

## IV. Equal Protection

---

[12] In light of our decision to remand the Second Amendment claim, we need not address Plaintiffs' arguments that the district court committed error by granting summary judgment to the State when there were several material facts in dispute, and, by the same token, denying summary judgment to Plaintiffs when the record contained various undisputed material facts that required entry of judgment as a matter of law in favor of Plaintiffs.

Plaintiffs also contest the district court's denial of their motion to exclude expert and fact testimony offered by the State. Having carefully considered these arguments, we conclude that the district court did not abuse its wide discretion in evidentiary matters by denying the motions and considering the testimony. See United States v. Min, 704 F.3d 314, 324-25 (4th Cir. 2013) (decisions under Rule of Evidence 701 reviewed for abuse of discretion); United States v. Wilson, 484 F.3d 267, 273 (4th Cir. 2007) (Rule of Evidence 702).

AGEE, Circuit Judge, wrote a separate opinion as to Part IV, in which Judge King concurred in the judgment:

The Equal Protection Clause guarantees that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.[13]   It does not follow, however, that all classifications are forbidden. Instead, the Equal Protection Clause is designed to "keep[] governmental decisionmakers from treating differently persons who are in all relevant respects alike." Nordlinger v. Hahn, 505 U.S. 1, 10 (1992).   In our view, the district court correctly determined that retired police officers are not similarly situated with the public at large for purposes of the Maryland Firearm Safety Act ("FSA").   Therefore, granting those officers certain rights under the FSA does not violate the Equal Protection Clause.

A.

1.

To succeed on an equal-protection claim, "a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated." Sandlands C & D LLC v. Cnty. of Horry, 737 F.3d 45, 55 (4th Cir. 2013).   "Generally, in determining whether persons are similarly situated for equal

---

[13]   This portion of the opinion omits internal marks, alterations, citations, emphasis, or footnotes from quotations unless otherwise noted.

protection purposes, a court must examine <u>all</u> relevant factors."
<u>United States v. Olvis</u>, 97 F.3d 739, 744 (4th Cir. 1996)
(emphasis added).  The court applies an appropriate level of
constitutional scrutiny to the challenged governmental act only
<u>after</u> the plaintiff makes this initial showing of similarity,
along with a showing that the government acted purposefully or
intentionally.  <u>Sandlands C & D LLC</u>, 737 F.3d at 55.

The "similarly situated" standard requires a plaintiff to
identify persons materially identical to him or her who has
received different treatment.  Different courts describe this
requirement in different ways.  The Seventh Circuit, for
example, has said that the two compared groups must be
"identical or directly comparable in all material respects."
<u>LaBella Winnetka, Inc. v. Village of Winnetka</u>, 628 F.3d 937, 942
(7th Cir. 2010).  The Eleventh Circuit indicates that different
groups must be "prima facie identical" to provide the relevant
comparison.  <u>Grider v. City of Auburn, Ala.</u>, 618 F.3d 1240, 1264
(11th Cir. 2010).  The First Circuit, meanwhile, takes a more
colloquial approach, stressing that "apples should be compared
to apples."  <u>Barrington Cove Ltd. P'ship v. R.I. Hous. & Mortg.</u>
<u>Fin. Corp.</u>, 246 F.3d 1, 8 (1st Cir. 2001).  However the test is
written, the basic point is the same: the "evidence must show an
extremely high degree of similarity."  <u>Willis v. Town of</u>
<u>Marshall, N.C.</u>, 275 F. App'x 227, 233 (4th Cir. 2008); <u>see also</u>

48

LaBella, 628 F.3d at 942 ("The similarly situated analysis is not a precise formula, but . . . what is clear is that similarly situated individuals must be very similar indeed.").

2.

A retired officer enjoys two privileges under the FSA that the public does not. First, he may possess an "assault weapon" as long as it was "sold or transferred to the [officer] by the law enforcement agency on retirement" or the officer "purchased or obtained" it "for official use with the law enforcement agency before retirement." Md. Code, Crim. Law § 4-302(7). Second, he is not subject to any of the restrictions on larger-capacity magazines. Id. § 4-305(a)(2).

Exceptions for retired law enforcement officers like these are common in firearms regulations. See, e.g., Cal. Penal Code §§ 25450, 26015; D.C. Code § 7-2502.01(a)(2); N.Y. Penal Law § 265.20.e (McKinney 2015); see also Public Safety and Recreational Firearms Use Protection Act, Pub. L. No. 103-322, § 110102(a)(4)(C), 108 Stat. 1796, 1996 (1994) (repealed 2004). But according to Plaintiffs, the differentiation found in Maryland's law renders the entire FSA unconstitutional. See Opening Br. 44 n.8.

B.

Plaintiffs argue that, when it comes to owning semi-automatic weapons and larger-capacity magazines, retired law

49

enforcement officers and the public at large are "similarly situated." In our view, that argument fails because retired law enforcement officers are different from the public in several fundamental respects. Three dissimilarities are particularly relevant.

1.

First, retired police officers possess a unique combination of training and experience related to firearms. See Shew v. Malloy, 994 F. Supp. 2d 234, 252 (D. Conn. 2014); Pineiro v. Greene, 937 F. Supp. 2d 161, 176 (D. Mass. 2013). All Maryland police officers undergo comprehensive training and qualification on their firearms. See Code of Md. Admin. Regs. 12.04.02.03–.10. This training incorporates live-fire exercises and academic study. Moreover, it covers not just how to fire a weapon accurately, but also when a given firearm is appropriately used, how to minimize harm, and how to safely store the firearm -- among many other subjects. After initial qualification, officers must then undergo additional training every year.

The officers do not just participate in some "general" form of firearms training. Rather, the officers that carry assault weapons on duty -- and thus, those most likely to obtain those weapons upon retirement -- must receive further training and certification tests that pertain specifically to those weapons.

An officer who wishes to carry an AR-15, for instance, must fire at least 350 rounds of ammunition with that weapon during initial training and qualification. See id. 12.04.02.06B(3)(c). The same officer must also spend at least 14 hours in the classroom discussing the appropriate use of such weapons. See id. 12.04.02.06B(2)(c). If an officer fails to meet any one of these requirements, he may not carry that weapon.

On a day-to-day basis, through their years of employment, police officers gain further practical experience with their weapons -- experience that few, if any, private civilians can claim to possess in equal measure. For "[u]nlike most employees in the workforce, peace officers carry firearms because their occupation requires them on occasion to confront people who have no respect either for the officers or for the law." Gonzalez v. City of Anaheim, 747 F.3d 789, 799 (9th Cir. 2014) (Trott, J., dissenting in part and concurring in part); see also United States v. Fernandez, 121 F.3d 777, 780 (1st Cir. 1997) ("[L]aw enforcement officers usually carry weapons[.]"). Indeed, perhaps except for military personnel, police officers likely have more experience with a firearm than any other profession in America.

And retired police officers are eligible to possess prohibited firearms under the FSA only when those firearms come directly from their employer upon retirement. In other words, the FSA does not grant open permission to acquire prohibited

51

firearms at will.    The officers will therefore have special familiarity and training with the specific weapons they are permitted to obtain.    It is significant that the FSA exceptions for retired police officers contain this clear nexus to their professional law enforcement employment and training.

2.

Second, because they are granted a "special degree of trust," O'Donnell v. Barry, 148 F.3d 1126, 1135 (D.C. Cir. 1998), police officers are instilled with what might be called an unusual ethos of public service.    "[Police forces] must demand a high level of discipline and duty of their members in order to function effectively for the good of all members of society."    Vorbeck v. Schnicker, 660 F.2d 1260, 1263 (8th Cir. 1981).    Officers swear to uphold the law and serve the public from the very start.    Indeed, they most often take such an oath on their first day as an officer.    Once employed, they agree to "serve mankind," and "to safeguard lives and property; to protect the innocent against deception; the weak against oppression or intimidation, and the peaceful against violence or disorder."    John Kleinig, The Ethics of Policing 236 (1996) (quoting International Association of Chiefs of Police's Law Enforcement Code of Ethics); see also Seegmiller v. LaVerkin City, 528 F.3d 762, 765 (10th Cir. 2008) (describing a law enforcement code of ethics); Thaeter v. Palm Beach Cty.

52

<u>Sheriff's Office</u>, 449 F.3d 1342, 1345-46 (11th Cir. 2006) (same).

The officers' responsibilities go beyond mere pledges and oaths, as the law requires police officers to meet the highest standards of conduct in acting to protect the public. For example, a police officer "owe[s] a fiduciary duty to the public to make governmental decisions in the public's best interests." <u>United States v. Woodard</u>, 459 F.3d 1078, 1086 (11th Cir. 2006). Likewise, "police have a duty to protect both the lives and the property of citizens." <u>United States v. Markland</u>, 635 F.2d 174, 176 (2d Cir. 1980). The law then grants officers the authority to arrest, detain, and use force to fulfill these essential responsibilities.

Given these publicly oriented responsibilities, law enforcement officers -- retired and active alike -- are "not to be equated with a private person engaged in routine public employment or other common occupations of the community." <u>Foley v. Connelie</u>, 435 U.S. 291, 298 (1978); <u>see also</u> <u>Peña v. Lindley</u>, No. 2:09-CV-01185-KJM-CKD, 2015 WL 854684, at *17 (E.D. Cal. Feb. 26, 2015) (holding that police officers' charge to protect the public differentiated them from the public); <u>Shew</u>, 994 F. Supp. 2d at 252 (same); <u>cf.</u> <u>Detroit Police Officers Ass'n v. City of Detroit</u>, 190 N.W.2d 97, 98 (Mich. 1971) ("The police force is a semi-military organization subject at all times to

immediate mobilization, which distinguishes this type of employment from every other in the classified service."). Retired and active police officers are used to acting in the public interest in a way that does not apply to the public at large.

3.

Third, retired police officers face special threats that private citizens do not. Most obviously, "retired law enforcement officers often have to defend themselves . . . from criminals whom they have arrested." H.R. Rep. 108-560, at 4 (2004), reprinted in 2004 U.S.C.C.A.N. 805, 806; see, e.g., Alison Gendar, Ex-Con with Grudge Busted in Bashing, N.Y. Daily News, July 1, 2007, at 13 ("Armed with a grudge and a set of brass knuckles, an ex-con pummeled a retired cop last week as payback for a minor arrest in 2002, authorities said."). This "greater risk of retaliatory violence," which continues "following retirement," makes law enforcement officers different even from other public employees. In re Wheeler, 81 A.3d 728, 763 (N.J. App. Div. 2013); see also Nichols v. Brown, No. CV 11-09916 SJO, 2013 WL 3368922, at *6 (C.D. Cal. July 3, 2013); Mehl v. Blanas, No. Civ. S 03-2682 MCE KHM, slip op. at 11 (E.D. Cal. Sept. 3, 2004) ("While an officer's duty to respond to the public's calls for help stops when he retires, the threat of danger from enemies he might have made during his service does

not."); cf. Williams v. Puerto Rico, 910 F. Supp. 2d 386, 399 (D.P.R. 2012) (noting that current and former government officials have a greater need for firearms because "[t]he sensitive nature of many of their jobs . . . subjects them to additional risks of danger").

What's more, the same public spirit and sense of civic duty that motivated retired law enforcement officers when they were active might also lead them to intervene more often in dangerous situations in retirement. Just recently, for example, a retired police officer was injured when he allegedly interrupted a robbery at his neighbor's house. See Matthew J. Coyne, Charges for 2 in Ex-Cop's Shooting, J. News (Westchester, N.Y.), July 15, 2015, at A1. Other examples are easy to find. See, e.g., Kevin K. Ivesmillard, Cops: Evidence Doesn't Support Teen Burglar's Account of How He Was Shot, Daily Commercial (Leesburg, Fla.), Aug. 12, 2015, at A1 (describing a retired police officer's shooting of a burglar who allegedly attacked him); Andrew Dys, Suspect Linked to Chester Councilman's Killing Pleads Guilty to Drug Charge, Herald (Rock Hill, S.C.), Mar. 17, 2015, at 521 (describing how a retired police officer was allegedly shot after he followed gang members en route to a robbery).

* * * *

55

Thus, in light of their special training, their extensive experience, their commitment to public service, and their unique need for protection in the face of post-retirement violence, retired law enforcement officers are not similarly situated to other Maryland citizens. That should end the equal-protection analysis. See Brown v. Montoya, 662 F.3d 1152, 1173 (10th Cir. 2011) ("[T]o assert a viable equal protection claim, plaintiffs must first make a threshold showing that they were treated differently from others who were similarly situated to them.").

C.

Chief Judge Traxler, in dissent on this issue, concedes that retired police officers are not similarly situated, but nonetheless deems that fact irrelevant -- positing that the differences between retired officers and private citizens are not sufficiently tied to the FSA's perceived objectives to be decisive. Plaintiffs never made this sort of argument; they argued instead that retired police and private citizens are equally well-trained and, consequently, similarly situated. The dissent also focuses on a characteristic that Plaintiffs never discuss: the "responsibility or authority . . . to protect" that a retired police officer can (or cannot) be said to possess. But even if Plaintiffs had pressed such a position, we should not embrace it.

1.

56

When passed, the FSA had a number of objectives. Among other things, it sought to "keep guns away from criminals" and lower the rate of gun deaths from incidents like "murders, suicides, and accidents," all while "protect[ing] legal gun ownership." See J.A. 1183-84. It did so by amending or repealing 31 separate sections of the Maryland Code covering matters as diverse as hunting areas, mental health, police training, and state record-keeping requirements. See 2013 Md. Laws Ch. 427. The sheer breadth of the legislation makes it obvious that the legislation was meant to balance many, sometimes-competing objectives.

The provisions permitting retired officers to obtain restricted firearms and magazines are directly related to these broad objectives. Police officers' experience and training makes it less likely that retired officers will harm others through the unskilled use of their firearms. See Shew, 994 F. Supp. 2d at 252; Pineiro, 937 F. Supp. 2d at 176. Given their years in public service, retired police officers would also be more likely use their firearms in ways consistent with the public's interests, not simply private ones. Retired police officers would further be expected to exercise special care to ensure that their firearms and magazines are not acquired for criminal purposes. And permitting retired police officers these particular firearms and magazines could deter the unique

57

retaliatory violence that only those officers face. Thus, retired police officers have "distinguishing characteristics relevant to the interests" that Maryland intended to serve in enacting the FSA. City of Cleburne, Tex. v. Cleburn Living Ctr., 473 U.S. 432, 441 (1985).

2.

In finding to the contrary, the dissent defines the FSA's legislative objectives too narrowly. It assumes that the General Assembly intended the Act to eliminate all of the restricted weapons, such that most any exception to a wholesale ban would be inconsistent with that objective (regardless of the characteristics of those who stand to benefit). But the General Assembly's intent seems more nuanced than that: to limit the prevalence of purportedly dangerous firearms and magazines except in those instances where (1) certain facts ameliorated the expected harms from the restricted items, or (2) other public interests justified the continuing risk.

This approach is entirely acceptable under the Equal Protection Clause. "[T]here is no mandate that a state must address its problems wholesale." Helton v. Hunt, 330 F.3d 242, 246 (4th Cir. 2003); accord FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 316 (1993) ("[T]he legislature must be allowed leeway to approach a perceived problem incrementally."). "[S]tates are free to regulate by degree, one step at a time, addressing the

58

phase of the problem which seems most acute to the legislative mind." Helton, 330 F.3d at 246; accord Williamson v. Lee Optical of Okla. Inc., 348 U.S. 483, 489 (1955) ("Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think."). The FSA is more appropriately characterized as such a step-by-step attempt.

The dissent also casts its lot with the Ninth Circuit, resting much of its analysis on an abrogated decision from that court, Silveira v. Lockyer, 312 F.3d 1052 (9th Cir. 2002), abrogated by District of Columbia v. Heller, 554 U.S. 570 (2008). But Silveira never engaged with the question before us, namely, whether retired police officers are "similarly situated" to private citizens. Instead, the Ninth Circuit ignored that threshold issue and jumped straight to rational-basis review of a California statute that granted retired police the right to carry semi-automatic weapons despite a ban. See Silveira, 312 F.3d at 1090-91. The Ninth Circuit then established the California statute's objectives by relying on legislative history and public statements specific to that statute, all of which indicated that the California law was intended to "eliminate the availability of the [restricted] weapons generally." Id. at 1091. In contrast, the record here contains

no evidence that the Maryland General Assembly had any similarly prohibitionist intent.

Most fundamentally, Silveira appears to have been animated by a hostility toward so-called "assault weapons" in general. Id. (holding that there is no "legitimate state interest" in permitting retired police officers -- and apparently anyone -- to "possess and use" "military-style weapons" "for their personal pleasure"); cf. Nordyke v. King, 319 F.3d 1185, 1192 n.4 (9th Cir. 2003) (criticizing "the Silveira panel's unnecessary historical disquisition" in which it "took it upon itself" to advance a limited reading of the Second Amendment). Silveira's equal-protection analysis should be put aside as a legally unsound and factually distinguishable discussion that lacks any persuasive authority.

D.

For all these reasons, we affirm the district court's decision on the equal-protection issue. Retired police officers and the public are not similarly situated, and dissimilar treatment of these dissimilar groups does not violate the Equal Protection Clause.


TRAXLER, Chief Judge, wrote the opinion for the court as to Parts V and VI, in which Judge Agee joined:

V.   Vagueness

60

Finally, Plaintiffs contend that the FSA is unconstitutionally vague on its face because it is not drafted with sufficient clarity to allow an ordinary citizen to understand when a firearm qualifies as a "copy" of a banned semi-automatic rifle. As previously explained, the FSA prohibits possession of "assault long guns," which are defined by reference to the list of specific "assault weapons or their copies" set forth in § 5-101(r)(2). The statute does not define the term "copies," and there is no state regulatory definition. The FSA has not been enforced against Plaintiffs, and they do not claim that they were forced to forego their Second Amendment rights because they were uncertain whether weapons they wished to acquire were prohibited. Nonetheless, Plaintiffs ask us to invalidate this portion of the FSA under the Due Process Clause.

"Due process requires that a criminal statute provide adequate notice to a person of ordinary intelligence that his contemplated conduct is illegal, for no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." United States v. Sun, 278 F.3d 302, 309 (4th Cir. 2002) (internal quotation marks omitted). "[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory

enforcement." Kolender v. Lawson, 461 U.S. 352, 357 (1983); see United States v. McLamb, 985 F.2d 1284, 1291 (4th Cir. 1993). Our task is to determine "whether the government's policy is set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with." Imaginary Images, Inc. v. Evans, 612 F.3d 736, 749 (4th Cir. 2010) (internal quotation marks omitted). In order to succeed on a vagueness challenge, therefore, a litigant must "prove that the enactment is vague not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all." Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495 n.7 (1982). Put another way, he must demonstrate that the "provision simply has no core." Id. (internal quotation marks omitted).

The State urges us to apply the rule set forth in United States v. Salerno, requiring Plaintiffs to establish that "no set of circumstances exists under which the Act would be valid." 481 U.S. 739, 745 (1987). We have noted previously that the continuing validity of the "no set of circumstances" formulation is unclear, see United States v. Comstock, 627 F.3d 513, 518 (4th Cir. 2010), and our concern was validated further in the Supreme Court's recent decision in Johnson v. United States, 135 S. Ct. 2551, 2561 (2015) ("[O]ur holdings squarely contradict

the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp."). Regardless, "at the very least, a facial challenge cannot succeed if a statute has a 'plainly legitimate sweep.'" Comstock, 627 F.3d at 518 (quoting Crawford v. Marion Cnty. Election Bd., 553 U.S. 181, 202 (2008); Martin v. Lloyd, 700 F.3d 132, 135 (4th Cir. 2012) ("[A] facial challenge is ineffective if the statute has a plainly legitimate sweep." (internal quotation marks omitted)).

The phrase "assault weapons and their copies" has a plainly legitimate sweep and is not unconstitutionally vague. Although the Act does not specifically define "copy," the plain meaning of the word—"something that is or looks exactly or almost exactly like something else: a version of something that is identical or almost identical to the original"—is not beyond the grasp of an ordinary citizen. Merriam-Webster online dictionary. The word is a familiar one in Maryland state law, Md. Code Pub. Safety § 5-101(r)(2), and even federal law, 18 U.S.C. § 921(a)(30)(A)(i) (1994 & Supp. V 1999). When read together with the specific list of prohibited firearms, "copies" is sufficiently definite to give notice to an ordinary person of the conduct that would subject him to criminal sanctions—possession of any firearm that is identical or almost identical to any of the 60-plus semi-automatic rifles listed in the Act is

63

prohibited.  Cf. United States v. Fontaine, 697 F.3d 221, 226–27 (3d Cir. 2012) (finding that statute prohibiting possession of an imitation firearm during crime of violence was not unconstitutionally vague).

Additionally, in 2010, Maryland's Attorney General provided guidance on the meaning of "copy" under section 5-101(r)(2) of the Public Safety Code: "[A] copy of a designated assault weapon must be similar in its internal components and function to the designated weapon.  Cosmetic similarity to an enumerated assault weapon alone would not bring a weapon within the regulated firearms law."  95 Op. Att'y Gen. 101. J.A. 678.  Following the Attorney General's issuance of this opinion, the Maryland State Police issued a bulletin indicating that a firearm was subject to regulation under the Act if it was "cosmetically similar to a specifically enumerated assault weapon" and "has completely interchangeable internal components necessary for the full operation and function of any one of the specifically enumerated assault weapons."  J.A. 676.

Plaintiffs argue that the typical gun owner would have no way of knowing whether the internal components of one firearm are interchangeable with the internal components of another. This argument has a commonsense appeal; nonetheless, Plaintiffs have not identified any firearm that they would not risk possessing because of any uncertainty over the meaning of

"copies." Although it is possible to invent "scenarios in which a regulation might be subject to a successful vagueness challenge," Wag More Dogs, LLC v. Cozart, 680 F.3d 359, 371 (4th Cir. 2012), "speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid in the vast majority of its intended applications," id. (internal quotation marks omitted). It is telling that the weapons that Plaintiffs, according to their own testimony, wish to acquire are all clearly prohibited by the FSA. Section 5-101(r)(2) is therefore "surely valid in the vast majority of its intended applications."

Finally, we note that this same list of "assault weapons or their copies" has been on the books in Maryland for more than 20 years. Although possession of these weapons was not banned prior to passage of the FSA, an individual could not acquire any of the specifically listed "assault weapons" or their "copies" without submitting to a background check. The failure to comply with the regulations was subject to criminal sanctions. Yet, Plaintiffs have not identified, and we are unaware of any instance, where the term "copy" created uncertainty or was challenged as too vague.

We reject Plaintiffs' vagueness argument. A statute need only have a "legitimate sweep," Martin, 700 F.3d at 135, that

identifies a "core" of prohibited conduct, Hoffman Estates, 455
U.S. at 495 n.7. "A failure by a statute to define all of its
terms does not necessarily render it impermissibly vague,"
Centro Tepeyac v. Montgomery Cnty., 722 F.3d 184, 191 n.4 (4th
Cir. 2013), and a "statute need not spell out every possible
factual scenario with celestial precision to avoid being struck
down on vagueness grounds," United States v. Hager, 721 F.3d
167, 183 (4th Cir. 2013). In short, "[v]agueness review is
quite deferential." United States v. Runyon, 707 F.3d 475, 502
(4th Cir. 2013). The challenged provisions of the Act
sufficiently demarcate a core of prohibited conduct under the
Act to survive that deferential test.

VI.

To sum up, the panel vacates the district court's summary
judgment order on Plaintiffs' Second Amendment claims and
remands for the district court to apply strict scrutiny. The
panel affirms the district court's summary judgment order on
Plaintiffs' Equal Protection claim with respect to the FSA's
exception permitting retired law enforcement officers to possess
semi-automatic rifles. Finally, the panel affirms the district
court's conclusion that the FSA is not unconstitutionally vague.

AFFIRMED IN PART,
VACATED IN PART,
AND REMANDED

66

KING, Circuit Judge, wrote an opinion dissenting as to Part III and concurring in the judgment as to Parts IV and V:

There is sound reason to conclude that the Second Amendment affords no protection whatsoever to the assault rifles and shotguns, copycat weapons, and large-capacity detachable magazines that are banned by the State of Maryland. Assuming, however, that Maryland's Firearm Safety Act (the "FSA") burdens the Second Amendment right, it is, put most succinctly, subject to nothing more than intermediate scrutiny. Indeed, no precedent of the Supreme Court or our own Court compels us to rule otherwise. And the suitability of intermediate scrutiny is confirmed by cogent decisions of other courts of appeals. I therefore dissent insofar as the panel majority — charting a course today that divides us from our sister circuits — vacates the district court's denial of the Plaintiffs' Second Amendment claims and remands for an application of strict scrutiny.

Although I am dissenting from the panel majority's reinstatement of the Second Amendment claims pressed by the Plaintiffs, I concur in the judgment to the extent that we affirm the district court's denial of the Plaintiffs' claims that the FSA violates the Equal Protection Clause of the Fourteenth Amendment and is unconstitutionally vague. I would, in sum, wholly affirm the judgment of the district court on the basis of its summary judgment decision, which I commend

unreservedly.  See Kolbe v. O'Malley, 42 F. Supp. 3d 768 (D. Md. 2014).[1]

## I.

## A.

Let's be real:  The assault weapons banned by Maryland's FSA are exceptionally lethal weapons of war.  In fact, the most popular of the prohibited semiautomatic rifles, the AR-15, functions almost identically to the military's fully automatic M16.  Significantly, the Supreme Court in its seminal Heller decision singled out "M-16 rifles and the like," i.e., arms "that are most useful in military service," as being "dangerous and unusual weapons" not even protected by the Second Amendment. See District of Columbia v. Heller, 554 U.S. 570, 624-25, 627 (2008) (recognizing "that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens

---

[1] In addition to a thoughtful and compelling analysis of the Second Amendment claims, the district court provided all the reasons needed to reject the equal protection and vagueness claims.  See Kolbe, 42 F. Supp. 3d at 797-99 (concluding that the FSA does not violate the Equal Protection Clause by excepting retired law enforcement officers from the assault-weapon and large-capacity-magazine bans, in "that retired law enforcement officers are differently situated by virtue of their experiences ensuring public safety and their extensive training on the use of firearms"); id. at 799-803 (ruling that, because it imparts "sufficient notice of banned conduct," including "what constitutes a 'copy' of the banned assault long guns," the FSA is not unconstitutionally vague).  As my good colleagues recognize, see ante at 46 n.12, the district court also properly denied the Plaintiffs' motion to exclude certain expert and fact evidence offered by the State.

for lawful purposes, such as short-barreled shotguns [and machineguns]"). Similar to the district court — and unlike the panel majority — I am far from convinced that the Second Amendment reaches the AR-15 and other assault weapons prohibited under Maryland law, given their military-style features, particular dangerousness, and questionable utility for self-defense. See Kolbe, 42 F. Supp. 3d at 788 ("Upon review of all the parties' evidence, the court seriously doubts that the banned assault long guns are commonly possessed for lawful purposes, particularly self-defense in the home, . . . and is inclined to find the weapons fall outside Second Amendment protection as dangerous and unusual.").

That the banned assault weapons are not constitutionally protected finds considerable support in the record, which includes the following evidence:

- The AR-15 and other banned assault weapons, like their military counterparts, "are firearms designed for the battlefield, for the soldier to be able to shoot a large number of rounds across a battlefield at a high rate of speed." See J.A. 206. The military-style features of those weapons include folding or telescoping stocks, pistol grips, flash suppressors, grenade launchers, night sights, and the ability to accept detachable magazines and bayonets. Their design results in "a capability for lethality — more wounds, more serious, in more victims — far beyond that of other firearms in general, including other semiautomatic guns." See id. at 1121-22.

69

- The sole difference between the M16 and the AR-15 is that the M16 is capable of automatic fire while the AR-15 is semiautomatic. That difference is slight, in that automatic firing of all the ammunition in a thirty-round magazine takes two seconds, whereas a semiautomatic rifle can empty the same magazine in about five seconds. Moreover, soldiers and police officers are often advised to choose semiautomatic fire, because it is more accurate and lethal than automatic fire in many combat and law enforcement situations.

- The banned assault rifles and shotguns constitute no more than 3% of the civilian gun stock, and ownership of such weapons is concentrated in less than 1% of the U.S. population. At the same time, assault weapons are used disproportionately to their ownership in mass shootings and the murders of police officers, and they cause more fatalities and injuries than other firearms.

- Maryland was inspired to enact the FSA by the December 14, 2012 mass shooting at Sandy Hook Elementary School in Newtown, Connecticut, where the gunman used an AR-15-style assault rifle to shoot his way into the locked building and then murder twenty first-graders and six educators in less than eleven minutes. That horrific event was preceded and has been followed by mass shootings across the nation.

- Criminals armed with the banned assault weapons possess a "military-style advantage" in firefights with law enforcement, as such weapons "allow criminals to effectively engage law enforcement officers from great distances (far beyond distances usually involved in civilian self-defense scenarios)," "are more effective than handguns against soft body armor," and "offer the capacity to fire dozens of highly-lethal rounds without having to change magazines." See J.A. 265.

70

- The banned assault weapons also can be more dangerous to civilians than other firearms. For example, "rounds from assault weapons have the ability to easily penetrate most materials used in standard home construction, car doors, and similar materials," and, when they do so, are more effective than rounds fired from handguns. See J.A. 279. Additionally, untrained users of assault weapons tend to fire more rounds than necessary, increasing the risk to bystanders.

- Although self-defense is a conceivable use of the banned assault weapons, most people choose to keep other firearms for self-defense, and assault-weapon owners generally cite reasons other than self-defense for owning assault weapons. There is no known incident of anyone in Maryland using an assault weapon for self-defense.

In these circumstances, I am entirely unable to discern a reasonable basis for saying that, although the M16 is a dangerous and unusual weapon, the AR-15 and similar arms are not. As the panel majority would have it, since all firearms are dangerous, the dangerous-and-unusual standard is really only concerned with whether a given firearm is unusual, i.e., "not in common use or typically possessed by the citizenry." See ante at 29-30. Pursuant to the majority's view, because M16s have long been outlawed while AR-15s have in some places been allowed, the AR-15 enjoys Second Amendment protection that the M16 is denied. Accord Friedman v. City of Highland Park, 784 F.3d 406, 416 (7th Cir. 2015) (Manion, J., dissenting) ("In the case of machine guns, nobody has argued, before or since, that

71

ordinary citizens used these weapons for lawful purposes, and so they have been rightly deemed not to fall within the ambit of the Second Amendment.  Had there been even a small amount of citizens who used them for lawful purposes, then the Second Amendment might have covered them.").

There are significant problems with the panel majority's conception of the dangerous-and-unusual standard.  First of all, even accepting that an "unusual" weapon is one that is not commonly possessed, "what line separates 'common' from 'uncommon' ownership is something the [Heller] Court did not say."  See Friedman, 784 F.3d at 409 (Easterbrook, J., writing for the court).  Moreover,

> relying on how common a weapon is at the time of litigation would be circular . . . .  Machine guns aren't commonly owned for lawful purposes today because they are illegal; semi-automatic weapons with large-capacity magazines are owned more commonly because, until recently (in some jurisdictions), they have been legal.  Yet it would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned.  A law's existence can't be the source of its own constitutional validity.

Id.; see also Br. of Appellees 17 ("Focusing . . . solely on the number or popularity of firearms owned would make the constitutionality of a ban dependent on the time at which it was enacted, with particularly dangerous weapons suddenly becoming entitled to constitutional protection upon reaching an imaginary constitutional numerosity threshold, but less dangerous firearms

permitted to be forever restricted if banned early enough."
(internal quotation marks omitted)). It follows that the term
"unusual" most likely does not have the meaning accorded to it
by my colleagues.

Another significant problem with the panel majority's
conception of the dangerous-and-unusual standard is that it
renders the word "dangerous" superfluous, on the premise that
all firearms are dangerous. In the course of doing so, the
majority rejects the State's contention that weapons lacking
Second Amendment protection are "unusually dangerous" ones.
More specifically, the majority asserts that the unusually
dangerous benchmark finds no support in Heller and would be too
difficult to apply. But the Heller Court surely had relative
dangerousness in mind when it repudiated Second Amendment
protection for short-barreled shotguns and "weapons that are
most useful in military service — M-16 rifles and the like."
See Heller, 554 U.S. at 624-25, 627 (internal quotation marks
omitted). Furthermore, the unusually dangerous benchmark is no
more difficult to apply than, for example, the majority's
dubious test of whether a weapon is "not in common use" and thus
"unusual."

That is not to say that it is easy to answer the question
of whether the assault weapons prohibited by Maryland's FSA are
protected by the Second Amendment. Nor is it clear whether the

Second Amendment protects the banned large-capacity detachable magazines, or "LCMs."[2]

The Supreme Court recently declined to expound on those issues when it denied certiorari in the Seventh Circuit's Friedman case. See Friedman v. City of Highland Park, 136 S. Ct. 447 (2015). Other of the federal courts of appeals have considered bans similar to Maryland's, discussed the complexity of the issue of Second Amendment coverage, and ultimately assumed — but not decided — that constitutional protection may be afforded to assault weapons and LCMs. See N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo, 804 F.3d 242, 257 (2d Cir. 2015); Heller v. District of Columbia, 670 F.3d 1244, 1261 (D.C. Cir. 2011) ("Heller II"). The district court likewise resolved to assume without deciding that the FSA "places some burden on the

---

[2] The State proffers two substantial grounds for ruling that LCMs are unprotected. First, LCMs could be deemed dangerous and unusual, in view of evidence that, inter alia, they "are particularly designed and most suitable for military and law enforcement applications." See J.A. 891; see also, e.g., Kolbe, 42 F. Supp. 2d at 787-88 (addressing the State's evidence that LCMs "can allow a criminal to cause mass casualties, while depriving victims and law enforcement of an opportunity to escape or overwhelm an assailant as he reloads his weapon"). Second, it could be concluded that LCMs are not "arms" within the meaning of the Second Amendment and thus not eligible for its protection. See Heller, 554 U.S. at 582 (observing that the Second Amendment extends to "bearable arms"); Br. of Appellees 26 ("A large-capacity detachable magazine is not an 'arm' . . . . Indeed, large-capacity magazines are not even ammunition, but instead are devices used for feeding ammunition into firearms that can easily be switched out for other devices that are of lower capacity . . . .").

Second Amendment right." <u>See</u> <u>Kolbe</u>, 42 F. Supp. 3d at 789. Although I am strongly inclined to instead proclaim that the Second Amendment is not implicated by the FSA, I will, as explained below, refrain from doing so.

B.

We need not decide today whether the banned assault weapons and large-capacity detachable magazines are protected by the Second Amendment, because — following the lead of our colleagues on the Second and District of Columbia Circuits — we can assume they are so protected and yet rule that Maryland's FSA passes constitutional muster under the highest appropriate level of scrutiny:  that is, the concept of intermediate scrutiny.  <u>See</u> <u>N.Y. State Rifle & Pistol Ass'n</u>, 804 F.3d at 257-64; <u>Heller II</u>, 670 F.3d at 1261-64; <u>see also</u> <u>Kolbe</u>, 42 F. Supp. 3d at 789-97. Notably, not a single court of appeals has ever — until now — deemed strict scrutiny to be applicable to a firearms regulation along the lines of the FSA.[3]  Indeed, in the wake of <u>Heller</u>, only

---

[3] In affirming the denial of a preliminary injunction in <u>Fyock v. City of Sunnyvale</u>, the Ninth Circuit concluded that the district court neither "clearly err[ed] in finding . . . that a regulation restricting possession of [LCMs] burdens conduct falling within the scope of the Second Amendment," nor "abused its discretion by applying intermediate scrutiny or by finding that [the regulation] survived intermediate scrutiny." <u>See</u> 779 F.3d 991, 998 (9th Cir. 2015).  Thereafter, in <u>Friedman</u>, the Seventh Circuit upheld the City of Highland Park's ban on assault weapons and LCMs, albeit without applying either intermediate or strict scrutiny.  <u>See</u> 784 F.3d at 410 (Continued)

75

the Sixth Circuit has applied strict scrutiny to any firearms regulation (there, a prohibition on the possession of firearms by a person who has been committed to a mental institution), and that decision was vacated by the court's grant of rehearing en banc. See Tyler v. Hillsdale Cty. Sheriff's Dep't, 775 F.3d 308 (6th Cir. 2014), vacated, No. 13-1876 (6th Cir. Apr. 21, 2015), ECF No. 50.

Employing no more than intermediate scrutiny in our constitutional analysis of the FSA is not only counselled by decisions of other courts of appeals, it is also entirely consistent with binding precedent. Puzzlingly, however, the panel majority deems itself "compelled by" the Supreme Court's decisions in Heller and McDonald v. City of Chicago, as well as our own post-Heller decisions, to apply strict scrutiny. See ante at 7. Of course, as our good Chief Judge previously explained, "Heller left open the level of scrutiny applicable to review a law that burdens conduct protected under the Second Amendment, other than to indicate that rational-basis review would not apply in this context." See United States v. Chester,

_____

("[I]nstead of trying to decide what level of scrutiny applies, and how it works, . . . we think it better to ask whether a regulation bans weapons that were common at the time of ratification or those that have some reasonable relationship to the preservation or efficiency of a well regulated militia, and whether law-abiding citizens retain adequate means of self-defense." (internal quotation marks omitted)).

628 F.3d 673, 682 (4th Cir. 2010); see also N.Y. State Rifle & Pistol Ass'n, 804 F.3d at 253 ("The [Heller] Court did imply that [Second Amendment] challenges are subject to one of 'the standards of scrutiny that we have applied to enumerated constitutional rights,' though it declined to say which . . . ." (quoting Heller, 554 U.S. at 628)). McDonald did not amplify Heller's analysis, but instead illuminated only "that the Second Amendment right is fully applicable to the States." See 561 U.S. 742, 750 (2010). Consequently, neither Heller nor McDonald can be read to require or demand strict scrutiny in this case.

Furthermore, our post-Heller decisions — particularly United States v. Masciandaro, 638 F.3d 458 (4th Cir. 2011), and Woollard v. Gallagher, 712 F.3d 865 (4th Cir. 2013) — do not compel an application of strict scrutiny to each and every restriction on the right of self-defense in the home. According to the panel majority, Masciandaro "noted" that "'any law that would burden the "fundamental," core right of self-defense in the home by a law-abiding citizen would be subject to strict scrutiny,'" ante at 40 (quoting Masciandaro, 638 F.3d at 470), while Woollard "observ[ed]" that "restrictions on 'the right to arm oneself at home' necessitate[] the application of strict scrutiny," id. (quoting Woollard, 712 F.3d at 878). Actually, however, Masciandaro did not note, it merely "assume[d] that any law that would burden the 'fundamental,' core right of self-

77

defense in the home by a law-abiding citizen would be subject to strict scrutiny." _See_ 638 F.3d at 470 (emphasis added). And _Woollard_ did not _observe_, it simply _described the plaintiffs' (rejected) contention_ that "the right to arm oneself in public [is] on equal footing with the right to arm oneself at home, necessitating that we apply strict scrutiny in our review of [an outside-the-home regulation]." _See_ 712 F.3d at 878; _see also id._ at 876 (reiterating that _Masciandaro_ did nothing more than "'assume'" that an inside-the-home regulation would be subject to strict scrutiny (quoting _Masciandaro_, 638 F.3d at 470)). Neither _Masciandaro_ nor _Woollard_ purported to, or had reason to, decide whether strict scrutiny always, or even ever, applies to regulations burdening the right of self-defense in the home. Those decisions do not provide even a smattering of support for the majority's position on the level-of-scrutiny question.

We are thus left to conduct the analysis spelled out in our _Chester_ decision for selecting between strict and intermediate scrutiny. Analogizing the Second Amendment to the First, _Chester_ explained that "the level of scrutiny we apply depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right." _See_ 628 F.3d at 682. Here, too, I part ways with the panel majority. Although I assume that the FSA implicates the "core protection" of the Second Amendment — "the right of law-abiding, responsible

citizens to use arms in defense of hearth and home," see Heller, 554 U.S. at 634-35 — I simply cannot agree that the FSA sufficiently burdens that right to elicit strict scrutiny.

Contrary to the panel majority, the FSA does not, in banning certain assault weapons and detachable magazines, prohibit "an entire category of weaponry." See ante at 36.  Nor "might [the FSA] be 'equivalent to a ban on a category of speech.'"  See id. at 37 (quoting Heller II, 670 F.3d at 1285 (Kavanaugh, J., dissenting)).  To support its theory, the majority carves out the popular AR-15 and its copies as "an entire class of semi-automatic rifles." See id. at 36 n.11. But, of course, a ban on one type of semi-automatic rifle does not equate to a prohibition on "an entire category of weaponry" in the same sense that, using the Heller example, a blanket ban on all handguns does.  That fact — that the FSA does "not ban 'an entire class of arms'" — renders "the restrictions substantially less burdensome." See N.Y. State Rifle & Pistol Ass'n, 804 F.3d at 260 (quoting Heller, 554 U.S. at 628).

Moreover, despite what the panel majority says, it does matter that the FSA leaves handguns, as well as nonautomatic and some semiautomatic long guns, available for self-defense in the home.  According to the majority, Heller "rejected essentially the same argument" when it dismissed the contention "'that it is permissible to ban the possession of handguns so long as the

79

possession of other firearms (i.e., long guns) is allowed.'" See ante at 37-38 (quoting Heller, 554 U.S. at 629). The majority's equation of this case and Heller is wholly untenable, because it depends on discounting the relevance of the handgun's status as "the quintessential self-defense weapon" — a status that was obviously and unquestionably important to the Supreme Court. See Heller, 554 U.S. at 628-29 (emphasizing that handguns are "overwhelmingly chosen by American society for [self-defense]"). To be sure, a ban on the possession of handguns is far more burdensome on the right of self-defense in the home than a prohibition on the possession of AR-15s and similar arms.

At bottom, I agree with the Second and District of Columbia Circuits "that 'the prohibition of semi-automatic rifles and large-capacity magazines does not effectively disarm individuals or substantially affect their ability to defend themselves.' The burden imposed by the challenged legislation is real, but it is not 'severe.'" See N.Y. State Rifle & Pistol Ass'n, 804 F.3d at 260 (quoting Heller II, 670 F.3d at 1262). Accordingly, I would apply intermediate scrutiny and, in an analysis like that of the district court, uphold Maryland's FSA as constitutional, in that it is reasonably adapted to a substantial government interest. See Kolbe, 42 F. Supp. 3d at 791-97 (concluding, inter alia, "that the ban on assault weapons is likely to

80

further the government's interest in protecting public safety by removing weapons that cause greater harm when used — to both civilians and police — and create greater obstacles for law enforcement in stopping and detaining criminals who are using them"). Simply put, the State has shown all that should be required: a reasonable, if not perfect, fit between the FSA and Maryland's substantial interest in protecting the public safety and deterring criminal activity.

## II.

To their credit, my colleagues declare their rejection of the Plaintiffs' contention that, "once we determine that the prohibited firearms fall within the protective ambit of the Second Amendment, the [FSA] is unconstitutional and our analysis is at an end." See ante at 32 n.9. I fear, however, that by liberally extending constitutional protection to unusually dangerous arms and then decreeing strict scrutiny applicable to every ban on law-abiding citizens' in-home possession of protected weapons, the panel majority has guaranteed the demise of the FSA and other sensible gun-control measures within this Circuit. After all, though strict scrutiny may not be "strict in theory, but fatal in fact," see Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 237 (1995), it is at least "the most demanding test known to constitutional law," see City of Boerne v. Flores, 521 U.S. 507, 534 (1997).

This grave matter calls to mind the thoughtful words of our esteemed colleague Judge Wilkinson, recognizing in Masciandaro the "serious business" of adjudicating the Second Amendment's breadth: "We do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we miscalculated as to Second Amendment rights." See 638 F.3d at 475. To put it mildly, it troubles me that, by imprudently and unnecessarily breaking from our sister courts of appeals and ordering strict scrutiny here, we are impeding Maryland's and others' reasonable efforts to prevent the next Newtown — or Virginia Tech, or Binghamton, or Fort Hood, or Tucson, or Aurora, or Oak Creek, or San Bernardino. In my view, any burden imposed by the FSA on the Second Amendment is far from severe. On the other hand, the State's paramount interest in the protection of its citizenry and the public safety is profound indeed. Unfortunately, however, I find myself outvoted today.

In these circumstances, and because I strongly agree with the excellent decision of our distinguished district court colleague upholding the constitutionality of the FSA, I wholeheartedly dissent.

TRAXLER, Chief Judge, wrote a dissenting opinion as to Part IV:

Plaintiffs contend that the FSA violates the Equal Protection Clause by creating an exception for retired law enforcement officers allowing them to acquire and possess banned firearms and LCMs. Unlike other citizens, retired officers are permitted under the Act to receive these weapons upon retirement. See Md. Code, Crim. Law §§ 4-302(7)(i), 4-305(a)(2). Plaintiffs argue that Maryland arbitrarily and irrationally grants a privilege to retired law enforcement officers that it denies to them and other similarly situated citizens.

The Equal Protection Clause provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Equal Protection Clause "keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." Nordlinger v. Hahn, 505 U.S. 1, 10 (1992). The Clause, however, "does not take from the States all power of classification," Personnel Adm'r v. Feeney, 442 U.S. 256, 271 (1979); "[l]awmaking by its nature requires that legislatures classify, and classifications by their nature advantage some and disadvantage others." Helton v. Hunt, 330 F.3d 242, 245 (4th Cir. 2003). Since "classification is the very essence of the art of legislation," a challenged classification is "presumed to

be constitutional under the equal protection clause." Moss v. Clark, 886 F.2d 686, 689 (4th Cir. 1989). To survive a constitutional challenge under the Equal Protection Clause, the classification in question "need only be rationally related to a legitimate state interest unless it violates a fundamental right or is drawn upon a suspect classification such as race, religion, or gender." Giarratano v. Johnson, 521 F.3d 298, 303 (4th Cir. 2008).

Plaintiffs do not suggest that we are presented with a suspect classification or a classification that impinges upon fundamental rights. Therefore, rational-basis scrutiny applies to determine whether the exception for retired law enforcement officers to possess prohibited semi-automatic rifles and magazines comports with Equal Protection.

An equal protection plaintiff first must "demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001). To be "similarly situated" means to be "similar in all aspects relevant to attaining the legitimate objectives of legislation." Van Der Linde Housing, Inc. v. Rivanna Solid Waste Auth., 507 F.3d 290, 293 (4th Cir. 2007) (emphasis added). "Once this showing is made, the court proceeds to determine whether the disparity in

treatment can be justified under the requisite level of scrutiny." Morrison, 239 F.3d at 654; see e.g., City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439-40 (1985).

In rejecting the equal protection claim, the district court proceeded no further than the threshold question of whether retired law enforcement officers in Maryland are similarly situated to law-abiding citizens who wish to possess weapons prohibited by the FSA. The district court concluded that retired law enforcement officers as a class are not similarly situated to the citizenry at large because of their firearms training and experience. The district court noted that officers who carry firearms are required to receive continuing classroom instruction, complete firearms training and qualify periodically with their firearms; that officers are trained how to store firearms and ammunition safely in the home; and that law enforcement officers, by virtue of their duty and authority to protect public safety by use of force if need be, are more experienced in the handling of firearms. Additionally, those officers who use one of the prohibited weapons during the course of duty are required to have received specialized training and instruction on these weapons.

Plaintiffs respond that retired officers have varying levels of training on these weapons, noting that most officers

in fact do not have specialized training on a prohibited weapon during their employment and the FSA does not <u>require</u> retired officers who obtain prohibited weapons under the exception to have specialized training. Plaintiffs suggest that the training and experience thus does not differentiate retired officers in Maryland from Plaintiffs or other individuals, some of whom are trained on the handling of semi-automatic rifles and some of whom are not. Maryland believes the <u>general</u> firearms training received by all law enforcement officers while on the job is sufficient to set them apart as a class from ordinary citizens.

Plaintiffs urge us to follow <u>Silveira v. Lockyer</u>, 312 F.3d 1052 (9th Cir. 2002), <u>abrogated on other grounds</u>, <u>District of Columbia v. Heller</u>, 554 U.S. 570 (2008),* in which the Ninth Circuit invalidated a similar statutory provision under the Equal Protection Clause. I find this case instructive. In <u>Silveira</u>, the plaintiffs raised an equal protection challenge to a California statute banning "assault weapons" but "allowing the possession of assault weapons by retired peace officers who acquire them from their employers at the time of their retirement." <u>Id.</u> at 1059. California's law also contained an

---

* <u>Silveira v. Lockyer</u> reaffirmed the Ninth's Circuit position at the time that the Second Amendment does not confer an individual right to bear arms. <u>See</u> 312 F.3d 1052, 1060-61 (9th Cir. 2002). The Supreme Court, of course, rejected this view in <u>District of Columbia v. Heller</u>, 554 U.S. 570, 592 (2008).

exception for active <u>off-duty</u> officers to use assault weapons "only for law enforcement purposes." <u>Id.</u> at 1089 (internal quotation marks omitted). The court concluded that the exception for off-duty officers passed muster because it was rationally related to the statutory objective of preserving public safety:

> We presume that off-duty officers may find themselves compelled to perform law enforcement functions in various circumstances, and that in addition it may be necessary that they have their weapons readily available. Thus, the provision is designed to further the very objective of preserving the public safety that underlies the [statute].

<u>Id.</u> By contrast, the court "discern[ed] no legitimate state interest in permitting <u>retired</u> peace officers to possess and use [assault weapons] for their <u>personal</u> pleasure" while denying it to others. <u>Id.</u> at 1091 (emphasis added). The court explained that because the retired officer exception "does <u>not</u> require that the transfer [of the weapon to the officer upon retirement] be for law enforcement purposes, and the possession and use of the weapons is not so limited," the exception bears no rational relationship and in fact is "directly contrary to the act's basic purpose of eliminating the availability of . . . military-style weapons and thereby protecting the people of California from the scourge of gun violence." <u>Id.</u> at 1090.

The Ninth Circuit did not explicitly address the threshold question of whether the plaintiffs and retired law enforcement

87

officers were similarly situated; however, the court rejected the notion that retired officers should be allowed to possess assault weapons for non-law enforcement purposes simply because they "receive more extensive training regarding the use of firearms than do members of the public." Id. at 1091. As the Ninth Circuit explained, "[t]his justification . . . bears no reasonable relationship to the stated legislative purpose of banning the possession and use of assault weapons in California . . . . The object of the statute is not to ensure that assault weapons are owned by those most skilled in their use; rather, it is to eliminate the availability of the weapons generally." Id.

The district court is likely correct that law enforcement officers receive greater firearms training and have more experience in the handling of firearms than an ordinary citizen and, in that respect, are not "similarly situated" to individuals who are not permitted to possess firearms banned under the Act. But, in my view, these differences are not "relevant to attaining the legitimate objectives of legislation." Van Der Linde Housing, 507 F.3d at 293. Maryland's Act was passed as part of "a comprehensive effort to promote public safety and save lives." Brief of Appellees at 9. Like the Ninth Circuit in Silveira, I see the general firearms training a retired officer received while on active police duty as having only attenuated relevance to an overarching objective

88

of the FSA—to preserve the safety of the public.  A retired officer has no greater responsibility or authority than an ordinary citizen to protect the general public.  I cannot discern how a retired officer's ability to wield a semi-automatic weapon with great adeptness for his _personal_ use would promote public safety through the elimination of semi-automatic rifles like the AR-15.  See _Silveira_, 312 F.3d at 1091 ("The object of the statute is not to ensure that assault weapons are owned by those most skilled in their use; rather, it is to eliminate the availability of the weapons generally.").  For purposes of this particular provision, I conclude that _retired_ law enforcement officers who are no longer charged with protecting the public are similarly situated to Plaintiffs who also wish to possess the prohibited weapons for personal uses such as self-defense.

Therefore, the only remaining question is "whether the disparity in treatment can be justified under the requisite level of scrutiny." _Morrison_, 239 F.3d at 654.  In this case, the requisite level of scrutiny is rational basis review.  This is hardly an imposing barrier for a statute to surmount.  Nonetheless, I think the best course, especially in light of our decision to remand the Second Amendment claim for the application of strict scrutiny review, is to remand the equal protection claim as well for reconsideration in light of this

89

opinion.    The parties  on  appeal  focused  their  arguments  on whether  citizens  like  Plaintiffs  and  retired  law  enforcement officers  are  "similarly  situated."   I  would  remand  and  havethe parties   focus  on  whether  the  FSA's  exception  permitting  retired law  enforcement  personnel  to  possess  semi-automatic  rifles  and LCMs  can  be  justified.